No. 25-2808

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

**COMMUNITY LEGAL SERVICES IN EAST PALO ALTO**, et al.
Plaintiffs-Appellees,

v.

**UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES**, et al.
Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-02847

———————————

## DEFENDANTS-APPELLANTS' PETITION FOR REHEARING EN BANC
## FROM THE PANEL'S ORDER OF MAY 14, 2025

———————————

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel

ELIZABETH K. FITZGERALD-
  SAMBOU
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8346
Elizabeth.K.Fitzgerald-
  Sambou@usdoj.gov

Attorneys for Defendants-Appellants

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................1

BACKGROUND ......................................................................................4

ARGUMENT ...........................................................................................7

    I.     The Panel's Order Contradicts Supreme Court and Circuit
          Precedent by Allowing Plaintiffs To Evade the Tucker Act.................7

    II.    The Panel's Order Contradicts Supreme Court Precedent and
          Violates the Separation of Powers by Allowing Judicial Second-
          Guessing of Spending Decisions Committed to Agency
          Discretion. ........................................................................................12

CONCLUSION ......................................................................................18

CERTIFICATE OF COMPLIANCE

APPENDIX 1

APPENDIX 2

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Allen v. Milas*,
896 F.3d 1094 (9th Cir. 2018) ....................................................... 2, 10

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
2025 WL 1189827 (9th Cir. Apr. 18, 2025) .................................. 5-6

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
135 F.4th 852 (9th Cir. Apr. 25, 2025) ......................... 1, 3, 6, 7, 12

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
2025 WL 1233674 (N.D. Cal. April 29, 2025) ................................ 5

*Cmty. Legal Servs. in E. Palo Alto v. HHS*,
2025 WL 1393876 (9th Cir. May 14, 2025) .................................... 1

*Dep't of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) ....................................................................... 12

*Erickson Air Crane Co. of Wash., Inc. v. United States*,
731 F.2d 810 (Fed. Cir. 1984) ...................................................... 10

*Heckler v. Chaney*,
470 U.S. 821 (1985) ...................................................................... 13

*Kidwell v. Dep't of Army*,
56 F.3d 279 (D.C. Cir. 1995) ........................................................ 11

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................... 3, 15, 16

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ...................................................................... 12

*Department of Education v. California*,
145 S. Ct. 966 (2025) ..................................................................... 2

*TigerSwan, Inc. v. United States*,
110 Fed. Cl. 336 (2013) .................................................................. 8

*United Aeronautical Corp. v. U.S. Air Force*,
80 F.4th 1017 (9th Cir. 2023) .................................................. 7, 8, 9

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................. 13

*Wright v. Foreign Serv. Grievance Bd.*,
    503 F. Supp. 2d 163 (D.D.C. 2007) ...................................... 11

## STATUTES

5 U.S.C. § 701(a)(2) ................................................................. 3, 12

5 U.S.C. § 702 ....................................................................... 7, 8

5 U.S.C. § 704 .......................................................................... 7

6 U.S.C. § 279 .......................................................................... 15

8 U.S.C. § 1232 ........................................................................ 15

8 U.S.C. § 1232(c)(1) .............................................................. 4, 5

8 U.S.C. § 1232(c)(5) ...................................................... 13, 14, 17

8 U.S.C. § 1362 ......................................................................... 4

28 U.S.C. § 1491 ....................................................................... 8

## REGULATIONS

45 C.F.R. § 410.1309(a)(2)(ii) .................................................. 4

45 C.F.R. § 410.1309(a)(4) ............................................. 3, 4, 5, 17

## INTRODUCTION

Even at the temporary restraining order (TRO) stage, ten judges of this Court would have granted en banc rehearing to correct the panel's refusal to stay the district court's "judicial overreach" and "misuse of injunctive relief." *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 135 F.4th 852, 852 (9th Cir. 2025) (Bumatay, J., and VanDyke, J., dissenting from the denial of rehearing en banc) (Dissent). Now the district court has doubled down, by issuing a preliminary injunction that effectively requires the Government to pay nearly $150 million to fund legal counsel for unaccompanied minors in immigration proceedings—which neither the statute nor the governing regulation requires. And a divided panel has *again* denied relief. *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 2025 WL 1393876 (9th Cir. May 14, 2025) (App. 1) (Order). The Order presents two exceptionally important issues and, at this stage, there can no longer be any procedural excuse: The Court should grant rehearing en banc, correct the panel's troubling departures from well-established Supreme Court precedent, and stay the legally baseless injunction that the district court issued.

To refresh: plaintiffs in this case are subcontractors who provide legal services to unaccompanied minors in immigration proceedings. No statute or regulation entitles plaintiffs to government payment for that work. Instead, they are paid under a prime contract with the Acacia Center for Justice (the Acacia Contract)—which the Government has chosen to partially terminate. That termination was perfectly

1

lawful, and certainly cannot be challenged in federal district court under the guise of an Administrative Procedure Act (APA) claim. Yet the district court granted plaintiffs a sweeping injunction that forbids the Government from withdrawing funding for their services—effectively conferring on plaintiffs an extraordinary, indefinite right to federal subsidies for their legal work as a matter of pure judicial fiat.

That injunction was groundless for two independent reasons, both of which warrant en banc correction. *First*, the panel erred by holding that plaintiffs' claims—which arise out of a *contract* with the federal government—could proceed in district court. Just last month, the Supreme Court granted a stay in analogous circumstances, recognizing that the Tucker Act requires breach-of-contract claims against the Government to be filed in the Court of Federal Claims. *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (per curiam). Other courts around the country have followed suit. But the panel majority dismissed that ruling, reasoning that plaintiffs, as *subcontractors*, have no right to bring their own contractual claims in the Court of Federal Claims. But that has things exactly backwards. Subcontractors have *fewer* rights against the Government—not more. And difficulty in bringing a Tucker Act suit does not confer APA jurisdiction. *Allen v. Milas*, 896 F.3d 1094, 1099 (9th Cir. 2018). Ultimately, this case simply "cannot be distinguished" from *Department of*

2

*Education*, and that inconsistency alone warrants rehearing en banc.  Dissent, 135 F.3d at 855.

*Second*, but equally important, even if plaintiffs could find a way around the jurisdictional obstacle, their claims are absolutely without merit, because the APA precludes review of the Government's discretionary determinations as to the best allocation of lump-sum appropriations—and certainly does not require the federal government to pay for plaintiffs' services.  Here, Congress appropriated funds for a wide variety of purposes, but did not mandate that the Government pay for legal services for unaccompanied minors.  To the contrary, Congress specifically said that it preferred those services to be provided *pro bono*.  And the governing regulation expressly provides that direct legal services may be funded at the "discretion" of the agency—not as a matter of right.  45 C.F.R. § 410.1309(a)(4).  Under these circumstances, the APA precludes judicial review, because the matter is committed to agency discretion by law.  *See* 5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).  The panel majority concluded otherwise only by grossly mischaracterizing the statute and all but ignoring the critical qualifying language in the regulation.

In short, nothing in the law requires the Government to pay for counsel for unaccompanied minors at all—let alone to fund the specific plaintiff entities here.  Yet the district court has forced reinstatement of a nearly $150 million contract for

those services, requiring disbursement of funds that the Government has no hope of recovering after this litigation. This Court should grant rehearing en banc to rein in this abuse of the judicial process and prevent this irreparable harm.

### BACKGROUND

**Legal Background.** In the Trafficking Victims Protection Reauthorization Act (TVPRA), Congress required the Department of Health and Human Services (HHS), "to the greatest extent practicable and consistent with ... 8 U.S.C. § 1362," to ensure that unaccompanied minors "have counsel" in legal proceedings and "make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge." 8 U.S.C. § 1232(c)(1). The cross-referenced provision permits the right to counsel in immigration proceedings only "at no expense to the Government." 8 U.S.C. § 1362.

The Office of Refugee Resettlement (ORR), a component of HHS, executes that responsibility. The regulation implementing that statutory provision—known as the Foundational Rule—provides that if "ORR determines" that it is "not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, *subject to ORR's discretion* and available appropriations." 45 C.F.R. § 410.1309(a)(4) (emphasis added); *see also id.* § 410.1309(a)(2)(ii) (requiring ORR to provide "reasonable assistance to ensure that the child is able to

successfully engage an attorney *at no cost to the Government*" (emphasis added)). Since 2012, Congress has funded HHS (and its component ORR) through lump-sum appropriations. *See Cmty. Legal Servs. in E. Palo Alto v. HHS*, 2025 WL 1233674 (N.D. Cal. April 29, 2025) (App. 2) (PI) 2.

**Factual Background.** In 2022, ORR, through the Department of Interior (DOI)—which handles contract-administration services for ORR—contracted with the Acacia Center for Justice (Acacia) to provide services to unaccompanied minors, including direct legal representation in certain circumstances. *See id.* In turn, Acacia hired subcontractor organizations, including plaintiffs, to provide those services. *See id.*

On March 20, 2025, ORR directed DOI to partially terminate the Acacia Contract. *See id.*

**Procedural Background.** Six days later, plaintiffs filed this APA lawsuit claiming that the Acacia Contract termination violated 8 U.S.C. § 1232(c)(1) and 45 C.F.R. § 410.1309(a)(4). *See id.* 2-3.

On April 1, 2025, the district court entered a TRO enjoining the Government "from withdrawing the services or funds provided by [ORR] as of March 20, 2025"—*i.e.*, reverting to the status quo before ORR cancelled the Acacia Contract. *Id.* 3. This Court dismissed the Government's appeal, concluding that the TRO was not an appealable order. *See Cmty. Legal Servs. in E. Palo Alto v. HHS*, 2025 WL

1189827 (9th Cir. Apr. 18, 2025). The Government sought rehearing en banc, which was denied over ten judges' dissent. *See* Dissent, 135 F.3d at 852-56.

On April 29, 2025, the district court entered a preliminary injunction that again enjoined the Government "from withdrawing the services or funds provided by [ORR] as of March 20, 2025." PI 14. Rejecting the Government's jurisdictional objection based on the Tucker Act, the district court concluded that the plaintiffs did not seek contract remedies, because as subcontractors "they have no contractual rights to enforce[,]" and instead sought to enforce the statute and regulations. *Id.* 7; *see id.* 6-7. The district court likewise found that the statute imposed an enforceable mandate, despite its discretionary language. *See id.* 8-9.

The Government again appealed, and sought to stay the injunction pending appeal, citing irreparable harm resulting from the reinstatement of the multi-million dollar contract with Acacia. *See* Order 1. On May 14, 2025, a divided panel of this Court denied the motion. The majority reasoned that the plaintiffs did not seek to enforce the Acacia Contract and that the proper remedy was requiring HHS to spend its lump-sum appropriation on the nearly $150 million contract with Acacia. *See id.* 2-5. Judge Callahan dissented for the same reasons stated in the TRO dissent, adding that HHS's decision to terminate funding to Acacia was a discretionary call for the agency to make. *Id.* 5 (citations omitted).

## **ARGUMENT**

The district court's entry of a sweeping injunction despite a "complete lack of jurisdiction," contrary to binding precedent from the Supreme Court and this Court, warrants rehearing en banc. Dissent, 135 F.3d at 855. The court's determination that HHS must spend its lump-sum appropriation on a nearly $150 million contract because, in the judge's view, that is the best way for HHS to comply with its statutory obligations, is blatant judicial overreach and a violation of the separation of powers. But absent en banc review, that money will be disbursed and lost forever. As a matter of law and equity alike, this injunction must be stayed immediately.

## I. The Panel's Order Contradicts Supreme Court and Circuit Precedent by Allowing Plaintiffs To Evade the Tucker Act.

Plaintiffs rely on the APA's waiver of sovereign immunity as the basis for their suit. But the APA waives immunity only if the plaintiff establishes three conditions: (1) he is "seeking relief other than monetary damages"; (2) he has "no other adequate remedy"; and (3) his claim is not "expressly or impliedly forbidden by another statute." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023) (alterations omitted) (quoting 5 U.S.C. §§ 702, 704). The last condition is the important one here. If another statute vests jurisdiction "in a

specialized court (*e.g.*, the Court of Federal Claims), it 'impliedly forbids' an APA action brought in federal district court." *Id.* (quoting 5 U.S.C. § 702).

The Tucker Act does just that as for plaintiffs' suit. The Tucker Act expressly provides that the Court of Federal Claims has jurisdiction over "any claim against the United States founded [] upon . . . any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). And the Court of Federal Claims reviews contract claims where, as here, the contract was terminated for the "convenience" of one of the parties. *See, e.g.*, *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 344-45 (2013).

As this Court has made clear, the Tucker Act governs a plaintiff's request for relief from a breach of contract, even if brought under the APA as a "'disguised' breach-of-contract claim." *United Aeronautical Corp.*, 80 F.4th at 1026. In order to ascertain whether an APA claim asserts a "disguised" contractual claim subject to the Tucker Act, courts in the Ninth Circuit examine both the claimed "rights" and the claimed "remedies" to evaluate if they are contractual in nature. *Id.*

Here, the rights that plaintiffs invoke, and the remedy they secured, sound in contract. Plaintiffs cannot point to any constitutional provision, statute, or regulation that entitles them to federal payment. Rather, their rights arise solely from the Acacia Contract. If not for the Acacia Contract, plaintiffs would have no standing and no claims. As for remedies, they sought and successfully secured an injunction

that prohibits the Government from withdrawing their funding under the Acacia Contract. Indeed, the injunction targets the Acacia Contract specifically, even citing the contract's termination date to avoid any confusion. *See* PI 28 (enjoining HHS from "withdrawing the services or funds provided [ ] as of March 20, 2025," the date the Acacia Contract was terminated); *see also id.* ("[T]he relief necessary to remedy the termination is for the Court to set aside that termination[.]"). Because the *remedy* reinstates the Acacia Contract, this case presents precisely the type of "disguised" contract claim which this Court held in *United Aeronautical Corporation* must proceed only under the Tucker Act. 80 F.4th at 1026.

The district court purported to justify APA jurisdiction by considering the non-monetary harm to plaintiffs' missions to provide legal representation services to unaccompanied minors. *See* PI 7, 13-14. But that harm does not match plaintiffs' requested remedy—reinstatement of the particular contract that funded their services. *See* Compl. 39; *see* Compl. ¶ 133, 140, 145-46. Nor does it map onto their asserted irreparable harm—potential loss of staff and expertise at their particular organizations. *See id.* ¶ 101; PI Mot. Dkt. 37-10 ¶ 9, Dkt. 37-15 ¶ 4. Their only concrete harm arises from the "termination in funding"—*i.e.*, termination of the Acacia Contract—that forced them "to issue layoff notices and threaten[ed] to require them to dismiss their specialized and seasoned attorneys." PI 12; *see* PI 2. At bottom, plaintiffs' asserted *harms* are contractual, so their asserted *rights* are

contractual. The statute does not confer a right for *plaintiffs* to be funded under the TVPRA—only the contract did. And plaintiffs requested that their prime contract be reinstated. This is exactly the type of claim that must be pursued in the Court of Federal Claims.

For its part, the panel majority principally reasoned that plaintiffs' claims are not barred by the Tucker Act because as subcontractors, they may not be able to bring their own contractual claim in the Court of Federal Claims. *See* Order 3; PI 7. But that flouts Congress's carefully crafted scheme for limited waivers of sovereign immunity in the APA and Tucker Act—and this Court's precedent on that issue. To be sure, under the Tucker Act, subcontractors' claims in the Court of Federal Claims may proceed only "with the prime contractor's consent and cooperation." *Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984). But that limitation does not mean that subcontractors can evade the Tucker Act by instead suing under the APA. Indeed, this Court has made clear that the APA does not exist to "guarantee a federal forum" for any grievance against an agency. *Allen*, 896 F.3d at 1099. The panel's suggestion that subcontractors' inability to directly pursue contractual claims under the Tucker Act means they have *greater* rights under the APA contradicts *Allen*'s reasoning.

Allowing government subcontractors to bring contractual disputes under the APA would have serious perverse consequences. As the D.C. Circuit has noted, the

Tucker Act's "primary purpose" is "to ensure that a central judicial body adjudicates most claims against the United States Treasury[.]" *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995). Yet the panel majority's conclusion that plaintiffs' APA claims fall outside the Tucker Act's reach because they are not in direct privity with the Government creates a jurisdictional loophole, where monetary requests grounded in a contract between the Government and a prime contractor—claims that ordinarily must be resolved by the Court of Federal Claims—are instead reviewable by district courts under the APA if a *subcontractor* who benefits from the prime contract brings the suit. That is backwards, and such a rule creates a circuit split that further warrants en banc correction.

Endorsement of such a jurisdictional workaround undermines the scheme Congress devised under the Tucker Act. *Cf. Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 181 (D.D.C. 2007) ("To allow a plaintiff to utilize the [APA's] waiver of sovereign immunity ... to obtain a district-court judgment that a government contract is void would create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims." (cleaned up)). It also upends settled expectations and agreed-upon obligations in federal-government contracts, as it allows subcontractors to indirectly litigate contractual rights in district court, while identical contract-based claims brought by a prime contractor must be brought in the Court of Federal Claims. The APA's

11

waiver of sovereign immunity should not be read to permit such an absurd result. *See Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) (noting that "a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign").

In short, the panel's precedential holding that plaintiffs' APA claim is *not* precluded contradicts the Supreme Court's order in *Department of Education* and this Court's decision in *United Aeronautical Corp.*; injects confusion about both the APA and the Tucker Act; and contravenes the Supreme Court's admonition that the implied-preclusion analysis exists to "prevent[] plaintiffs from exploiting the APA's waiver" of sovereign immunity, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). As ten judges of this Court already concluded regarding an identical TRO, plaintiffs' request for monetary relief and the district court's provision of such relief make plain that their claims are contractual and, thus, that "*Department of Education* cannot be distinguished[.]" Dissent, 135 F.4th at 855; *see also* Order 6 (Callahan, J., dissenting).

## II. The Panel's Order Contradicts Supreme Court Precedent and Violates the Separation of Powers by Allowing Judicial Second-Guessing of Spending Decisions Committed to Agency Discretion.

The panel majority committed a second error that independently warrants en banc review. Under the APA, district courts lack jurisdiction to review agency action if it "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The

Supreme Court has construed that language to preclude review when there is no meaningful standard against which to judge the agency's exercise of discretion. *See Heckler v. Chaney*, 470 U.S. 821, 830, 834-35 (1985). That is the case here. Neither the statute nor the governing regulation—provides any meaningful standard to review the agency's discretionary allocation of resources.

Starting with the TVPRA, it states only that ORR "shall ensure, to the greatest extent practicable," that unaccompanied minors have representation by counsel. 8 U.S.C. § 1232(c)(5). The statute nowhere commands that every such minor be given legal representation *at federal expense*; to the contrary, it explicitly provides that the agency must aim to provide *pro bono* counsel whenever possible. *Id.*

The panel emphasized Congress's use of the word "shall." Order 2. But when "inevitable resource constraints and regularly changing public-safety and public-welfare needs" require a "complicated balancing process" for the allocation of resources, even stronger language (the use of "shall" without qualifiers like those at issue here), may "leave[] courts without meaningful standards" for judicial review. *United States v. Texas*, 599 U.S. 670, 680 (2023).

The panel majority also reasoned that "to the greatest extent practicable" is different than "to no extent at all," and that it could therefore review whether the Government's decision to partially terminate the Acacia Contract was consistent with the statute. Order 5. But that does not advance the ball. Again, it is *access to*

*counsel* that must be assured "to the greatest extent practicable," not *federally funded counsel*. 8 U.S.C. § 1232(c)(5). Otherwise, "to the greatest extent practicable" would necessarily require all available appropriations to be made available to fund legal counsel for every unaccompanied minor—which nobody contends is the law. And neither the district court nor the panel concluded, or had any factual basis to conclude, that the Government was taking no steps to assure that unaccompanied minors had access to counsel, including *pro bono* counsel consistent with Congress's express preference.

The panel's reasoning thus rests on a basic mischaracterization of the TVPRA, as requiring federal funding when in fact Congress wanted "representation … *without charge*." 8 U.S.C. § 1232(c)(5) (emphasis added).

The appropriations statutes only further confirm the agency's discretion—not mandate—to provide funding for legal services. Specifically, Congress appropriated HHS's current funding using a lump-sum appropriation that incorporated the 2024 appropriations statute by reference. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A, Tit. I, Sec. 1101(8) (2025) (extending Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, Tit. I, 138 Stat. 460, 664-65 (2024)). The 2024 statute provided a lump-sum appropriation for numerous programs, explaining that the funds were to be used "[f]or necessary expenses for refugee and entrant assistant activities authorized by"

statute and to "carry out" the agency's statutory obligations. 138 Stat. 664. Notably, HHS administers multiple programs related to "refugee and entrant assistant activities"—not just the legal-representation program at issue here. *See, e.g.*, *id.* (appropriating funds to ensure unaccompanied minors' care, custody placement, reunification with parents, and statistical tracking, 6 U.S.C. § 279; protect unaccompanied minors from trafficking, safely repatriate unaccompanied minors, place unaccompanied minors in removal proceedings, and provide legal orientation presentations, "child advocates," and permanent protection to certain unaccompanied minors, 8 U.S.C. § 1232; and conduct "research and evaluation" of TVPRA activities). And, of course, the appropriations statutes do not reference the provision of direct legal representation, the Acacia Contract, or plaintiffs.

The Supreme Court has held that lump-sum appropriations demonstrate that Congress has vested an agency with discretion, such that courts may review only whether "the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives," not how the agency allocates funds among those objectives. *Lincoln*, 508 U.S. at 193. That is because "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Id.* at 192. Indeed, "the very point of a lump-sum appropriation is to give the agency the capacity to adapt to changing circumstances and *meet its statutory responsibilities* in what it sees as the most

effective or desirable way." *Id.* (emphasis added). Because Congress's lump-sum appropriation unambiguously granted HHS discretion in how to spend its funding, there was no basis for further judicial inquiry. *Id.*

The panel majority concluded that *Lincoln* "has no application" here because "the agency fails to carry out a program that is *required* by statute." Order 4. But as just explained, the statute does not *require* funding legal services. Anyway, the panel's logic misses the critical point: because *all* lump-sum appropriations are necessarily enacted "to give an agency the capacity to ... *meet its statutory responsibilities*" and the *agency* has the discretion to determine how that lump-sum appropriation should be spent, courts may not review how the agency decides to spend its funds among permissible objectives. *Lincoln*, 508 U.S. at 192 (emphasis added). Here, Congress granted HHS a lump sum to be divided across numerous programs. Plaintiffs make no allegation that HHS has elected to spend those funds on impermissible objectives. The panel therefore had no basis to second-guess the agency's decision to exercise its discretionary authority to reallocate funds previously spent on the Acacia Contract.

Finally, insofar as the panel majority rested on ORR's governing regulation, it misread that too. The Foundational Rule provides:

> To the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal

16

representation for certain unaccompanied children, **subject to ORR's discretion and available appropriations**. . . .

45 C.F.R. § 410.1309(a)(4) (emphasis added); *see also id.* at (a)(1) ("This paragraph (a) describes ORR's responsibilities in relation to legal services for unaccompanied children, consistent with 8 U.S.C. 1232(c)(5)."). That dual condition—express agency discretion plus limited appropriations—places these decisions squarely beyond judicial review.

The Foundational Rule thus makes clear that funding for direct immigration legal representation services is entirely subject to agency discretion. ORR's funding obligation comes into play only "[t]o the extent *ORR* determines that appropriations are available," demonstrating that at the threshold, ORR must make a discretionary assessment regarding the availability of limited funds within its lump-sum appropriation. 45 C.F.R. § 410.1309(a)(4) (emphasis added). Courts are not well-positioned to review that determination, which is expressly conferred on the agency. And even if ORR determines that funds are available, and that it is not practicable to use *pro bono* counsel, as required by statute, any provision of legal representation is "subject to ORR's discretion." *Id.* It is difficult to imagine language that more clearly vests an agency with discretion over a particular decision. Far from creating a binding entitlement, the regulation conditions these benefits on the agency's discretionary assessment as to the best allocation of resources. The panel majority recognized that the regulation "grants the agency some discretion," but nonetheless

17

believed that the agency's exercise of that discretion to terminate the Acacia Contract could be deemed unlawful. Order 5. The panel offered no principled basis for that conclusion, which also cannot be reconciled with *Lincoln*.

For these reasons, the panel had no basis to second-guess the discretion that both Congress and the Foundational Rule confer upon the agency in determining the best allocation of limited resources. The en banc Court should grant rehearing to correct the panel's serious error and prevent nearly $150 million in irreparable harm to the Government.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant rehearing en banc and stay the district court's injunction.

May 28, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel

/s/ *Elizabeth K. Fitzgerald-Sambou*
ELIZABETH K. FITZGERALD-SAMBOU
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8346
Elizabeth.K.Fitzgerald-Sambou@usdoj.gov

Attorneys for Defendants-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 25-2808

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[X] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,086**.**
    *(Petitions and responses must not exceed 4,200 words)*

**OR**

[  ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/ Elizabeth K. Fitzgerald-Sambou          **Date:** May 28, 2025

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                                                 *Rev. 12/01/24*

# APPENDIX 1

*Community Legal Services in East Palo Alto, et al. v. United States Department of Health and Human Services, et al.*,
--- F.4th ---, 2025 WL 1393876
(9th Cir. May 14, 2025),
No. 25-2808

2025 WL 1393876
United States Court of Appeals, Ninth Circuit.

COMMUNITY LEGAL SERVICES IN EAST PALO
ALTO; Social Justice Collaborative; Amica Center
for Immigrant Rights; Estrella Del Paso; Florence
Immigrant and Refugee Rights Project; Galveston-
Houston Immigrant Representation Project; Immigrant
Defenders Law Center; National Immigrant Justice
Center; Northwest Immigrant Rights Project; Rocky
Mountain Immigrant Advocacy Network; Vermont
Asylum Assistance Project, Plaintiffs - Appellees,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; United
States Department of the Interior; Office of
Refugee Resettlement, Defendants - Appellants.

No. 25-2808
|
Filed May 14, 2025

**Synopsis**
**Background:** Legal services subcontractors brought action
against Department of Health and Human Services (HHS),
Office of Refugee Resettlement (ORR), and Department of
the Interior (DOI), alleging agencies' termination of funding
for direct legal representation of unaccompanied children
in immigration proceedings was contrary to Trafficking
Victims Protection Reauthorization Act of 2008 (TVPRA)
and Foundational Rule promulgated by ORR, in violation
of Administrative Procedure Act (APA). Subcontractors
filed motion for preliminary injunction. The United States
District Court for the Northern District of California, Araceli
Martínez-Olguín, J., 2025 WL 1233674, granted motion
and preliminarily enjoined government from withdrawing
funding for counsel for unaccompanied children. Government
appealed and moved to stay injunction pending appeal.

**Holdings:** The Court of Appeals, Koh, Circuit Judge, held
that:

subcontractors' claims were not based on any government
contract that would bring them within ambit of Tucker Act;

Tucker Act's exclusive-jurisdiction provision did not deprive
district court of jurisdiction over subcontractors' claims;

government was unlikely to succeed on merits of argument
that APA review was unavailable for termination of funding;
and

government failed to establish irreparable injury absent stay
pending appeal.

Motion denied.

Callahan, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** Interlocutory Appeal; Motion for
Stay.

Appeal from the United States District Court for the Northern
District of California, Araceli Martinez-Olguin, District
Judge, Presiding, D.C. No. 3:25-cv-02847-AMO

**Attorneys and Law Firms**

F. Evan Benz, Samantha Hsieh, Peter C. Alfredson, and
Adina B. Appelbaum, Amica Center for Immigrant Rights,
Washington, D.C.; Karen C. Tumlin, Esther H. Sung, and
Laura Flores-Perilla, Justice Action Center, Los Angeles,
California; Alvaro M. Huerta, Carson A. Scott, and Lya
Ferreyra, Immigrant Defenders Law Center, Los Angeles,
California; Katherine M. Marquart, Gibson Dunn & Crutcher
LLP, Los Angeles, California; Monica K. Loseman, Laura M.
Sturges, Patricia M. Herold, and Caelin M. Miltko, Gibson
Dunn & Crutcher LLP, Denver, Colorado; Richard W. Mark,
Gibson Dunn & Crutcher LLP, New York, New York; for
Plaintiffs-Appellees.

Jonathan K. Ross and Zachary A. Cardin, Trial Attorney;
Michael A. Celone, Christina Parascandola, and Katelyn
Masetta-Alvarez, Senior Litigation Counsel; William C.
Silvis, Assistant Director; Office of Immigration Litigation;
Drew C. Ensign, Deputy Assistant Attorney General; Yaakov
M. Roth, Acting Assistant Attorney General; Civil Division,
United States Department of Justice, Washington, D.C.; for
Defendants-Appellants.

Before: William A. Fletcher; Consuelo M. Callahan; and
Lucy H. Koh, Circuit Judges.

Order by Judge Koh;

Dissent by Judge Callahan

**ORDER**

KOH, Circuit Judge:

**\*1** To protect unaccompanied children in immigration proceedings from the risks of "mistreatment, exploitation, and trafficking," the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, directs that the Department of Health and Human Services ("HHS") "shall ensure, to the greatest extent practicable," that unaccompanied children in immigration custody receive legal representation. *Id.* § 1232(c)(5). To carry out this obligation, the Office of Refugee Resettlement ("ORR") promulgated the "Foundational Rule" which states that "ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations." 45 C.F.R. § 410.1309(a)(4). Since 2012, and as recently as March 15, 2025, Congress has consistently appropriated funds to ensure compliance with the TVPRA's statutory mandate. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A Tit. I Sec. 1101(8), 139 Stat. 9, 11 (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664–665 (2024); Consolidated Appropriations Act, 2012, Pub. L. 112-74, Div. F, Tit. II, 125 Stat. 786, 1077 (2011); S. Rep. 118-84, at 169. In this matter, the district court preliminarily enjoined Defendants HHS, ORR and the Department of the Interior ("DOI") (collectively, the "Government") from withdrawing government-provided funding for counsel to represent unaccompanied children in immigration proceedings. The Government appealed the issuance of the preliminary injunction and now moves to stay the injunction while this appeal is pending.

When deciding a motion for a stay pending appeal, the court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). "The first two factors ... are the most critical," and the court will address the last two factors only once the applicant has satisfied the first two factors. *Id.* at 434–35, 129 S.Ct. 1749.

"The party requesting a stay bears the burden of showing that the circumstances justify" issuance of the stay. *Id.* at 433–34, 129 S.Ct. 1749.

We conclude the Government has shown neither a likelihood of success on the merits nor irreparable injury absent a stay and accordingly deny the Government's motion. [1]

[1] Because the Government failed to satisfy the first two stay factors, we need not reach the two remaining stay factors. *See Nken*, 556 U.S. at 434–35, 129 S.Ct. 1749.

**I.**

The Government offers two reasons why it believes it is likely to succeed on the merits. First, the Government argues the Tucker Act, 28 U.S.C. § 1491, "impliedly forbids" plaintiffs' Administrative Procedure Act ("APA") claims and thus the district court lacked jurisdiction. Second, the Government argues that its decision to completely defund direct legal services for unaccompanied children constitutes an unreviewable exercise of agency discretion. As explained below, the Government has not made "a strong showing that [it] is likely to succeed on the merits" of either argument. *Nken*, 556 U.S. at 434, 129 S.Ct. 1749 (quoting *Hilton*, 481 U.S. at 776, 107 S.Ct. 2113).

**A.**

**\*2** The APA "embodies [a] basic presumption of judicial review to one 'suffering legal wrong because of agency action.' " *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (quoting 5 U.S.C. § 702). The APA generally waives sovereign immunity and permits a challenge to agency action unless "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. [2] The Government argues that the Tucker Act "impliedly forbids" plaintiffs' suit because plaintiffs' claims sound in contract and accordingly can only be brought in the Court of Federal Claims (if at all). This argument is unlikely to succeed for two reasons.

[2] The APA also does not apply to suits that either (a) seek "money damages," 5 U.S.C. § 702; or (b) where "other adequate remed[ies]" to review the agency action exist, *id.* § 704. On appeal, the Government does not argue that either of these limitations on APA review apply here.

*First*, contrary to the Government's argument, plaintiffs' APA claims are based on the Government's statutory and regulatory violations, not any government contract. In fact, no contract exists between plaintiffs and the Government. Instead, the Government has entered into a nationwide agreement with an organization called Acacia, which in turn subcontracts with legal service providers such as plaintiffs.

"[T]he Tucker Act ... 'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). In making this determination, we "look[ ] to (1) 'the source of the rights upon which the plaintiff bases its claims' and (2) 'the type of relief sought (or appropriate).' " *Id.* (quoting *Doe v. Tenet*, 329 F.3d 1135, 1141 (9th Cir. 2003)).

"If rights and remedies are *statutorily* or *constitutionally* based, then district courts have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims does ...." *Id.* (emphasis in original); *see also Ferreiro v. United States*, 501 F.3d 1349, 1353 n.3 (Fed. Cir. 2007) ("An order compelling the government to follow its regulations is equitable in nature and is beyond the jurisdiction of the Court of Federal Claims.").

Here, plaintiffs seek to enforce compliance with statutes and regulations, not any government contract. The TVPRA provides that the Government "*shall ensure*, to the greatest extent practicable ... that all unaccompanied alien children ... have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5) (emphasis added). The Foundational Rule states that "ORR *shall* fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations." 45 C.F.R. § 410.1309(a)(4) (emphasis added). Seeking to ensure compliance with statutory and regulatory commands is a matter beyond the scope of the Tucker Act's exclusive jurisdiction.

In evaluating the merits, the district court found plaintiffs were likely to succeed in showing a violation of both of these provisions. Congress has appropriated substantial funds specifically to carry out the TVPRA for over a decade and as recently as 2025. *See, e.g.*, Full-Year Continuing

Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A Tit. I Sec. 1101(8), 139 Stat. 9, 11 (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664–665 (2024). The district court found that the Government elected to withhold all congressionally authorized funding for direct legal representation, even though such funding was necessary to ensure all unaccompanied children remained represented. It was "undisputed that appropriations for direct representation remain available," and that the Government had "evidenced no effort to ensure pro bono counsel." Indeed, the district court found the Government made its decision "with no supplemental plan to ensure unaccompanied children have legal counsel" at all, let alone "to the greatest extent practicable." On appeal, the Government contests the district court's jurisdiction but does not dispute any of the aforementioned findings. Plaintiffs accordingly are likely to establish the requisite violations of law to support their APA claims irrespective of any contractual violation.

**\*3** *Second*, as the Government concedes, subcontractors such as plaintiffs do not even have the right to sue under the Tucker Act. The Tucker Act provides the Court of Federal Claims with jurisdiction to hear claims based "upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Consistent with the statute's plain text, "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (quoting *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990)). Subcontractors, who have not entered into contracts with the Government, generally have no right to sue under the Tucker Act, and the Court of Federal Claims has no jurisdiction to hear their suit. *See id.*; *Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984).

The Government concedes (and indeed affirmatively argues) that the Court of Federal Claims lacks jurisdiction to hear plaintiffs' claims because "it is 'a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act.' " But the Government nonetheless argues the Tucker Act "impliedly forbids" plaintiffs' APA claims because "subcontractors have *fewer* legal rights than prime contractors." This argument lacks merit.

The Tucker Act's "exclusive jurisdiction" has been construed "to impliedly forbid contract claims against the Government

2025 WL 1393876, 2025 Daily Journal D.A.R. 3981

from being brought in district court under the waiver in the APA." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (cleaned up) (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618–19 (D.C. Cir. 2017)). But "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). For this reason, the D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Id.* at 176; *see also Crowley*, 38 F.4th at 1109 ("Because a plaintiff could not bring this type of tort action in [the Court of Federal Claims] in the first place, that Court would not have exclusive jurisdiction of them.").

The result requested by the Government would mean that no court has jurisdiction to hear plaintiffs' claims. Not only is this result contrary to common sense, but it also conflicts with the "strong presumption favoring judicial review of administrative action" that is embodied in the APA. *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486, 135 S.Ct. 1645, 191 L.Ed.2d 607 (2015) (internal quotation marks omitted); *see Abbott Lab'ys*, 387 U.S. at 140–41, 87 S.Ct. 1507.

The Supreme Court's recent decision in *Department of Education v. California*, —— U.S. ——, 145 S. Ct. 966, —— L.Ed.2d —— (2025), does not change this conclusion. *Department of Education* involved a claim to enforce grant agreements that the plaintiffs had entered into directly with the government and thus "to enforce a contractual obligation to pay money." *Id.* at 968 (citation omitted). The Supreme Court held that this claim fell within the Tucker Act's grant of exclusive jurisdiction and accordingly suggested that the suit must be brought in the Court of Federal Claims. *See id.* ("But, as we have recognized, the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here. Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on any express or implied contract with the United States." (internal citations and quotation marks omitted)). *Department of Education* has no application where, as here, the claims sound in statute, rather than contract.

**\*4** Accordingly, the Government has not shown a likelihood of success on its Tucker Act argument.

**B.**

The APA does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception has been construed "narrowly" to apply only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23, 139 S.Ct. 361, 202 L.Ed.2d 269 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993)). The Supreme Court has identified certain categories of agency decisions that have traditionally been regarded as committed to agency discretion and are, accordingly, "presumptively unreviewable." *Heckler v. Chaney*, 470 U.S. 821, 832–33, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (holding agency decision whether to initiate an enforcement action was presumptively unreviewable). Even where an action falls within the class of actions traditionally committed to agency discretion, "judicial review is available where there are 'meaningful standards to cabin the agency's otherwise plenary discretion.'" *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) (quoting *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002)).

The Government argues that the decision to cancel the program is committed to agency discretion by law. Its argument is based entirely upon the Supreme Court's decision in *Lincoln v. Vigil*, 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993). In that case, the Indian Health Service (the "Service") was provided with a single lump-sum appropriation that covered all of the agency's activities. *Id.* at 185, 113 S.Ct. 2024. The Service was authorized, but not required, to " 'expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians,' for the 'relief of distress and conservation of health,' " including on "Indian mental-health care." *Id.* at 184, 113 S.Ct. 2024 (quoting 25 U.S.C. § 13). The Service had historically exercised this discretion to establish the "Indian Children's Program," which provided a variety of medical services to Indian children, but subsequently decided to cancel that program. *Id.* at 184–85, 113 S.Ct. 2024. Plaintiffs brought an APA claim challenging the Service's decision not to fund the program. *Id.*

The Supreme Court held that the Service's "allocation of funds from a lump-sum appropriation is [a type of] administrative decision traditionally regarded as committed to agency discretion" and was, accordingly, presumptively unreviewable. *Id.* at 192, 113 S.Ct. 2024. The Court explained that "allocation of funds from a lump-sum appropriation

requires 'a complicated balancing of a number of factors which are peculiarly within [agency] expertise.' " *Id.* at 193, 113 S.Ct. 2024 (quoting *Heckler,* 470 U.S. at 831, 105 S.Ct. 1649). Because the relevant statutes did "not so much as mention the Program" that was cancelled, let alone require it, the Court found "[t]he decision to terminate the Program was committed to the Service's discretion" by law. *Id.* at 193–94, 113 S.Ct. 2024.

The rule announced in *Lincoln* has no application where, as here, the agency fails to carry out a program that is *required* by statute. *Lincoln* made clear that "an agency is not free simply to disregard statutory responsibilities" and "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* at 193, 113 S.Ct. 2024; *see also Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell,* 729 F.3d 1025, 1038 (9th Cir. 2013) (noting that *Lincoln* applies only "absent some statutory constraint on the agency's discretion"). Where Congress establishes a mandatory program, in the sense that "Congress directs (rather than merely authorizes) the agency to conduct" certain activities, the rule in *Lincoln* has no application. U.S. Gov't Accountability Off., GAO-16-464SP, *Principles of Federal Appropriations Law* 2-37 & n.40 (4th Ed. 2016); U.S. Gov't Accountability Off., GAO-17-797SP, *Principles of Federal Appropriations Law* 3-30 (4th Ed. 2017 Rev.) ("When Congress appropriates money to implement a program, and implementation of the program is mandatory, the agency may not use the appropriated amounts to terminate the program."); *see, e.g., Shawnee Tribe v. Mnuchin,* 984 F.3d 94, 100 (D.C. Cir. 2021) (explaining that where "Congress has 'circumscribe[d] agency discretion to allocate resources by putting restrictions in the operative statute[ ]' " there is "no presumption of non-reviewability" (quoting *Lincoln,* 508 U.S. at 193, 113 S.Ct. 2024)); *Ramah Navajo Sch. Bd. v. Babbitt,* 87 F.3d 1338, 1347 (D.C. Cir. 1996) (distinguishing *Lincoln* where "Congress intended the [statute] to limit the Secretary's discretion in funding matters"). Rather, in such circumstances the Executive has no authority to withhold the funds appropriated by Congress or otherwise refuse to comply with the law. *See City & Cnty. of San Francisco v. Trump,* 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress."); *In re Aiken Cnty.,* 725 F.3d 255, 266 (D.C. Cir. 2013) (Kavanaugh, J.) ("Prosecutorial discretion does not include the power to disregard other statutory obligations that apply to the Executive Branch, such as statutory requirements to issue rules, or to pay benefits, or to implement or administer

statutory projects or programs." (internal citation omitted)); *see also* Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969) ("While there have been instances in the past in which the President has refused to spend funds appropriated by Congress for a particular purpose, we know of no such instance involving a statute which by its terms sought to require such expenditure.").

**\*5** Here, the TVPRA provides that HHS "*shall ensure,* to the greatest extent practicable ..., that all unaccompanied alien children ... have counsel to represent them in legal proceedings." 8 U.S.C. § 1232(c)(5) (emphasis added); *see also id.* § 1232(c)(1) (HHS "*shall* establish policies and programs to *ensure* that unaccompanied alien children in the United States are protected from traffickers" (emphasis added)). This statute does not say that HHS "may" provide certain services, as was the case in *Lincoln.* Instead, the use of "shall" plainly imposes a mandatory duty on HHS to take steps to ensure "all" such children have counsel. *See Alabama v. Bozeman,* 533 U.S. 146, 153, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) ("The word 'shall' is ordinarily the language of command." (internal quotation marks and citation omitted)). Similarly, the Foundational Rule states that "ORR *shall* fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations." 45 C.F.R. § 410.1309(a)(4) (emphasis added). These affirmative obligations stand in stark contrast with those at issue in *Lincoln,* where "no statute or regulation even mention[ed] the Program" that was cancelled, let alone required that the Executive carry out the program. 508 U.S. at 190, 113 S.Ct. 2024.

To be sure, HHS is only required to provide counsel "to the greatest extent practicable" and the Foundational Rule similarly grants the agency some discretion in the procurement of counsel for unaccompanied children, but that in no way defeats judicial review. Whatever discretion the agency may have in evaluating what "the greatest extent practicable" may be, this phrase certainly is not the same as "to no extent at all." *See Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n,* 449 F.2d 1109, 1114 (D.C. Cir. 1971) (explaining that the fact that the agencies' statutory duties were "qualified by the phrase 'to the fullest extent possible' " did "not provide an escape hatch for footdragging agencies" and did "not make [the statute's] requirements somehow 'discretionary' "). APA

Section 701(a)(2) has "never been thought to put all exercises of discretion beyond judicial review." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th Cir. 2015). To the contrary, "the APA itself commits final agency action to [judicial] review for 'abuse of discretion.' " *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 720 (9th Cir. 2011) (quoting 5 U.S.C. § 706(a)(2)(A)). Review is prohibited only where "there is truly no law to apply." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024) (quoting *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019)). And courts routinely find far less determinate language than that at issue here establishes a sufficient standard to permit review. *See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (determination whether "no feasible and prudent alternative" existed was reviewable); *Pac. Nw. Generating Coop. v. Bonneville Power Admin.*, 596 F.3d 1065, 1075 (9th Cir. 2010) (requirement that agency act "consistent with sound business principles" provided meaningful standard for review); *City of Los Angeles v. U.S. Dep't of Com.*, 307 F.3d 859, 869 n.6 (9th Cir. 2002) (requirement that an agency Secretary "shall" act "if he considers it feasible" provided a meaningful standard for review). Accordingly, the Government has not shown a likelihood of success on this argument either.

## II.

An applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending. *See Nken*, 556 U.S. at 434, 129 S.Ct. 1749. "[S]imply showing some possibility of irreparable injury" is insufficient. *Id.* (internal quotation marks omitted). Rather, "[t]he minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citing *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011)).

The Government has not met its irreparable injury burden. Despite waiting nearly a week to file this emergency motion to stay the preliminary injunction, the Government provides no evidence to support its claims of irreparable injury. *Cf. Al Otro Lado*, 952 F.3d at 1007 (rejecting "a weak showing" of harm where the government had the opportunity to gather evidence in support of its claims). Rather, the Government asserts evidence is unnecessary in this case because the injunction requires the disbursement of taxpayer funds that may never be recovered, and the injunction harms the separation of powers. We disagree.

*6 *First*, the Government has made no showing that dispersing congressionally appropriated funds for statutorily mandated purposes would cause irreparable harm in this case. Since 2012, and as recently as March 15, 2025, Congress has consistently appropriated funds to ensure compliance with the TVPRA's statutory mandate. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A Tit. I Sec. 1101(8), 139 Stat. 9, 11 (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664–665 (2024); Consolidated Appropriations Act, 2012, Pub. L. 112-74, Div. F, Tit. II, 125 Stat. 786, 1077 (2011); S. Rep. 118-84, at 169. These funds are statutorily earmarked to carryout the TVPRA. Pursuant to the TVPRA, HHS "shall ensure, to the greatest extent practicable ..., that all unaccompanied alien children ... have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). The President is required to spend these funds for the purpose of carrying out the TVPRA and only for that purpose. *See* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); *City & Cnty. of San Francisco*, 897 F.3d at 1232 ("[T]he President does not have unilateral authority to refuse to spend the funds." (quoting *Aiken*, 725 F.3d at 261 n.1)). The district court concluded that the Government is likely now shirking a statutory obligation that has been in place for over a decade. The Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). The Government has failed to demonstrate that spending congressionally appropriated funds as directed by Congress causes irreparable injury.

The Supreme Court's decision in *Department of Education* is not to the contrary. In assessing the risks of injury to the government there, the Supreme Court relied upon a declaration from a government official asserting the difficulties inherent in recovering disbursed funds under the specific grant agreements in that case. *See* 145 S. Ct. at 969 (citing App. To Application To Vacate Order 15a, 17a.). No such evidence has been presented here. To the contrary, the Government's motion fails to cite any evidence at all. Absent any showing from the Government, we cannot conclude that irreparable injury "is the more probable or likely outcome" here. *Al Otro Lado*, 952 F.3d at 1007 (quoting *Leiva-Perez*, 640 F.3d at 968).

*Second*, we reject the notion that the injunction's effect on the "separation of powers" qualifies as irreparable harm at the stay stage. *See Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) ("To the extent that the Government claims that it has suffered an institutional injury by erosion of the separation of powers, that injury is not 'irreparable.' It may yet pursue and vindicate its interests in the full course of this litigation."); *see also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (finding a separation of powers argument inadequate to demonstrate irreparable harm). In denying a motion to stay in another case, we concluded that the government had not established irreparable harm because "if we were to adopt the government's assertion that the irreparable harm standard is satisfied by the fact of executive action alone, no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). The Government does not acknowledge this line of precedent, much less attempt to distinguish it.

**III.**

For the reasons set forth above, we deny the Government's request for a stay pending appeal.

CALLAHAN, Circuit Judge, dissenting:

For the reasons provided in the dissent from rehearing en banc that I joined in the prior appeal in this case, I respectfully dissent. *See Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 135 F.4th 852, 854–56 (9th Cir. 2025) (Bumatay, J., and VanDyke, J., dissenting from the denial of rehearing en banc). Even if the district court had jurisdiction under the Administrative Procedure Act, the decision to terminate funding—or the decision of *who* to fund —is committed to agency discretion by law under 5 U.S.C. § 701(a)(2). *See* 8 U.S.C. § 1232(c)(5) (qualifying the provision of legal services "to the greatest extent practicable"). I would therefore grant the government's stay motion.

**All Citations**

--- F.4th ----, 2025 WL 1393876, 2025 Daily Journal D.A.R. 3981

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX 2**

*Community Legal Services in East Palo Alto, et al. v. United States Department of Health and Human Services, et al.*,
--- F. Supp. 3d ----, 2025 WL 1233674
(N.D. Cal. Apr. 29, 2025),
No. 25-cv-02847-AMO

2025 WL 1233674
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

COMMUNITY LEGAL SERVICES IN
EAST PALO ALTO, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al., Defendants.

Case No. 25-cv-02847-AMO
|
Signed April 29, 2025

**Synopsis**

**Background:** Legal services and nonprofit organizations brought action against Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR), and Department of the Interior (DOI) alleging order from DOI, telling legal service organization to "immediately stop all work" on contract through which HHS and ORR provided funding for counsel for unaccompanied children in immigration proceedings and terminating funding for direct legal representation services, violated Trafficking Victims Protection Act (TVPRA), conflicted with Unaccompanied Children Program Foundational Rule promulgated by ORR, and constituted arbitrary and capricious agency action, each in violation of Administrative Procedure Act (APA), and requesting injunctive relief. Plaintiffs filed motion for preliminary injunction.

**Holdings:** The District Court, Araceli Martínez-Olguín, J., held that:

organizations had Article III organizational standing;

organizations' asserted rights did not implicate Tucker Act;

organizations seeking preliminary injunction had substantial likelihood of success on merits of claim that DOI's order violated TVPRA and thus was not in accordance with law under APA;

organizations had substantial likelihood of success on merits of claim that DOI's order conflicted with Unaccompanied Children Program Foundational Rule promulgated by ORR in violation of APA;

organizations seeking preliminary injunction had substantial likelihood of success on merits of claim that order was arbitrary and capricious agency action under APA;

organizations would likely suffer irreparable harm in absence of preliminary injunction; and

balance of hardships and public interest supported grant of preliminary injunction.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

Esther Hsiao-In Sung, Pro Hac Vice, Karen Cassandra Tumlin, Laura Flores-Perilla, Justice Action Center, Los Angeles, CA, Alvaro M. Huerta, Carson Scott, Lya Ferreyra, Immigrant Defenders Law Center, Los Angeles, CA, Adina Bassin Appelbaum, Pro Hac Vice, Frederick Evan Benz, Pro Hac Vice, Peter Cameron Alfredson, Pro Hac Vice, Samantha Hsieh, Pro Hac Vice, Amica Center for Immigrant Rights, Washington, DC, for Plaintiffs.

Jonathan Kevin Ross, Katelyn Masetta-Alvarez, Michael Celone, DOJ-United States Attorney's Office, Washington, DC, for Defendants.

Ashley Brooke Vinson Crawford, Akin Gump Strauss Hauer & Feld, San Francisco, CA, for Amicus Amici Former Immigration Judges & Former Members of the Board of Immigration Appeals.

Benjamin Joseph Bien-Kahn, Rosen Bien Galvan and Grunfeld LLP, San Francisco, CA, for Amicus Former Officials of the United States Department of Health and Human Services.

Mishan Raini Wroe, National Center for Youth Law, Oakland, CA, for Amicus National Center for Youth Law.

Shaffy Moeel, Moeel Lah Fakhoury LLP, Berkeley, CA, Jane Liu, Pro Hac Vice, Young Center for Immigrant Children's Rights, Chicago, IL, for Amicus Young Center for Immigrant Children's Rights.

## ORDER GRANTING PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

Re: Dkt. No. 37

Araceli Martínez-Olguín, United States District Judge

**\*1** This matter comes before the Court on a Motion for Preliminary Injunction filed by Plaintiff nonprofit organizations that provide legal representation to unaccompanied children in immigration courts across the country. Plaintiffs challenge the recent termination of funding for counsel representing unaccompanied children by Defendants the United States Department of Health and Human Services ("HHS"), HHS's Office of Refugee Resettlement ("ORR"), and the United States Department of the Interior ("DOI") (collectively, "Government" or "Defendants"). Having considered Plaintiffs' motion, Defendants' response, the arguments of the Parties at the April 23, 2025 hearing, and the relevant case law, the Court hereby **GRANTS** Plaintiffs' Motion for Preliminary Injunction for the following reasons.

## I. BACKGROUND

### A. Legal Framework

Congress established a coordinated scheme to govern the legal representation of unaccompanied children in immigration proceedings, a scheme primarily reflected in two statutes: the Homeland Security Act of 2002 ("HSA") and the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"). Giving effect to the TVPRA, ORR promulgated the Unaccompanied Children Program Foundational Rule.

As relevant to this case, the HSA defines an "unaccompanied alien child" (hereafter "unaccompanied children") as "a child who – (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom – (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Further, the HSA assigns ORR broad authority over the care and custody of unaccompanied children while they are in federal custody. This authority includes coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans

to "ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child." 6 U.S.C. § 279(b)(1)(A). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

Congress enacted the TVPRA to strengthen protections for unaccompanied children. Consistent with the HSA, the TVPRA makes the HHS Secretary responsible for the care and custody of unaccompanied children. 8 U.S.C. § 1232(b)(1). It requires HHS to "ensure, to the greatest extent practicable ..., that all unaccompanied alien children ... have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule ("Foundational Rule"), codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing programs for unaccompanied children. The Foundational Rule, which became effective July 1, 2024, provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is "not practicable." 45 C.F.R. § 410.1309(a)(4). Other subsections of the Foundational Rule impose obligations – requiring, for example, ORR to ensure unaccompanied children receive mandatory services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v).

### B. Congressional Funding and ORR's Termination

**\*2** Since 2012, Congress has consistently appropriated funds for the direct legal representation of unaccompanied children in immigration proceedings, including the most recent appropriation for over \$5 billion to ensure "all children ... have access to counsel in their immigration proceedings." Compl. ¶¶ 77-87. Congressional appropriations for direct legal representation of unaccompanied children remain available until September 2027, including funds appropriated as recently as March 15, 2025, one week before the Government's challenged actions. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act,

2025 WL 1233674

2024; Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169. Despite funding being available, ORR decided on or about March 20, 2025, to partially terminate the contract funding direct legal representation services. Biswas Decl. (ECF 24-1) ¶¶ 12-13. This termination followed a directive memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families dated February 3, 2025. *Id.* ¶¶ 13-14; *see also* Biswas Decl., Ex. 1 (ECF 24-2, the "Secretarial Directive"). The Secretarial Directive instructed agency personnel to pause all payments to contractors and vendors related to immigration and refugee resettlement "for payment integrity." *Id.* On March 21, 2025, DOI sent a letter to Acacia Center for Justice, the sole contractor for direct representation legal services, terminating the contract line items through which HHS and ORR provided funding for counsel for unaccompanied children in immigration proceedings. Compl. ¶ 11; Biswas Decl. ¶ 12, Ex. 2 (ECF 24-3, the "Cancellation Order"). The Cancellation Order instructed Acacia to "immediately stop all work" on the contract. *Id.* The Cancellation Order terminated funding for direct legal representation services "for the Government's convenience" and made no reference to the Secretarial Directive. *Id.* Acacia notified its direct representation subcontractors, including Plaintiffs, of the Cancellation Order the same day. *See, e.g.*, FIRRP Decl. (ECF 7-4) ¶ 32.

### C. Plaintiff Organizations

Plaintiffs include the following organizations: Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project (collectively, "Plaintiffs"). Plaintiffs previously received funding for their work from ORR disbursed through Acacia Center for Justice. Compl. ¶¶ 64-65; 88. The organizations share the mission of ensuring persons in immigration proceedings, including the uniquely vulnerable population of unaccompanied children, have legal representation. *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 5 ("Since the Florence Project began serving children in 2000, a central tenet of our mission has been that no child should have to stand alone in court."); NWIRP Decl. (ECF 7-10) ¶¶ 1-2 (Northwest Immigrant Rights Project "provides legal services to unaccompanied immigrant children and youth" in accordance with its "mission to promote justice by defending

and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education."); KIND Decl. (ECF 7-18) ¶ 1 (describing KIND's "mission [to] ensur[e] that no child appears in immigration court without high-quality legal representation."); *see also* Compl. ¶ 102.

In response to the Cancellation Order, and the resulting funding termination, Plaintiffs state that they have been forced to choose between cutting vital organizational programs or dismissing their specialized and seasoned attorneys. *See, e.g.*, GHIRP Supp. Decl. (ECF 53-2) ¶ 3 (describing the layoff of eight staff members due to the Cancellation Order's termination of funding). Further, the Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children direct representation, impeding Plaintiffs from ensuring unaccompanied children are supported by legal counsel. *See, e.g.*, Estrella del Paso Supp. Decl. (ECF 53-4) ¶¶ 3-4; ImmDef Supp. Decl. (ECF 53-5) ¶ 8. The unaccompanied children to whom Plaintiffs would normally have provided representation are instead facing immigration court proceedings without counsel. *See, e.g.*, GHIRP Supp. Decl. (ECF 53-2) ¶¶ 4-7. Consequently, "[t]his means that children who want voluntary departure will have their return home unacceptably delayed, [and] victims of trafficking will not be able to access the protections they deserve[.]" ImmDef Decl. (ECF 7-8) ¶ 25.

### D. Procedural History

Plaintiffs brought this lawsuit against the Government on the bases that the Cancellation Order (1) violates the TVPRA, (2) conflicts with the Foundational Rule, and (3) constitutes an "arbitrary and capricious" agency action, each of which gives rise to a claim for violation of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A). Compl. ¶¶ 127-46.

**\*3** On March 27, 2025, Plaintiffs filed a motion for temporary restraining order ("TRO") and preliminary injunction. ECF 7. The Court issued an order setting a hearing, as well as a deadline for the Government's written response to Plaintiffs' TRO motion. ECF 17. On March 31, 2025, in accordance with the schedule set on March 27, the Government filed its opposition to Plaintiffs' motion. *See* ECF 24. On April 1, 2025, the parties appeared for a hearing on Plaintiffs' motion. ECF 30.

After taking the matter under submission, the Court granted Plaintiffs' motion, issued a TRO, and set an expedited briefing schedule on Plaintiffs' request for a preliminary injunction. ECF 33. The TRO provided,

Defendants are **ENJOINED** from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a) (4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children. This injunction precludes cutting off access to congressionally appropriated funding for its duration.

ECF 33 at 7.

After the TRO grant, several motions were filed. Plaintiffs filed their motion for preliminary injunction (ECF 37), as well as two motions to enforce the TRO (ECF 40, ECF 53). The Government moved to dissolve the TRO (ECF 38) and for recusal of a district judge pursuant to Title 28 U.S.C. § 455 (ECF 47). Finding that consideration of the recusal motion constituted good cause, the Court extended the TRO for an additional 14 days in accordance with Federal Rule of Civil Procedure 65(b)(2), set a briefing schedule on the recusal motion, and continued the hearing on Plaintiffs' motion for preliminary injunction. *See* ECF 48. The Government sought to appeal the TRO following its extension. ECF 56. The Government additionally moved to stay the TRO pending that appeal. ECF 57.

Following complete briefing, this Court denied the Government's motion for recusal. ECF 69. A panel of the Ninth Circuit subsequently determined that the TRO was not appealable and dismissed the Government's appeal, *see Cmty. Legal Servs. in East Palo Alto v. Dept. Health & Hum. Servs.*, Case No. 25-2358, Order (9th Cir. Apr. 18, 2025), rendering the Government's motion for a stay pending appeal (ECF 57) moot. [1] The Court denied the Government's motion to dissolve the TRO by written order dated April 21, 2025. ECF 75. At the time of writing, the TRO remains in effect.

[1] The Government sought en banc review, which was denied. *Cmty. Legal Servs. in E. Palo Alto v. United States Dept. of Health and Human Servs.*, No. 25-2358, ⸺ F.4th ⸺, ⸺, 2025 WL 1203167, at *1 (9th Cir. Apr. 25, 2025).

## II. DISCUSSION

Plaintiffs move for a preliminary injunction on much of the same reasoning underlying the TRO. The Government opposes on several bases. The Court first addresses the Government's arguments regarding threshold issues of standing and subject matter jurisdiction before turning to the merits of Plaintiffs' motion.

### A. Plaintiffs' Standing

The Court understands the Government to challenge Plaintiffs' standing under two theories. First, the Government contends that Plaintiffs lack Article III standing to bring this lawsuit because Plaintiffs' purported harms are not redressable by a favorable ruling from this Court. Second, the Government contends that Plaintiffs fall outside the "zone of interests" necessary to bring their APA claims. Though not squarely challenged by Government, the Court first considers whether the Plaintiffs have adequately established organizational injury in fact in support of Article III standing and then takes up each of the Government's standing arguments in turn.

### 1. Article III

**\*4** Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 338, 136 S.Ct. 1540 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

#### a. Organizational Injury in Fact

"Organizations can assert standing on behalf of their own members, or in their own right[.]" *East Bay Sanctuary*

*Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) ("*EBSC III*") (citations omitted). "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id. at 663*; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (setting forth organizational standing test of "frustration of mission" coupled with "diversion of resources"). Organizational plaintiffs may also "demonstrate organizational standing" by showing that a government policy "will cause them to lose a substantial amount of funding." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766-67 (9th Cir. 2018) ("*EBSC I*").

Here, Plaintiffs establish that the Government's conduct "has frustrated [their] mission and caused [them] to divert resources in response to that frustration of purpose." *EBSC III*, 993 F.3d at 663. The organizations share the mission of ensuring persons in immigration proceedings, including the uniquely vulnerable population of unaccompanied children, have legal representation. *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 5 ("Since the Florence Project began serving children in 2000, a central tenet of our mission has been that no child should have to stand alone in court."); NWIRP Decl. (ECF 7-10) ¶¶ 1-2 (Northwest Immigrant Rights Project "provides legal services to unaccompanied immigrant children and youth" in accordance with its "mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education."); KIND Decl. (ECF 7-18) ¶ 1 (describing KIND's "mission [to] ensur[e] that no child appears in immigration court without high-quality legal representation."). Plaintiffs' missions and ethical duties drive them to continue legal representation of unaccompanied children in immigration proceedings. By cancelling all funding for direct legal representation of unaccompanied children, the Government "perceptibly impair[s]" Plaintiffs' ability to fulfill their shared organizational mission. *See EBSC III*, 993 F.3d at 663. Plaintiffs present significant evidence that unaccompanied children were not provided counsel following the Cancellation Order, leaving them unrepresented in immigration proceedings, subject to removal and/or unable to pursue desired relief. *See, e.g.*, KIND Decl. ¶¶ 13-19; Estrella Supp. Decl. (ECF 40-2) ¶¶ 4-9. Plaintiffs thus satisfy the "frustration of mission" requirement for organizational standing as set forth by this circuit.

In addition to demonstrating a frustration of mission, Plaintiffs must also establish that the Government's actions required them to divert resources that they would have spent in other ways. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011). Plaintiffs have needed to draw on funds intended for other organizational purposes to respond to the suddenly diminished funding resulting from the Government's Cancellation Order. *See, e.g.*, FIRRP Supp. Decl. (ECF 37-5) ¶ 3 ("Florence Project has continued to provide services to our clients, drawing on funding from other sources and fundraising to ensure that we are able to provide legal representation, pro bono placement and mentoring, additional legal services, court preparation, and friend of court services to unrepresented children in keeping with our mission for as long as we can responsibly financially manage to do so."); NIJC Supp. Decl. (ECF 37-11) ¶ 3 ("Since the ORR funding ceased, NIJC was forced to temporarily shift staff members to work on other NIJC projects."). Given the ways in which Plaintiffs have had to divert resources to adequately advocate for unaccompanied children, there can be little doubt that the Government's conduct has "impaired [Plaintiffs'] ability to provide [legal] services" to unaccompanied children, and "there can be no question that the organization[s] ha[ve] suffered injury in fact." *Havens*, 455 U.S. at 379, 102 S.Ct. 1114; *see also EBSC III*, 993 F.3d at 663 (finding standing where new administrative rule barring access to asylum procedures for certain migrants caused diversion of resources for organizations formed to assist asylum seekers). [2]

[2]    Though standing is not challenged on this basis, Plaintiffs likely also have standing to challenge the Government's Cancellation Order because of the new and ongoing operational costs they allege. *City and Cnty. of San Francisco v. United States Citizenship and Immigration Servs.*, 944 F.3d 773, 787-88 (9th Cir. 2019). Plaintiffs have suffered near-immediate financial impacts, and they have thus made a sufficient showing of concrete and imminent economic injury. *See, e.g.*, Estrella del Paso Decl. ¶ 13 (describing staff furloughs in response to Cancellation Order).

### b. Redressability

**\*5** The Government asserts that Plaintiffs cannot satisfy Article III's requirements because they cannot establish that

a favorable ruling would redress their alleged injuries. *See* Opp. at 12-14. Redressability, the third element of Article III standing, demands that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (citation and internal quotation marks omitted). Plaintiffs' burden to establish redressability is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Tucson v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024). "Plaintiffs need not demonstrate that there is a guarantee that their injuries will be redressed by a favorable decision." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (internal citation and quotation omitted). Rather, Plaintiffs need only show that a favorable decision would result in a "change in a legal status," and that a "practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002).

The Government argues that Plaintiffs' purported harms are not redressable because the agencies hold no obligation to continue to fund the Plaintiff organizations. Opp. at 12-13. However, this argument distorts Plaintiffs' claims as sounding in contract, an incorrect characterization for reasons discussed in greater depth below. *See* Section II.B. Plaintiffs pursue injunctive relief requiring the Government to ensure legal representation of unaccompanied children in immigration proceedings. Plaintiffs concede that the Government can accomplish this by means other than by paying for their services and, if the Government takes steps to ensure direct representation through others, the harm Plaintiffs suffer in the form of providing representation without payment or diverting resources would be alleviated. *See* Reply (ECF 63) at 14. The reinstatement of funding for direct representation to unaccompanied children increases the likelihood that Plaintiffs will obtain relief, either through funding to continue their own representations or an alternative plan providing legal representation to unaccompanied children consistent with the TVPRA and the Foundational Rule. *Id.* The requested injunctive relief thus is likely to ensure that the unaccompanied children have and maintain counsel, which will redress the injury to Plaintiffs' missions, and this is sufficient to establish standing.

## 2. APA – Zone of Interests

The Government avers that Plaintiffs fall outside the zone of interests to bring their APA claims because the TVPRA was not enacted to protect service providers' finances or operational goals. *See* Opp at 7-6. The Government contends that Plaintiffs fall outside the zone of interests because the organizations are not in the class of unaccompanied minors intended for the TVPRA's protections. *Id.* These arguments miss the mark.

"The breadth of the zone-of-interests test varies, depending on the provisions of law at issue. Under the APA, the test is not especially demanding. The zone-of-interests analysis forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *EBSC III*, 993 F.3d at 667 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014)) (internal quotation marks omitted). "[B]ecause the APA provides a cause of action only to those 'suffering legal wrong because of agency action ... within the meaning of a relevant statute,' the relevant zone of interest is that of the" TVPRA. *See id.* at 667.

Plaintiffs' interests in ensuring TVPRA protections for unaccompanied children, including direct representation legal services, is consistent with the TVPRA's purpose of "[p]reventing the trafficking of unaccompanied [noncitizen] children found in the United States by ensuring that they are not repatriated into the hands of traffickers or abusive families, and are well cared for." H.R. Rep. No. 110-430 at 35 (2007); *see EBSC III*, 993 F.3d at 668 (concluding that courts are "not limited to considering the specific statute under which plaintiffs sued, but may consider any provision that helps [them] to understand Congress' overall purposes in enacting the statute.") (internal quotation marks omitted); *see also EBSC I*, 932 F.3d at 768 (finding organizational plaintiffs in the Immigration and Nationality Act's zone of interests because their "interest in aiding immigrants seeking asylum is consistent with the INA's purpose to establish the statutory procedure for granting asylum to refugees") (internal quotation marks and alterations omitted). Under the TVPRA, the Government "shall ensure, to the greatest extent practicable[,] ... that all unaccompanied [noncitizen] children who are or have been in the custody of the Secretary of [HHS] or the Secretary of Homeland Security ... have counsel to represent them in legal proceedings" and that, "[t]o the greatest extent practicable, the Secretary of [HHS] shall make every effort to utilize the services of pro bono counsel[.]"

2025 WL 1233674

8 U.S.C. § 1232(c)(5). Indeed, ORR contracted with Acacia Center, and Acacia in turn subcontracted with Plaintiffs to fill this role contemplated by the TVPRA. Plaintiffs fit within the zone of interests because their interests are congruent with the TVPRA's and Foundational Rule's beneficiaries, namely, unaccompanied children. Indeed, Plaintiffs' missions align with Congress's purpose in enacting the TVPRA, ensuring representation for unaccompanied children to prevent their trafficking and abuse. *EBSC I*, 932 F.3d at 768 (finding organizational plaintiffs in zone of interests where "Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to" those protected by the relevant statutes). Given the zone of interests test for APA claims is not "especially demanding," *Lexmark*, 572 U.S. at 130, 134 S.Ct. 1377, the Court is persuaded that Plaintiffs have more than met their burden to show that their interests are "marginally related to" and "arguably within" the scope of the relevant statutes. *See EBSC III*, 993 F.3d at 668.

**B. Subject Matter Jurisdiction (Tucker Act)**

**\*6** Having resolved the Government's challenges to Plaintiffs' standing, the Court turns to the Government's argument that the Tucker Act requires Plaintiffs' claims be brought in the Federal Court of Claims because they sound in contract, and thus this Court lacks subject matter jurisdiction. *See* Opp. at 8-11. The Government is mistaken.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over suits based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). However, "the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action ... into one one the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). "Generally speaking, the Tucker Act does not permit the [Court of Federal Claims] to grant equitable or declaratory relief." *N. Star Alaska v. United States*, 9 F.3d 1430, 1432 (9th Cir. 1993). "Due to this limited remedial authority, a contract-based action falls within the scope of the Tucker Act only if the plaintiff seeks *money damages* for the breach of a government contract." *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (emphasis in original). Nonetheless, the Supreme Court has long recognized that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages' " within the meaning of the APA's and Tucker Act's jurisdictional limitations. *Bowen v. Massachusetts*, 487 U.S.

879, 893, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (holding that federal district courts, not the Court of Federal Claims, have jurisdiction to review federal agency action such as the denial of reimbursements owed for Medicaid expenditures).

The Ninth Circuit has held that the Tucker Act " 'impliedly forbid[s]' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp.*, 80 F.4th at 1026 (citing *Megapulse*, 672 F.2d at 968). To assess whether an APA claim is an improperly disguised contract claim, the court adopted the same two-part test from the D.C. Circuit's *Megapulse* decision, requiring assessment of (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *United Aeronautical Corp.*, 80 F.4th at 1026 (citing *Doe v. Tenet*, 329 F.3d 1135, 1141 (9th Cir. 2003)); *see also Megapulse*, 672 F.2d at 968. To assess the "source of rights" that form the basis of a plaintiff's claim, the Court must consider whether: (a) the plaintiff's asserted rights and the government's purported authority arise from statute or contract; (b) the plaintiff's rights "exist[ ] prior to and apart from rights created under the contract"; and (c) the plaintiff "seek[s] to enforce any duty imposed upon" the government "by the ... relevant contracts to which" the government "is a party." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (internal quotations and citations omitted).

Here, the source of Plaintiffs' claims is the APA. They aver that the Government's refusal to fund direct representation for unaccompanied children violates the agencies' obligations under the TVPRA and the Foundational Rule. They advance that the Government's conduct gives rise to a claim under the APA as contradictory to law, another claim under the APA as contravening the agencies' regulations, and a third claim under the APA for arbitrary and capricious acts. Plaintiffs assert no breach-of-contract claim for money damages. Indeed, although the Government repeatedly contends that Plaintiffs seek to enforce contractual rights, the contract underlying the Cancellation Order was between DOI and Acacia Center – these legal services providers were not parties to that contract and assert no rights related to that contract. [3] Moreover, as discussed above, Plaintiffs' asserted harms arise from the frustration of their mission and diversion of resources to ensure unaccompanied children have legal representation. Plaintiffs' asserted rights do not rely on or arise from any contract, are not contract claims in disguise, and thus do not implicate the Tucker Act under the first prong of the *Megapulse* test.

3    Even if Plaintiffs brought a claim for breach of the contract between DOI and Acacia Center under a theory of third-party liability, they likely would not be able to litigate in the Federal Court of Claims – given the absence of privity between the Government and subcontractors like Plaintiffs, there is no express or implied contract that would implicate the Tucker Act. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550-51 (Fed. Cir. 1983).

**\*7** Turning to the second prong, the type of relief sought, Plaintiffs seek "declaratory and injunctive relief" under the APA to prevent the Government from refusing to fund counsel for unaccompanied children. Their action does not seek money damages to compensate them for losses; instead, they seek an injunction and vacatur of the purportedly unlawful Cancellation Order. That such relief may result in the payment of money does not transform their claim into one for money damages. *Cf. Bowen, 487 U.S. at 893, 108 S.Ct. 2722.* Plaintiffs could not obtain the injunctive relief they seek in the Court of Federal Claims, which "has no power to grant equitable relief[.]" *Richardson v. Morris, 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973).* Because Plaintiffs seek injunctive relief rather than money damages, the claims do not implicate the Tucker Act under the second prong of the *Megapulse* test. Finally, Plaintiffs do not seek to enforce any duty imposed on the Government by a contract. The Government makes clear that the contract by which ORR funded direct representation of unaccompanied children was coming to a close by its own terms, potentially hampering any potential claim to enforce a duty under that contract. *See* Biswas Decl. (ECF 24-1) ¶ 11 (stating that the Government's contract with Acacia was set to expire March 29, 2025). Plaintiffs' claims for injunctive relief do not seek enforcement of any contractual duty; rather, they pursue enforcement of the TVPRA and the Foundational Rule. *See* Compl. ¶¶ 127-46. Because all of the *Crowley Government Services* factors indicate that Plaintiffs' claims do not sound in contract, the Court rejects the Government's argument that it lacks jurisdiction over this case.

The Government resists this conclusion by attempting to analogize this case to the Supreme Court's recent order staying a different district court's temporary restraining order in *Department of Education v. California*, 604 U.S. ——, 145 S. Ct. 966, —— L.Ed.2d —— (2025).[4] In *Department of Education*, the state government plaintiffs brought an APA challenge to the Department of Education's termination of contracts for the payment of certain educational grants to the respective states. *Id.*, 145 S. Ct. at 968. The district court issued a TRO enjoining the Government from terminating the grants and requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* The Supreme Court granted the Government's request for a stay of the TRO on the basis that the district court "lacked jurisdiction to order the payment of money under the APA." *Id.* The Court further held, based in significant part on the relief pursued by the state governments, that the Government would likely show the district court lacked jurisdiction over the contractual claims calling for payment, as those claims are committed to the Court of Federal Claims pursuant to the Tucker Act. *Id.* (citing 28 U.S.C. § 1491(a)(1)).

4    The Government earlier moved to dissolve the TRO in reliance on the same order from the Supreme Court's emergency docket. *See* ECF 38. The Court denied the Government's motion to dissolve the TRO. ECF 75. The Court's earlier reasoning regarding the inapplicability of *Department of Education* remains applicable.

In the course of this litigation, this Court has already found *Department of Education* insufficient to warrant dissolution of the TRO. ECF 75. It adds that *Department of Education* is distinguishable from Plaintiffs' APA claims related to the termination of funding for legal services for unaccompanied children in immigration proceedings. These Plaintiffs, in contrast to the state governments in *Department of Education*, are subcontractors lacking privity with the Government, and they have no contractual rights to enforce. Moreover, though the Government regularly characterizes their claims as nothing more than a money grab, the legal service providers do not seek payout – they seek to ensure representation for unaccompanied children in immigration proceedings, regardless of which lawyers provide it. *Department of Education* has no bearing here given the lack of (1) contractual relationship or (2) contractual relief sought against the United States by Plaintiffs, the two hallmarks of actions left to the jurisdiction of the Federal Court of Claims.

For these reasons, Plaintiffs' claims have no business before the Federal Court of Claims and this Court has jurisdiction to consider Plaintiffs' APA claims.

**C. Preliminary Injunction**

Having rejected the Government's jurisdictional arguments, the Court next examines whether Plaintiffs are entitled to the extraordinary relief they seek. To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Where the government is a party, courts merge the analysis of the final two *Winter* factors, the balance of equities and the public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305, 112 S.Ct. 1, 115 L.Ed.2d 1087 (1991) (internal quotation marks and citation omitted). The *Winter* factors may be evaluated on a sliding scale, such that preliminary relief may be issued when the moving party demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation omitted).

### 1. Likelihood of Success on the Merits

**\*8** The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.' " *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16, 140 S.Ct. 1891, 207 L.Ed.2d 353 (2020) (citation omitted). "The [APA] was adopted to provide, inter alia, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). To that end, "[t]he APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). It authorizes judicial review for those "suffering legal wrong" or "adversely affected" by a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. §§ 702, 704.[5]

[5]    The parties do not appear to dispute that the Cancellation Order constitutes a final agency action for purposes of APA review. In the interest of thoroughness, the Court finds that the Cancellation Order is a final agency action as the Government has not indicated, much less evidenced, that it intends to take further steps in its decision-making process and, thus, the termination of funding leads to legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

The Government contends that Plaintiffs are unlikely to succeed on the merits of their APA claims because the provisions at issue leave discretion to the agencies that evades judicial review. The Court takes up this issue first, and after concluding the conduct at issue is not committed to Government discretion, it then considers the substance of Plaintiffs' three APA claims. Though Plaintiffs' need only show a likelihood of success on one claim to demonstrate likelihood of success in support of a preliminary injunction, the Court analyzes each of their claims.

### a. Bar to Review

The Government argues that Title 5 U.S.C. § 701(a)(2) precludes judicial review of the Cancelation Order. Section 701(a)(2) provides an exception to the waiver of sovereign immunity found in Sections 702 and 706 of the APA. Under Section 701(a)(2), a court may not review an agency action if the "agency action is committed to agency discretion by law." However, the Section 701(a)(2) waiver is a narrow exception.

An agency action "is committed to agency discretion by law" only "where a statute is drawn in such broad terms that in a given case there is no law to apply, and the court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *see Jajati v. United States Customs & Border Prot.*, 102 F.4th 1011, 1014 (9th Cir. 2024) (holding that the Section 701(a)(2) exception applies when "there is truly no law to apply"). The Supreme Court requires courts to "read the exception in § 701(a)(2) quite narrowly" such that it should apply only in "rare circumstances." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23, 139 S.Ct. 361, 202 L.Ed.2d 269 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993)). Even when Congress

intended to create a wide zone within which decisions are committed to an agency's discretion, the agency still must meet "permissible statutory objectives." *Lincoln*, 508 U.S. at 183, 113 S.Ct. 2024.

In one of the few cases in which the Supreme Court applied the Section 701(a)(2) exception, it held the exception applied in cases involving "agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation." *Weyerhaeuser*, 586 U.S. at 23, 139 S.Ct. 361 (citing *Lincoln*, 508 U.S. at 191, 113 S.Ct. 2024). In *Lincoln*, the Court found the Indian Health Service's particular use of funds from a "lump sum" grant was committed to its discretion because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192, 113 S.Ct. 2024. That is, "a lump-sum appropriation reflects a congressional recognition that an agency must be allowed flexibility to shift funds within a particular appropriation account so that the agency can make necessary adjustments for unforeseen developments and changing requirements." *Id.* at 193, 113 S.Ct. 2024 (internal citation omitted).

**\*9** The Government argues that the appropriation for direct legal representation of unaccompanied children at issue here mirrors the lump sum appropriation over which the Indian Health Service maintained discretion to allocate funds in *Lincoln*. *See* Opp. at 11-12. But unlike the appropriation in *Lincoln*, the TVPRA mandates direct legal representation, and Congress has expressly appropriated funds for services required under the TVPRA, including direct representation. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664-65 (2024); S. Rep. 118-84, at 169. The Government's cancellation of all funding for direct representation is not the type of judgment regarding how to spend appropriated funds that is presumptively committed to agency discretion.

Beyond the appropriations question, the Court has several meaningful standards against which to judge the agencies' discretion. *Cf. Weyerhaeuser*, 586 U.S. at 23, 139 S.Ct. 361. Indeed, the TVPRA and the Foundational Rule provide "meaningful standards under which courts can review whether [the Government] wielded its discretion in a

permissible manner." *Jajati*, 102 F.4th at 1014. Both the TVPRA and Foundational Rule include language describing the Government's obligations to fund direct representation. *See* 8 U.S.C. § 1232(c)(5) (HHS "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal "counsel to represent them in legal proceedings"); 45 C.F.R. § 410.1309(a)(4) (ORR "shall fund legal service providers ... subject to ORR's discretion and available appropriations"). Such statutory and regulatory language offers a clear standard to assess the Government's actions; therefore, Section 701(a)(2) does not bar review of the Government's actions in this case.

### b. First Claim – Agency Action Not in Accordance with Law

The APA requires reviewing courts to "hold unlawful and set aside agency action ... found to be ... not in accordance with law"; "contrary to constitutional right [or] power"; or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A)-(C). Plaintiffs argue that the Government's termination of funding for direct legal representation violates the TVPRA. *See* Mot. (ECF 37) at 11. The relevant subsection provides that the Government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5). [6] By cancelling all funding for direct representation of unaccompanied children and failing to ensure that the children receive counsel when funds remain available for that purpose, Plaintiffs contend, the Government violates the express mandate of the TVPRA.

[6]    The provision reads in full:

The Secretary of Health and Human Services shall ensure, to the greatest extent practicable and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362), that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security, and who are not described in subsection (a)(2) (A), have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking. To the greatest extent practicable, the Secretary of Health and Human Services shall make every

effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge.

8 U.S.C. § 1232(c)(5).

The Government asserts that the TVPRA "does not mandate government-funded legal representation," Opp (ECF 55) at 9, arguing Section 235 of the TVPRA merely "encourages" HHS to ensure unaccompanied children have counsel "to the greatest extent practicable," *id.* at 11. The Court disagrees. Section 235 creates an affirmative obligation on the Government, requiring the agencies "shall ensure" unaccompanied children have legal counsel "to the greatest extent practicable." 8 U.S.C. § 1232(c)(5). There is no dispute that congressionally appropriated funds for legal representation are available, making the provision of direct legal services "practicable," particularly in the absence of alternative methods to provide counsel. *See* Further Consolidated Appropriations Act, 2024, Pub. L.118-47, § 4, 130 Stat. 460, 461. The Government here terminated all funding for direct legal services through its Cancellation Order, *see* Biswas Decl., Ex. 2 (ECF 24-3), effectively eliminating direct representation for unaccompanied children. Amica Supp. Decl. ¶ 8; VAAP Decl. (ECF 7-7) ¶¶ 20-21. While the Government posits that " 'to the greatest extent practicable' cannot reasonably be construed as a mandate for HHS to unconditionally pay for direct immigration legal representation for all" unaccompanied children, that is not what Plaintiffs seek nor what the TVPRA requires. Opp. at 15. The TVPRA's proviso that HHS "shall ensure" counsel to represent unaccompanied children "to the greatest extent practicable" requires something more than zero expenditure where appropriated funds are available and the agencies fail to show any effort to ensure representation through alternative means. The Government violates the TVPRA by withholding funding for direct legal representation entirely, with no supplemental plan to ensure unaccompanied children have legal counsel "to the greatest extent practicable." *Cf.* Pacito v. Trump, No. 2:25-CV-255-JNW, —— F.Supp.3d ——, ——, 2025 WL 655075, at *18 (W.D. Wash. Feb. 28, 2025) (finding that withholding congressionally appropriated funding for private service providers likely violated the APA and supported the grant of a preliminary injunction). On this basis, Plaintiffs show likelihood of success on their first APA claim.

**c. Second Claim – *Accardi* Violation**

*\*10* Under the *Accardi* doctrine, "an administrative agency is required to adhere to its own internal operating procedures." Church of Scientology of Cal. v. United States, 920 F.2d 1481, 1487 (9th Cir. 1990) (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954)). In accordance with this principle, agencies must follow a regulation if they promulgate one. Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 852 (9th Cir. 2003). To establish an APA claim under the *Accardi* doctrine, Plaintiffs must show both that (1) the Government violated its own regulations, and (2) Plaintiffs suffer substantial prejudice as a result of that violation. *See* Al Otro Lado, Inc. v. Mayorkas, 2024 WL 4370577, at *8-9 (S.D. Cal. Sept. 30, 2024).

Here, Plaintiffs aver that the Government violated the Foundational Rule, under which "ORR shall fund legal service providers" "[t]o the extent ORR determines that appropriations are available and insofar as it is not practicable for ORR to secure pro bono counsel." 45 C.F.R. § 410.1309(a)(4).[7] The Government argues that interpreting the Foundational Rule to require continued funding of direct representation for unaccompanied children conflicts with Title 8 U.S.C. § 1362, which provides that the privilege of being represented by counsel in immigration proceedings shall be "at no expense to the Government." *See* Opp. at 15. The Court finds no conflict between these two provisions. Section 1362 simply clarifies that Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), does not extend to immigration proceedings – meaning persons subject to removal proceedings have a right to counsel, but that right does not require the Government to provide such counsel. The Foundational Rule does not conflict with Section 1362 because it does not create a substantive right to counsel at the expense of the Government. Instead, it creates an obligation for ORR to seek out direct representation counsel for unaccompanied children, including by securing pro bono counsel or utilizing appropriated funds when ORR is not able to secure pro bono counsel. It is undisputed that appropriations for direct representation remain available, and the Government has evidenced no effort to ensure pro bono counsel. Thus, the Government cannot invoke this perceived statutory conflict as a basis for failing to comply with its obligations under the Foundational Rule.

7    The provision reads in full:

Direct immigration legal representation services for unaccompanied children currently or previously under ORR care. To the extent ORR

determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations. Examples of direct immigration legal representation include, but are not limited to:

(i) For unrepresented unaccompanied children who become enrolled in ORR Unaccompanied Refugee Minor (URM) programs, provided they have not yet obtained immigration relief or reached 18 years of age at the time of retention of an attorney;

(ii) For unaccompanied children in ORR care who are in proceedings before EOIR, including unaccompanied children seeking voluntary departure, and for whom other available assistance does not satisfy the legal needs of the individual child;

(iii) For unaccompanied children released to a sponsor residing in the defined service area of the same legal service provider who provided the child legal services in ORR care, to promote continuity of legal services; and

(iv) For other unaccompanied children, to the extent ORR determines that appropriations are available.

45 C.F.R. § 410.1309(a)(4).

**\*11** Changing tack, the Government next acknowledges the Foundational Rule obliges ORR to "fund legal service providers to provide direct immigration legal representation for certain unaccompanied children," but emphasizes the discretion ORR retains, as the obligation to fund legal services exists only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4). The Government contrasts this provision to other subsections that leave ORR no discretion. For instance, the Foundational Rule explicitly requires ORR to ensure unaccompanied children receive mandatory services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v). According to the Government, this intentional distinction clarifies that direct funding for legal representation remains discretionary, conditional upon

the availability of appropriations, and subject to agency determination.

Even so, the Government's argument does not address Plaintiffs' claim. The Government may be right that it retains some modicum of discretion related to how direct representation legal services are provided and to what degree the Government funds them; however, the Cancellation Order contravenes the Foundational Rule. The termination of all direct representation funding is incompatible with the Foundational Rule's requirement that the agency "shall fund" direct representation so long as funds remain available and pro bono legal services are not secured. The Government proffers no evidence that it found pro bono counsel or even sought out alternative representation for the unaccompanied children. Plaintiffs are prejudiced by the Government's failure to comply with the Foundational Rule because they are inhibited in their ability to fulfill their missions of ensuring representation for unaccompanied children. *See* Section II.A.1.a, above. The Government's Cancellation Order thus violates the Foundational Rule, and Plaintiffs have shown a likelihood of success on their APA claim under the *Accardi* doctrine.

### d. Third Claim – Arbitrary and Capricious Agency Action

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.' " *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "[A]n agency's action can only survive arbitrary or capricious review where it has articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (citing *Altera Corp. & Subsidiaries*, 926 F.3d at 1080). "Although we may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, we may not infer an agency's reasoning from mere silence." *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (citations and quotation marks omitted). As the Supreme Court has elucidated, "[a]n agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy," even though it need not convince the court of the merits

of its new policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (internal citation omitted). Also, where an agency action rescinds a prior policy, the agency must show that it gave due consideration to "serious reliance interests." *Id.* at 515, 129 S.Ct. 1800; *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. at 30, 140 S.Ct. 1891 ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'").

Here, only two documents are proffered to provide insight into the Government's change in position – the February 3, 2025 Secretarial Directive and the March 21, 2025 Cancellation Order. *See* Biswas Decl., Ex. 1 (ECF 24-2) & Ex. 2 (ECF 24-3).[8] Neither of the documents contemplates any alternatives to the existing policy of funding legal services providers for direct representation. *Cf. Regents*, 591 U.S. at 30, 140 S.Ct. 1891. Neither of the documents finds any facts that would support the decision to terminate all funding, nor do they draw a rational connection between any facts considered and the decision made "for the Government's convenience." Biswas Decl., Ex. 2 (ECF 24-3). Rather, the Government identifies, for the first time in its opposition, a handful of rationales for the decision to terminate funding for direct legal services, including "sustainability" and "fiscal constraints." The Government contends that "ORR's rationale, focusing on legal orientation and screenings to ensure all UAC receive basic legal information, while trusting that pro bono resources (supplemented by post-release services and child advocates in special cases) will provide representation in meritorious cases, is a rational strategy to fulfill its statutory obligations in a sustainable way." Opp. at 17; *see also* Opp. at 17-18 (alternatively detailing the rationale, without supporting citation, as "aligning with the TVPRA's pro bono preference, addressing fiscal constraints, and rebalancing priorities to ensure core legal orientation and screening services reach all" unaccompanied children). None of these rationales are evidenced in the record. Neither of the agency documents in evidence refers to "legal orientation and screenings" as a policy course to replace direct legal representation. Moreover, those legal services are separately required by the Foundational Rule. *See* 45 C.F.R. § 410.1309(a)(2) (enumerating a panoply of services an "unaccompanied child in ORR's legal custody child shall receive"). The Government's interpretation essentially reads the direct legal representation contemplated in (a)(4) out of the Foundational Rule. Further, neither of the agency documents in evidence refers to pro bono resources as

a replacement for the direct legal representation available by use of congressionally earmarked funds.[9] "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20, 140 S.Ct. 1891 (internal quotation marks and citation omitted). The Government's attempt to make up for its failure to provide meaningful explanation for the funding termination amounts to post hoc rationalization via attorney argument. This is insufficient to overcome the Government's failure to proffer any competent evidence of reasoned decision making. Though the Government characterizes this litigation as "a disagreement over policy," Opp. at 19, the agencies have failed to identify any reasoned policy with which Plaintiffs could disagree – there are no materials showing even the "minimal level of analysis" required under the APA. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212, 136 S.Ct. 2117, 195 L.Ed.2d 382 (2016). On this record, the Court finds that Plaintiffs show a likelihood of success on their third APA claim for arbitrary and capricious agency action.

[8] The Government has so far refused to produce any administrative record to justify the funding termination decision until it files its answer. Amica Supp. Decl. (ECF 37-15) ¶ 13. Moreover, though the Government argues that "the administrative record here reflects a reasoned decision," Opp. at 17, when pressed at the preliminary injunction hearing about the administrative record in this case, the Government conceded that its briefs should refer instead to "record evidence" in the absence of an administrative record. Hr'g Tr. (ECF 83) at 22-23.

[9] Because the exclusive use of pro bono attorneys to replace government-funded direct representation does not find any support in the record, the Court does not reach the parties' further dispute regarding the viability of relying exclusively on pro bono counsel to represent unaccompanied children. *See* Opp. at 19; Reply at 12; *see also* Amicus Br. Former HHS Officials (ECF 78) at 7-9 (describing impracticability of replacing funded direct representation with pro bono counsel).

## 2. Irreparable Harm

**\*12**  Beyond establishing a likelihood of success of the merits, plaintiffs seeking a preliminary injunction must show that they are likely to suffer irreparable harm without preliminary relief. *Winter*, 555 U.S. at 20, 129 S.Ct. 365. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted). A "showing of a mere possibility of irreparable harm is not sufficient under *Winter*." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010).

Here, Plaintiffs have shown that they are likely to suffer, if not already suffering, irreparable harm in the absence of preliminary relief. The Government's termination of funding has impacted Plaintiffs, forcing them to issue layoff notices and threatening to require them to dismiss their specialized and seasoned attorneys. *See* GHIRP Decl. (ECF 53-2) ¶ 3 (describing the layoff of eight staff members due to the Cancellation Order's termination of funding). As the Court noted in its standing analysis, the Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children with the direct representation required by the TVPRA and the Foundational Rule, frustrating Plaintiffs' missions of ensuring unaccompanied children are supported by legal counsel. *See, e.g.*, Estrella del Paso Supp. Decl. (ECF 53-4) ¶¶ 3-4; ImmDef Supp. Decl. (ECF 53-5) ¶ 8. Given these harms, the Plaintiff organizations "have established a likelihood of irreparable harm" based on their showing of serious "ongoing harms to their organizational missions," including diversion of resources and the non-speculative loss of substantial funding. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). The Government's repetition of its arguments against standing fail to persuade. The irreparable harm resulting from the Government's Cancellation Order weighs in favor of a preliminary injunction.

### 3. Balance of Equities and Public Interest

In deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 24, 129 S.Ct. 365). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305, 112 S.Ct. 1, 115 L.Ed.2d 1087

(1991) (internal quotation marks and citation omitted). Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co.*, 747 F.3d at 1092 (citing *Nken*, 556 U.S. at 435, 129 S.Ct. 1749).

When the Court issued the TRO, it concluded that these third and fourth *Winter* factors supported enjoining the Cancellation Order. *See* ECF 33 at 5-6. The Court's reasoning remains intact. The record reveals substantial, immediate, and ongoing harms to the Plaintiff organizations. But further, as amici make clear, the risk of substantial harm to unaccompanied children as a result of not receiving counsel further weighs in favor of injunctive relief. One group of amici, including civil rights legal organizations that represent detained immigrant children, details the important role that direct legal service providers play in recognizing and combatting the potential mistreatment of unaccompanied children in ORR custody. *See* Amicus Br. of National Center for Youth Law et al. (ECF 79). Another group of amici, former HHS officials, warns that unaccompanied children lacking counsel face greater risk of exploitation and human trafficking. Amicus Br. of Former HHS Officials (ECF 78) at 5. Such harms weigh in favor of injunctive relief. The Government avers that it would suffer harm where executive branch authority is hindered, Opp. at 21-22, but the Government cites no authority that this is a factor properly considered. *Id.* at 22. Indeed, the Government's argument fails to address the equities of granting an injunction and instead merely reasserts its position that the Cancellation Order violates neither the TVPRA nor the Foundational Rule. The public interest is not served by maintaining agency actions that conflict with federal law and federal agencies' own regulations. *Valle del Sol*, 732 F.3d at 1029 (no legitimate government interest in violating federal law). Because the Court has concluded that the Cancellation Order likely violates the APA, the balance of equities and the public interest both tip decisively in Plaintiffs' favor.

### 4. Bond

**\*13**  The Government requests that the Court require Plaintiffs to post a bond as security for damages that may result from a wrongfully-granted injunction. Opp. at 24. In granting relief under Rule 65, "[t]he court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d

1319, 1325 (9th Cir. 1985). As result of the Cancellation Order, the Plaintiff organizations are unable to pay their staff and are laying some of them off. *See e.g.*, MIRC Decl. (ECF 37-10) ¶ 4. Based on this record, the Court finds that requiring a bond would stifle Plaintiffs' enforcement of their rights under the APA. Because this litigation is brought by nonprofit organizations to protect the public interest and ensure compliance with federal law, the Court declines the Government's request.

### 5. Scope of Relief

The Government argues that any injunctive relief granted by the Court must be narrowly tailored to address only the harm suffered by these Plaintiffs and may not extend nationwide. *See* Opp. at 25. Under the APA, however, courts are required to "hold unlawful and set aside" agency action found to be invalid such that the challenged agency action no longer applies to anyone, not just the plaintiffs at bar. 5 U.S.C. § 706(2). Indeed, appropriate relief for successful plaintiffs in APA cases may necessarily reach nationwide. *See, e.g., Regents*, 591 U.S. at 9, 140 S.Ct. 1891 (holding that the rescission of a major federal program "must be vacated"); *see also Lujan*, 497 U.S. at 913, 110 S.Ct. 3177 (Blackmun, J., dissenting) ("[I]f the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual.").

The Ninth Circuit has consistently recognized "the authority of district courts to enjoin unlawful immigration policies on a universal basis." *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (citation omitted) ("A final principle is also relevant: the need for uniformity in immigration policy."); *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."); *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) ("[A] fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy.") (citing *Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015)). "Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, 908 F.3d at 512.

In this case, there is no practical way to limit injunctive relief relating to immigration law and policy by party or by geography. Indeed, as discussed with the Government's declarants at the preliminary injunction hearing, there exists only one contract for the provision of the subject funding, and it applies to direct legal services nationwide. *See* Hr'g Tr. at 8-9. Moreover, the Government fails to identify any way to limit injunctive relief only to these Plaintiffs. Nor would such fractured relief prove effective at addressing the scope of the Government's likely violation of the APA. The Government's Cancellation Order had nationwide effect; the relief necessary to remedy the termination is for the Court to set aside that termination and require the Government to comply with its statutory and regulatory obligations. Therefore, the relief granted by the Court must reach nationwide.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for preliminary injunction. The Court **ORDERS** as follows:

> **\*14** Defendants are **ENJOINED** from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children. This injunction precludes cutting off access to congressionally appropriated funding for its duration.

This injunction takes effect **immediately**, replacing the Court's April 1, 2025 temporary restraining order (ECF 33), and will remain in place until a final judgment on Plaintiffs' claims. Defendants shall file a status report by no later than 2:00 p.m. PST, Friday, May 2, 2025, to report on compliance with the injunction. Additional status reports regarding compliance with the injunction shall be filed no later than 2:00 p.m. PST, on May 9 and 23, 2025, and every 45 days thereafter. This Order shall apply to the maximum

extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706. Non-compliance or delayed compliance may result in a contempt finding and sanctions.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2025 WL 1233674

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2025, counsel for Defendants-Appellants electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system and that service will be accomplished via the ACMS system.


/s/ *Elizabeth K. Fitzgerald-Sambou*
ELIZABETH K. FITZGERALD-SAMBOU

Dated: May 28, 2025                    Attorney for Defendants-Appellants