No. 25-2808

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,

Plaintiffs-Appellees,

*v.*

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

Defendants-Appellants.

_____

**DEFENDANTS-APPELLANTS' OPENING BRIEF**
_____

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney
General

WILLIAM C. SILVIS
Assistant Director

ELIZABETH K. FITZGERALD-
SAMBOU
MICHAEL CELONE
CHRISTINA PARASCANDOLA
JONATHAN K. ROSS
Senior Litigation Counsel

ZACHARY CARDIN
Trial Attorney

KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals
Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 514-0120
katelyn.masetta.alvarez@usdoj.gov

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

I.       **INTRODUCTION**.................................................................1

II.     **STATEMENT OF JURISDICTION** ....................................6

III.    **STATEMENT OF THE ISSUES** ..........................................7

IV.    **STATEMENT OF THE CASE** ............................................8

V.     **SUMMARY OF THE ARGUMENTS**.................................15

VI.    **STANDARD OF REVIEW** .................................................18

VII.   **ARGUMENT** .....................................................................19

        A.    The Tucker Act bars jurisdiction over the
              Organizations' claims because they sound in
              contract.........................................................................20

        B.    The District Court erred concluding that the
              Organizations were likely to succeed in
              overcoming 5 U.S.C. § 701(a)(2)'s jurisdictional
              bar on review of agency action committed to
              agency discretion by law...............................................37

        C.    The District Court's conclusion that the
              Organizations demonstrated irreparable harm
              was erroneous. ............................................................47

        D.    The District Court failed to weigh the
              Government's equities. .................................................52

V.      **CONCLUSION** .................................................................154

# TABLE OF AUTHORITIES

Cases

*Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2004) .......................................................24, 31
*Allen v. Milas*,
   896 F.3d 1094 (9th Cir. 2018) .........................................................2, 30
*Alphapointe v. Dep't of Veterans Affairs*,
   475 F. Supp. 3d 1 (D.D.C. 2020) ........................................................22
*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) ............................................................50
*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ............................................................48
*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) .............................................................50
*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ..........................................................................33
*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) .............................................................51
*Church v. Biden*,
   573 F. Supp. 3d 118 (D.D.C. 2021) ....................................................54
*Clapper v. Amnesty Int'l, USA*,
   568 U.S. 398 (2013) ..........................................................................50
*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   38 F.4th 1099 (D.C. Cir. 2022) .................................................23, 25, 31
*Dep't of Army v. Blue Fox, Inc.*,
   525 U.S. 255 (1999) .................................................................20, 31, 37
*Dep't of Educ. v. California*,
   145 S. Ct. 966 (2025) ................................................................ passim
*Dep't of State v. AIDS Vaccine Advocacy Coalition*,
   145 S. Ct. 753 (2025) ...................................................................52, 54
*E. Palo Alto v. HHS*,
   137 F.4th 932 (9th Cir. 2025).................................................15, 47, 48
*E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
   135 F.4th 852 (9th Cir. 2025)...................................................... passim
*El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742
   (9th Cir. 1991)..................................................................................26

*Erickson Air Crane Co. of Wash., Inc. v. United States,*
   731 F.2d 810 (Fed. Cir. 1984) ............................................................... 29

*FDIC v. Meyer,*
   510 U.S. 471 (1994) ............................................................................ 20

*Granny Good Foods Inc. v. Brotherhood of Teamsters and Auto Truck*
   *Drivers Local No. 70 of Alameda County,*
   415 U.S. 423 (1974) ............................................................................ 53

*Great-West Life & Annuity Ins. Co. v. Knudson,*
   534 U.S. 204 (2002) ...................................................................... 27, 34

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ............................................................................ 46

*Heckler v. Turner,*
   468 U.S. 1305 (1984) .......................................................................... 52

*Immigrant Legal Res. Ctr. v. City of McFarland,*
   827 F. App'x 749 (9th Cir. 2020) ...................................................... 54

*Ingersoll-Rand Co. v. United States,*
   780 F.2d 74 (D.C. Cir. 1985) ...................................................... passim

*Kidwell v. Dep't of Army,*
   56 F.3d 279 (D.C. Cir. 1995) ....................................................... 34, 35

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ...................................................... 3, 43, 44, 46

*Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 1980) .......................................................... 50

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) .................................................... passim

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
   886 F.3d 803 (9th Cir. 2018) ............................................................ 54

*Olson v. U.S. Dep't of Energy,*
   980 F.3d 1334 (9th Cir. 2020) .................................................... 28, 29

*Spectrum Leasing Corp. v. United States,*
   764 F.2d 891 (D.C. Cir. 1985) .......................................................... 25

*Tucson Airport Auth. v. Gen. Dynamics Corp.,*
   136 F.3d 641 (9th Cir. 1998) ............................................................ 21

*United Aeronautical Corp. v. U.S. Air Force,*
   80 F.4th 1017 (9th Cir. 2023) ..................................................... 21, 23

*United States v. Washington,*
   853 F.3d 946 (9th Cir. 2017) ............................................................ 19

*Webster v. Doe,*
   486 U.S. 592 (1988) .................................................................. 38
*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................... 19
*Wright v. Foreign Serv. Grievance Bd.,*
   503 F. Supp. 2d 163 (D.D.C. 2007) ...................................... 37
*Yee v. Jewell,*
   228 F. Supp. 3d 48 (D.D.C. 2017) ........................................ 34

## Statutes

5 U.S.C. § 701(a) ........................................................................ 3
5 U.S.C. § 701(a)(2) .......................................... ii, 37, 38, 47
5 U.S.C. § 702 ....................................................... 7, 33, 34
6 U.S.C. § 279 ......................................................................... 10
8 U.S.C. 1362 ............................................................. passim
8 U.S.C. § 1232 ............................................... 9, 10, 11
8 U.S.C. § 1232(c)(5) ............................................... passim
28 U.S.C. § 455 ................................................... 13, 14
28 U.S.C. § 1292(a)(1) .......................................................... 6
28 U.S.C. § 1331 ...................................................................... 6
28 U.S.C. § 1491 .................................................................... 36
28 U.S.C. § 1491(a)(1) ................................................... 4, 21
Pub. L. No. 118-47 ...................................... 10, 43, 45
Pub. L. No. 119-4 .......................................... 10, 43

## Rules

Fed. R. App. P. 29(a)(5) ......................................................... C
Fed. R. App. P. 32(a)(5) ......................................................... C
Fed. R. App. P. 32(f) .............................................................. C
Fed. R. Civ. P. 65(b) ............................................................. 12
Federal Rule of Civil Procedure 65(c) ................................... 5

## Regulations

45 C.F.R. § 410.1309(a) ................................... 12, 41, 42
45 C.F.R. § 410.1309(a)(4) ............................... 9, 41, 42, 44
FAR § 52.212-4(l) ................................................................. 12

# I. INTRODUCTION

The Plaintiff organizations in this case (the Organizations) are subcontractors who provide legal services to unaccompanied-alien children (UAC) in immigration proceedings. No statute or regulation entitles the Organizations to government payment for that work. Instead, the Organizations are paid under a prime contract with the Acacia Center for Justice (the Acacia Contract)—which the Government has decided to partially terminate. That termination was perfectly lawful and certainly cannot be challenged in federal district court under the guise of an Administrative Procedure Act (APA) claim. Yet the District Court issued a preliminary injunction that forbids the Government from withdrawing funding for the Organizations' legal services—effectively compelling the Government to pay out millions of taxpayer dollars and conferring on the Organizations an extraordinary, indefinite right to federal subsidies for their legal work as a matter of pure judicial fiat.

The District Court lacked jurisdiction to enter that order for two independent reasons. For one, Congress vested the Court of Federal Claims, not federal district courts, with jurisdiction to adjudicate disputes that stem from contracts with the federal government. And in

any event, it is the Executive Branch, not the courts, that is exclusively empowered to make allocation decisions regarding funds for discretionary statutory programs. This Court should respect the bounds that Congress created and reverse the District Court's ruling.

*First*, the District Court erred by holding that the Organizations' claims—which arise out of a *contract* with the federal government—could proceed in federal district court. Just last month, the Supreme Court granted a stay in analogous circumstances, recognizing that the Tucker Act requires breach-of-contract claims against the government to be filed in the Court of Federal Claims. *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025). Other courts around the country have followed suit. But the District Court dismissed that ruling, reasoning that plaintiffs, as *subcontractors*, have no right to bring their own contractual claims in the Court of Federal Claims. That has things backwards. Subcontractors have *fewer* rights against the Government—not more. And difficulty in bringing a Tucker Act suit does not confer APA jurisdiction. *Allen v. Milas*, 896 F.3d 1094, 1099 (9th Cir. 2018). Ultimately, this case simply "cannot be distinguished" from *Department of Education*, and that inconsistency alone warrants reversal. *Cmty. Legal Servs. in E. Palo Alto*

2

*v. U.S. Dep't of Health & Hum. Servs.*, 135 F.4th 852, 855 (9th Cir. 2025) (Bumatay, J., & VanDyke, J., dissenting).

*Second*, but equally important, even if the Organizations could find a way around the Tucker Act's jurisdictional obstacle, their claims are absolutely without merit, because the APA precludes review of the Government's discretionary determinations as to the best allocation of lump-sum appropriations—and certainly does not require the federal Government to pay for the Organizations' services. Here, Congress appropriated funds for a wide variety of purposes, but did not mandate that the Government pay for legal services for UAC. To the contrary, Congress specifically said that it preferred those services to be provided *pro bono*. And the governing regulation expressly provides that direct legal services may be funded at the "discretion" of the agency—not as a matter of right. Under these circumstances, the APA precludes judicial review, because the matter is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993); 5 U.S.C. § 701(a)(2. The District Court concluded otherwise only by grossly mischaracterizing the statutory and regulatory scheme.

3

Further compounding the District Court's jurisdictional errors, the District Court applied conflicting reasoning when analyzing the Organizations' injuries and request for relief. The District Court acknowledged that the Organizations sought to set aside the Cancellation Order, requesting relief that would force the Government to perform the Acacia contract and pay the Organizations for providing legal services for UAC. But such explicit *contractual* relief would subject the Organizations' claims to the Tucker Act, 28 U.S.C. § 1491(a)(1), and strip the District Court of jurisdiction to hear their APA claims. To get around this hurdle, the Organizations characterized their request for relief as a request for injunctive and declaratory relief setting aside the Cancellation Order because the Government's decision to terminate funding was, by their telling, contrary to law. The District Court accepted the Organizations' creative pleading, but in doing so contradicted itself. It found that APA jurisdiction was proper because the Organizations' alleged injuries were *not* monetary and therefore could be redressed by injunction—but then found irreparable harm based on the very monetary harms that it disclaimed for jurisdiction. That is not equity; that is a double standard.

4

Even setting aside the order's jurisdictional defects, the District Court further abused its discretion in issuing the PI. It improperly found that the Organizations' monetary losses amounted to irreparable harm, but failed to acknowledge that the Government—and the public—are likely to suffer irreparable harm. And it all but assured that the Government will be unable to recoup its losses if it prevails on the merits by failing to require a bond under Federal Rule of Civil Procedure 65(c).

In short, nothing in the law requires the Government to pay for counsel for UAC at all—let alone to fund the specific Organizations here. Yet the District Court has forced reinstatement of a nearly $150 million contract for those services, requiring disbursement of funds that the Government has no hope of recovering after this litigation. This Court should reverse the District Court's preliminary-injunction order, which "raises serious questions about judicial overreach, separation of powers, and the misuse of injunctive relief." *Cmty. Legal Servs. in E. Palo Alto*, 135 F.4th at 852 (Bumatay, J., & VanDyke, J., dissenting).

## II. STATEMENT OF JURISDICTION

A. The District Court had federal-question jurisdiction under 28 U.S.C. § 1331.

B. The District Court granted the Organizations' motion for a preliminary injunction on April 29, 2025. The Government filed a timely notice of appeal on April 30, 2025. This Court therefore has jurisdiction under 28 U.S.C. § 1292(a)(1).

## III.   STATEMENT OF THE ISSUES

A. To determine whether the Court of Federal Claims has exclusive jurisdiction over a plaintiff's claim under the Tucker Act, district courts must determine whether the plaintiff's source of rights and relief sought are in essence contractual. The Organizations seek to vacate an order partially cancelling a contract with the federal government. Did the District Court err in determining that it has jurisdiction over the Organizations' claims?

B. Under the APA, a district court lacks jurisdiction to review an agency action that is "committed to agency discretion by law," 5 U.S.C. § 702. Congress assigned the Department of Health and Human Services (HHS) discretionary responsibility for UAC's legal representation in removal proceedings and delegated funds through a lump-sum appropriation for multiple programs. Agency regulation further confirms that discretion as to the best allocation of limited appropriated funds. Did the District Court err in determining that HHS's decision regarding how to spend this appropriation was subject to judicial review under the APA?

7

C. The Government is irreparably harmed when it is unable to recover taxpayer money after it is paid pursuant to an injunction. *Department of Education*, 145 S. Ct. at 969. In balancing the equities, the District Court found the Organizations' monetary harms were irreparable but did not consider that the taxpayer funds to be distributed under the preliminary injunction could not be recouped. It also failed to require security. Did the District Court abuse its discretion in failing to consider irreparable harm to the Government and public interest in issuing its injunction?

## IV. STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

In the Trafficking Victims Protection Reauthorization Act (TVPRA), Congress provided that HHS is responsible for custody and several types of services and activities for UAC in certain immigration proceedings. The Office of Refugee Resettlement (ORR), a component of HHS, executes that responsibility. Legal services are among those provisions covered by the TVPRA. Specifically, the statute provides that:

> [HHS] shall ensure, *to the greatest extent practicable and consistent with section 292* of the Immigration and Nationality Act (8 U.S.C. 1362), that [UAC] ... have counsel to represent them in legal proceedings or matters and protect

8

them from mistreatment, exploitation, and trafficking. *To the greatest extent practicable*, [HHS] *shall make every effort to utilize the services of pro bono counsel* who agree to provide representation to such children *without charge*.

8 U.S.C. § 1232(c)(5) (emphases added). The cross-referenced provision permits the right to counsel in immigration proceedings "at no expense to the Government." 8 U.S.C. § 1362.

The regulation implementing 8 U.S.C. § 1232—known as the Foundational Rule—provides that:

To the extent ORR determines that appropriations are available, and *insofar as it is not practicable for ORR to secure pro bono counsel*, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, *subject to ORR's discretion* and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphases added); *see also id.* § 410.1309(a)(2)(ii) (requiring ORR to provide "reasonable assistance to ensure that the child is able to successfully engage an attorney *at no cost to the Government*" (emphasis added)).

Since 2012, Congress has funded HHS (and its component ORR) through lump-sum appropriations. Congress appropriated HHS's current funding using a lump-sum appropriation that incorporated the 2024 appropriations statute by reference. *See* Full-Year Continuing

9

Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A, Tit. I, Sec. 1101(8) (2025) (extending Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, Tit. I, 138 Stat. 460, 664-65 (2024)). The 2024 statute provided a lump-sum appropriation for numerous programs, explaining that the funds were to be used "[f]or necessary expenses for refugee and entrant assistant activities authorized by" statute and to "carry out" the agency's statutory obligations. 138 Stat. 664. Those activities and obligations comprise numerous statutory programs, including (1) providing care, custody placement, reunification with parents, and statistical tracking for UAC, 6 U.S.C. § 279; (2) protecting UAC from trafficking, safely repatriating UAC, placing UAC in removal proceedings, and providing legal orientation presentations, "child advocates," and permanent protection to certain UAC, 8 U.S.C. § 1232; and (3) conducting "research and evaluation" of TVPRA activities. 138 Stat. 664. ORR has in the past engaged in many of those activities by contracting with outside organizations to perform the relevant obligations.

*B. The Government's Contract with Acacia.*

In 2022, ORR, through the Department of Interior (DOI)—which handles contract-administration services for ORR—contracted with Acacia to provide services to UAC. 3-ER-299. Those services include various UAC programs, one of which is a program funding lawyers to provide direct legal representation for UAC in the care of or released from the care of ORR in those UAC's immigration proceedings. 3-ER-295; 3-ER-355. Acacia provides those services by hiring subcontractor organizations, including Plaintiffs, to provide direct legal representation to UAC. 3-ER-292. ORR paid Acacia using funds from HHS's lump-sum appropriation. *Id.*

On March 20, 2025, ORR directed DOI to partially terminate the Acacia contract. 3-ER-293. While ORR terminated the provisions of the contract that provided funding for direct legal representation of UAC, it maintained the provisions funding other legal services for UAC, such as Know-Your-Rights presentations and individual legal screenings. 3-ER-295.

On March 21, 2025, DOI, as the contracting officer for ORR, sent Acacia a "Notice of Partial Termination for the Government's

11

Convenience." 3-ER-293. The notice explained that ORR was terminating these provisions pursuant to Federal Acquisition Regulation § 52.212-4, which "reserves" the Government's "right" to terminate any contract for "its sole convenience." FAR § 52.212-4(l). 3-ER-299.

*C. Litigation Below*

On March 26, 2025, several organizations that subcontract with Acacia to provide immigration-legal services to UAC filed this lawsuit against HHS, ORR, and DOI, claiming that the Cancellation Order violated the TVPRA, 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a). 3-ER-369–373. The Organizations sought relief under the APA. *Id.*

On March 27, 2025, the Organizations moved for a temporary restraining order ("TRO") under Fed. R. Civ. P. 65(b). On April 1, 2025, the District Court granted the TRO, and enjoined Defendants from withdrawing the services or funds provided by ORR as of March 20, 2025, particularly ORR's provision of funds for direct-legal-representation services to UAC. The TRO was to be effective on April 2, 2025 and last fourteen days. 3-ER-254.

12

Three days after the District Court entered the TRO, the Supreme Court issued *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam). The Supreme Court held that the Government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" and that such cases must proceed, if at all, in the Court of Federal Claims. *Id.* at 968. On the same day, the Organizations filed a motion for a preliminary injunction. 2-ER-145.

On April 9, 2025, the Government moved to recuse the District Court judge under 28 U.S.C. § 455 because, *inter alia*, the district judge had previously been employed as a managing attorney by the lead Organization. Cmty. Legal Srvs., No. 3:25-cv-2847 (N.D. Cal.), Dkt. Nos. 47, 68. On April 10, the District Court extended the TRO until April 30, 2025, on the sole basis that the recusal motion provided good cause for the extension. *Id.*, Dkt. No. 48. The District Court judge ultimately denied this motion and is still presiding over the case. *Id.*, Dkt. No. 69.

On April 11, 2025, the Government appealed from the TRO and thereafter moved for a stay in the court of appeals. *Cmty. Legal Srvs.*, 25-2358 (9th Cir.), DktEntry 5.1. On April 18, 2025, a panel issued a two-sentence decision dismissing the appeal for lack of jurisdiction. *Id.*,

13

DktEntry 16.1. The Government then petitioned for rehearing en banc. *Id.*, DktEntry 17.1. While the Court denied the Government's petition, ten judges dissented from the denial. *Cmty. Legal Servs.*, 135 F.4th at 852. The dissenting judges observed that the case "raises serious questions about judicial overreach, separation of powers, and the misuse of injunctive relief." *Id.* (Bumatay, J., and VanDyke, J., dissenting).

On April 29, 2025, the District Court granted the Organizations' motion for a preliminary injunction, ordering ORR to continue funding direct representation services for UAC while the litigation proceeds. 1-ER-29. The preliminary injunction—like the TRO before it—requires HHS to resume funding notwithstanding its discretionary decision to terminate the Acacia contract and redirect funds within the UAC Program. *Id.*

The District Court's injunction effectively compels the Government to reinstate its previous contract with Acacia and direct taxpayer money to fund advocates representing UAC in immigration proceedings. 2-ER-36–37. The District Court also denied the Government's request for a bond under Rule 65(c), so the Government has no security from Plaintiffs'

potential insolvency. 1-ER-27. Plaintiffs have repeatedly noted that potential insolvency themselves. 3-ER-348, 3-ER-366, 3-ER-369.

The Government appealed from the preliminary injunction on April 30, 2025. The Government also moved this Court for an immediate stay of the preliminary injunction pending appeal, to prevent irreparable harm to the Government and ensure that discretionary appropriations decisions remain in the hands of the Executive Branch. On May 14, 2025, a panel denied the Government's motion. *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932 (9th Cir. 2025). The Government filed a petition for rehearing en banc on May 28, 2025. DktEntry 23.

## V. SUMMARY OF THE ARGUMENTS

A. The District Court lacks jurisdiction over the Organizations' APA claims because they essentially seek to reinstate a government contract. The Tucker Act, not the APA, governs suits seeking payment from the Government based on a contractual agreement. *Department of Education*, 145 S. Ct. 966. The District Court's rejection of that principle failed to acknowledge that the Organizations' source of rights was contractual. Instead, it hung its hat on the Organizations' subcontractor status, and the Tucker Act's limitations on relief for subcontractors

15

through a breach-of-contract claim. But subcontractors enjoy *fewer* rights under Congress's statutory scheme, so they cannot evade the Tucker Act's limitations. Indeed, allowing the Organizations to avoid the Tucker Act because they are subcontractors would create a perverse incentive for parties to a government contract to bring breach-of-contract claims (disguised as APA claims) through subcontractors to avoid the strictures of the Tucker Act.

The District Court's finding that the Organizations do not seek monetary relief blinks both reality and binding precedent—to say nothing of the District Court's own irreparable-harm findings and the Organizations' own plea for relief. Like the plaintiff States in *Department of Education*, 145 S. Ct. 966, the Organizations here seek to reinstate funding that was previously available through a contract—the only remedy capable of remedying their alleged financial injuries and precisely the remedy the District Court ordered. Indeed, the District Court explicitly found that the Organizations seek "vacatur of the purportedly unlawful Cancellation Order" of the Acacia contract, that is, reinstatement of the Acacia contract and enforcement of its terms—classic contractual remedies. Because the Organizations' source of rights

16

and remedies sound in contract, the Tucker Act mandates that the Court of Federal Claims has exclusive jurisdiction over their claims.

B.     The District Court lacked jurisdiction for a second reason: the Government's decision to terminate funding was committed to agency discretion by law and thus is not reviewable under the APA. The relevant statutes and regulation condition HHS's funding for direct legal services based on what is "practicable" in light of its budget—the sort of unascertainable standard incapable of judicial resolution under the APA. 8 U.S.C. § 1232(c)(5). The statute also reiterates that HHS is obligated "to the greatest extent practicable" to "ensure" that UAC are represented by "pro bono" counsel "without charge," consistent with 8 U.S.C. § 1362 (stating that aliens have the "privilege" of being represented in removal proceedings "at no expense to the Government"). *Id.* The proper extent to which UAC should be represented by pro bono counsel or hired counsel under scarce funds that HHS might spend on other services for UAC is not subject to any sort of manageable judicial line-drawing.

Moreover, the appropriations statute authorizing funds is a lump-sum appropriation that provides no direction to HHS as to how it must distribute the appropriation. These explicit conferrals of discretionary

authority to HHS leave no doubt that Congress intended to afford HHS full discretion over how to distribute its lump-sum appropriations and how to administer this program.

C. Even assuming, *arguendo*, that the District Court had jurisdiction—which it did not—the District Court abused its discretion in granting the PI. The District Court dismissed the Government's argument that the Organizations' injuries are purely financial in rejecting the Government's Tucker Act arguments, but then it flipped the script and found irreparable harm based exclusively on the Organizations' loss of taxpayer funding. At the same time, the District Court ignored the irreparable harm that the Government is now facing: the expenditure of millions in unrecoverable funds. Indeed, Plaintiffs have loudly shouted their precarious financial condition, underscoring the Government's potential harms given the District Court's refusal to impose a bond requirement. The District Court's failure to consider the harm to the Government was an abuse of discretion.

## VI. STANDARD OF REVIEW

This Court reviews a district court's issuance of a preliminary injunction under three standards: "factual findings for clear error, legal

18

conclusions de novo, and the scope of the injunction for abuse of discretion." *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017).

## VII. ARGUMENT

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish four conditions: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Id.* at 20. While courts must consider and balance the parties' competing claims of injury, courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citations omitted).

The APA does not waive sovereign immunity over the Organizations' claims for two independent reasons, so the District Court erred in concluding that they were likely to succeed on the merits. But even if the Organizations could demonstrate likelihood of success, the District Court abused its discretion because it failed to properly balance

19

the harms and equities. It relied on the Organizations' alleged monetary injuries to find that they would suffer irreparable harm absent a preliminary injunction but did not consider the Government's inability to recoup the millions of dollars in taxpayer funds once they are paid out— and it failed to offer any security against that prospect by refusing to impose a bond. The District Court thus erred in granting the extraordinary remedy of enjoining the Government from withdrawing services or funds for direct legal representation.

### A. The Tucker Act bars jurisdiction over the Organizations' claims because they sound in contract.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). The Supreme Court has "frequently held" that a waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). Plaintiffs have the burden of proving they meet this "high standard." *Id.* Just as in *Department of Education*, the Organizations have failed to meet that high standard here.

The Organizations rely on the APA's waiver of sovereign immunity as the basis for their suit. But the APA waives sovereign immunity over

the Organizations' claims "only if three conditions are met: (1) [their] claims are not for money damages, (2) an adequate remedy for its claims is not available elsewhere and (3) [their] claims do not seek relief expressly or impliedly forbidden by another statute." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998). The last condition is the important one here. If another statute vests jurisdiction "in a specialized court (*e.g.*, the Court of Federal Claims), it 'impliedly forbids' an APA action brought in federal district court." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023) (quoting 5 U.S.C. § 702). The Tucker Act does just that here. *See Dep't of Educ.*, 145 S. Ct. at 968.

The Tucker Act provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). This Court accordingly "interpret[s] the Tucker Act to 'impliedly forbid'" APA claims that sound in contract. *United Aeronautical Corp.*, 80 F.4th at 1026 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). And that is true regardless of how a claim is styled—even a "'disguised' breach-of-

21

contract claim" may proceed only in the Court of Federal Claims. *Id.* Thus, a district court lacks jurisdiction over that claim, however labeled, if it is in "its essence" contractual. *Megapulse*, 672 F.2d at 967; *see also Dep't of Educ.*, 145 S. Ct. at 968 (explaining that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States,'" and the APA does not waive sovereign immunity as to such claims).

That jurisdictional barrier matters. It ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law." *Alphapointe v. Dep't of Veterans Affairs*, 475 F. Supp. 3d 1, 11 (D.D.C. 2020); *see also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes.").

To ascertain whether an APA claim asserts a "disguised" contractual claim subject to the Tucker Act, courts look not to whether the plaintiff invokes the word "contract," but rather whether the plaintiff's "source of the rights" and the relief sought are contractual in nature. *Megapulse,* 672 F.2d at 967–68; *see also Ingersoll-Rand*, 780 F.2d

22

at 77–78 ("That [the] complaint nowhere mentions breach of contract, therefore, cannot alone suffice to establish jurisdiction in the District Court."). "[I]f rights and remedies are *contractually* based then only the Court of Federal Claims [has jurisdiction], even if the plaintiff formally seeks injunctive relief." *United Aeronautical Corp.*, 80 F.4th at 1026 (emphasis in original). That is why the Supreme Court held in *Department of Education* that the Tucker Act precluded APA jurisdiction over plaintiffs' claims seeking an injunction that would ultimately require payment of grant obligations. 145 S. Ct. at 968. The same result should obtain here.

*1. The Organizations' sole source of rights is the Acacia contract.*

To assess the first *Megapulse* condition, the "source of rights" of a plaintiff's claim, courts consider: (1) whether the plaintiff's asserted rights and the Government's purported authority arise from statute or contract; (2) whether the plaintiff's rights "exist[ ] prior to and apart from rights created under the contract"; and (3) whether the plaintiff "seek[s] to enforce any duty imposed upon" the Government "by the ... relevant contracts to which" the Government "is a party." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022)

23

(quotations and citations omitted). All three of these considerations confirm that the Organizations' source of rights is the Acacia contract. This case thus falls squarely within the exclusive jurisdiction of the Court of Federal Claims.

As to the first consideration, the Organizations' only rights to funding arise under the contract they have with Acacia; neither the TVPRA nor ORR's Foundational Rule provide the Organizations any entitlement to the appropriated funds. Likewise, because ORR's authority to terminate the parts of the Acacia contract permitting funding for UAC direct legal services was its termination-for-convenience clause, the propriety of the Government's decision to terminate the Acacia contract "turns *entirely* on the terms of" that contract. *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004). The Court of Federal Claims has authority to consider cases under the Tucker Act where the Government has invoked the termination-for-convenience clause—as it did here. *Ingersoll-Rand*, 780 F.2d at 78. That the contract termination also implicates "certain other regulations does not transform the action into one based solely on those regulations." *Id.*

24

Second, the Organizations' rights do not "exist[ ] prior to and apart from rights created under the contract." *Crowley*, 38 F.4th at 1107. Had HHS, through DOI, never entered into a contract with Acacia to provide direct legal services to UAC, the Organizations would have no injury to complain of. *See*, *e.g.*, *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (finding a lack of jurisdiction in part because the "right to [] payments is created in the first instance by the contract," even though the plaintiffs styled their complaint as an APA challenge). Absent a contract, the Organizations would have never received federal funding and would never have suffered financial losses and ensuing harms from the termination of federal funding. The *only* nexus connecting the Organizations' injuries and the Cancellation Order (the final agency action here) is their status as subcontractors under Acacia's contract with DOI.

And third, as explained further below, the Organizations seek to enforce a duty imposed by the contract—specifically, payment of HHS's obligations under the contract. *See infra* Section VII.A.2. The core of the Organizations' suit seeks specific performance of the Government's

25

contract with Acacia. Only adherence to that contractual duty can relieve their alleged financial injury.

The District Court's contrary holding that the Organizations' source of rights is the APA (1-ER-14) is incorrect. The APA "does not create substantive rights." *El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Rev.*, 959 F.2d 742, 753 (9th Cir. 1991). Rather, the Organizations' source of rights must derive from a statute. *Id.* ("There is no right to sue for a violation of the APA in the absence of a 'relevant statute' whose violation 'forms the legal basis for [the] complaint.'") (citation omitted).

To the extent the District Court found that the Organizations' source of rights is the TVPRA and the Foundational Rule, its analysis is still flawed. First, it relied only on the Organizations' framing of their claims without scrutinizing whether they are in "essence [] contract claim[s]." *Megapulse*, 672 F.2d at 967. (As explained above, they are.) The District Court concluded that because they "assert no breach-of-contract claim for money damages," the Organizations do not seek to enforce a contract. 1-ER-14. But the Organizations' use of "lawyerly inventiveness" to phrase their "claim for legal relief" "in terms of an injunction" under

26

the APA rather than damages for breach of contract, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002), "cannot alone suffice to establish jurisdiction in the District Court," *Ingersoll-Rand*, 780 F.2d at 77. *Megapulse* requires the District Court to look behind the complaint's blanket assertions to determine the true "source of the rights" the Organizations seek to enforce. 672 F.2d at 968. Turning a blind eye was error.

The District Court then explained that the Organizations' source of rights was not contractual because "Plaintiffs' asserted harms arise from the frustration of their mission and diversion of resources to ensure unaccompanied children have legal representation." 1-ER-14. But this finding is incorrect—only the contract entitled Plaintiffs to *taxpayer funding* to perform their mission—and contradicts the District Court's irreparable-harm analysis. Just a few pages later in the same decision, the District Court found that the Organizations would suffer irreparable harm absent an injunction due to financial difficulties allegedly caused by the Cancellation Order. *See* 1-ER-26. (finding that the "Government's *termination of funding* has impacted Plaintiffs, forcing them to issue layoff notices and threatening to require them to dismiss their specialized

27

and seasoned attorneys"); *see also id.* ("[T]he *Cancellation Order* prevents Plaintiffs from providing thousands of unaccompanied children with the direct representation[.]"). Based on these alleged harms, the District Court concluded that the Organizations had shown irreparable harm based on their "diversion of resources and the *non-speculative loss of substantial funding*." *Id.*

The Organizations cannot have it both ways. The Organizations either may seek to be made whole through payment or reinstatement of the Acacia contract—in which case Congress, through the Tucker Act, has channeled their claims to the Court of Federal Claims (*see supra*)— or they may challenge some alleged agency action, not based in contract, to abandon the TVPRA's provisions regarding direct legal representation (and accept the attendant strictures on APA review). They chose the former, not the latter. Yet the District Court's contradictory factual findings selectively characterize the Organizations' asserted harms to have it both ways. That flawed analysis should be reversed. *Olson v. U.S.*

*Dep't of Energy*, 980 F.3d 1334, 1337 (9th Cir. 2020) (application of law to factual findings is reviewed *de novo*).[1]

The District Court's final justification for finding that the Organizations' source of rights did not lie in contract was that the Organizations are not parties to the Acacia contract and thus cannot enforce that contract themselves. 1-ER-14. That subcontractors may be restricted in how they bring their claims in the Court of Federal Claims does not permit them to evade the Tucker Act by instead suing under the APA. *See Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) (explaining the "hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act," and instead may only enforce their rights against the government "with the prime contractor's consent and cooperation"). Rather, it reflects Congress's

---

[1] The District Court's use of a double standard to benefit the Organizations is particularly troublesome considering that the District Court judge was previously the "managing attorney" for the lead Organization, Community Legal Services in East Palo Alto. *Cmty Legal Srvs.*, 3:25-cv-2847 (N.D. Cal.), Dkt. No. 48. The District Court nonetheless found that these factors were insufficient to create an appearance of bias, *id.*, Dkt. No. 69.

29

considered judgment regarding the limited scope of the Tucker Act's waiver of sovereign immunity. The APA, which does not "guarantee [] a federal forum" for grievances against agencies, provides no backdoor around the Tucker Act's limitations. *Allen*, 896 F.3d at 1099. The District Court's assessment that subcontractors have APA claims where prime contractors do not thus run contrary to case law and the plain language of the APA.

Additionally, adopting the District Court's conclusion regarding subcontractors' claims has perverse consequences. The District Court's view would allow any Government subcontractor with a quintessential breach-of-contract claim to plead its way into district court and APA review by requesting an "injunction" for the Government to "cease withholding funds" instead of seeking money damages or specific performance. Thus, permitting the Organizations to bring APA claims just because they are not in direct privity with the Government would create a jurisdictional loophole. Monetary requests grounded in a contract between the Government and a prime contractor—claims that ordinarily belong in the Court of Federal Claims—would instead be reviewable by district courts under the APA if a *subcontractor* who

30

benefits indirectly from the prime contract brings the suit. It also would upend settled expectations and agreed-upon obligations in federal-government contracts, as it would allow subcontractors to indirectly litigate contractual rights in any district court, while identical contract-based claims brought by a prime contractor must be brought in the Court of Federal Claims. This Court should not read the APA's waiver of sovereign immunity to permit such an absurd result. *See Blue Fox*, 525 U.S. at 261 (noting that "a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign").

2.  *The relief the Organizations seek is continued funding through the reinstatement of the Acacia contract.*

Under the second *Megapulse* prong, when the nature of the relief sought "sounds in contract," the claim falls within the Tucker Act. *Albrecht*, 357 F.3d at 68. Thus, when a party seeks a "classic contractual remedy[,]" the Tucker Act precludes their APA claim. *Crowley*, 38 F.4th at 1110 (citations omitted); *Ingersoll-Rand*, 780 F.2d at 79–80.

In *Ingersoll-Rand*, the plaintiff alleged that the Air Force's decision to terminate its contract for convenience was arbitrary and capricious because the agency contravened several federal-acquisition regulations. 780 F.2d at 74–75. The plaintiff sought a declaration that the contract

31

termination was unlawful and an injunction requiring the Air Force to reinstate the contract. *Id.* at 79–80. While the D.C. Circuit acknowledged that the plaintiff's complaint sought "only a declaratory and injunctive order," *id.* at 79, "the essence" of the claim was "a request for specific performance of the original contract" because he sought to reinstate the original contract. *Id.* at 79; *see also id.* at 80 ("[A]n award of the contract would mean that the government must perform."). The same analysis applies here.

The Organizations seek classic contractual relief: reinstatement of the Acacia contract. As the District Court acknowledged, the Organizations seek an injunction and "vacatur of the purportedly unlawful Cancellation Order." 1-ER-14. Nor do the Organizations hide that they seek to reinstate the Acacia contract: Throughout their Complaint, the Organizations challenge the Government's Cancellation Order partially terminating the contract with Acacia as the source of their injuries. *See* 3-ER-341 ("The Cancellation Order flies in the face of the TVPRA and the Foundational Rule."); 3-ER-347 ("Defendants' Cancellation Order severely limits Plaintiffs in performing their respective missions to provide legal representation the law requires be

32

made available to unaccompanied children."); 3-ER-370 ("[T]he Cancellation Order ends government-funded legal representation for unaccompanied children despite the availability of appropriated funding for such representations[.]"). Indeed, the Cancellation Order is the final agency action that the Organizations seek to set aside (1-ER-17). Granting that requested relief would impose a contractual duty on ORR to pay Acacia—a specific contracting partner nowhere mentioned in the TVPRA or the Foundational Rule—for direct legal services. Put simply, the Plaintiffs' requested relief is fundamentally contractual. *Ingersoll-Rand*, 780 F.2d at 79–80.

Further, the District Court's conclusion that "Plaintiffs seek injunctive relief rather than money damages,"[2] 1-ER-14, fails to consider

---

[2] The District Court also misapplied *Bowen* to this case. *See* 1-ER-13 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) to explain that "'[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages"' within the meaning of the APA's and Tucker Act's jurisdictional limitations."). *Bowen* addressed the APA provision precluding "[a]n action ... seeking relief other than money damages," 5 U.S.C. § 702. *See* 487 U.S. at 891–901. Regardless of whether Plaintiffs' requested relief is best characterized as money damages, APA jurisdiction is independently barred here because the Tucker Act forbids Plaintiffs' attempt to compel continued funding *under a contract*.

what the Organizations "in essence" seek. *Ingersoll-Rand*, 780 F.2d at 79; *Dep't of Educ.*, 145 S. Ct. at 968 (holding that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money'" (quoting *Knudson*, 534 U.S. at 212)). Although a plaintiff does not necessarily seek monetary relief "merely because ... success on the merits may obligate the United States to pay[,]" a plaintiff cannot avoid the Tucker Act's jurisdictional consequences by "converting" through creative pleading what is essentially a claim for money into one "requesting injunctive relief or declaratory actions." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995); *cf. Knudson*, 534 U.S. at 211 n.1 ("[A]ny claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction."). In assessing the type of relief a plaintiff seeks, a court must accordingly "look to the complaint's substance, not

---

5 U.S.C. § 702; *see Yee v. Jewell*, 228 F. Supp. 3d 48, 56 (D.D.C. 2017) (recognizing that a demand for "monetary relief" for purposes of Tucker Act jurisdiction is a "concept distinct from 'money damages' in the sense of *Bowen*"). And the Supreme Court made clear in *Department of Education* that *Bowen* does not permit APA jurisdiction in cases like this one involving orders "enjoining the Government from terminating" grants and requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 145 S. Ct at 968.

merely its form." *Kidwell*, 56 F.3d at 284. And a plaintiff's request for injunctive or declaratory relief is truly not contractual only if that requested relief "has 'considerable value' independent of any future potential for monetary relief[.]" *Id.* (quotations and citations omitted).

The substance of the Organizations' complaint makes plain that they seek contractual relief in excess of $10,000—relief that only the Court of Federal Claims may award. They request that the District Court "[e]njoin Defendants nationwide from ceasing to fund counsel to represent unaccompanied children"—something that the Government can only do by entering contracts.

While the Organizations stop short of explicitly asking the District Court to reinstate the Acacia contract, reinstatement and specific performance of that contract (that is, payment by HHS) is the only possible cure for the Organizations' alleged injuries. The harms the Organizations invoke, such as being forced to halt their programs and divert their resources, are the byproduct of not receiving taxpayer funds. Because the only way to redress this alleged injury is by forcing the Government to reinstate the Acacia contract specifically and continue

paying under that contract, the Organizations' artful pleading cannot get around the Tucker Act roadblock.

The District Court further erred in finding that the Tucker Act does not bar APA jurisdiction because the Court of Federal Claims cannot grant the injunctive and declaratory relief the Organizations want. 1-ER-14. First, the Court of Federal Claims has the power to compensate the Organizations for their monetary losses if that is what the Acacia contract, TVPRA, or Foundational Rule actually require. *See* 28 U.S.C. § 1491 (granting the Court of Federal Claims jurisdiction over claims "founded either upon the Constitution, *or any Act of Congress or any regulation* of an executive department, *or* upon any express or implied contract with the United States") (emphases added). Second, whether the Court of Federal Claims can grant the Organizations' requested injunctive and declaratory relief is immaterial. Congress, adopting limited waivers of sovereign immunity, chose to foreclose APA relief on breach-of-contract claims and to direct such claims to the Court of Federal Claims, subject to the remedies available there. This Court's endorsement of the Organizations' jurisdictional strategy would undermine the careful scheme Congress created under the Tucker Act.

36

*Cf. Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 188–81 (D.D.C. 2007) ("To allow a plaintiff to utilize the [APA's] waiver of sovereign immunity ... to obtain a district-court judgment that a government contract is void would create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims.") (cleaned up).

To the extent that this Court finds this issue to be a close call, such doubts must be resolved in favor of the Government. *Blue Fox*, 525 U.S. at 261. Further, the Supreme Court's decision in *Department of Education*, which ten judges in this Circuit recently found to be "indistinguishable" from this case, *Cmty. Legal Servs.*, 135 F.4th at 852 (Bumatay, J., & VanDyke, J., dissenting), resolves any doubt as to the proper outcome here—the Tucker Act precludes APA jurisdiction. *Dep't of Educ.*, 145 S. Ct. at 968. Thus, reversal and remand with instructions to dismiss for lack of jurisdiction is warranted here.

**B. The District Court erred concluding that the Organizations were likely to succeed in overcoming 5 U.S.C. § 701(a)(2)'s jurisdictional bar on review of agency action committed to agency discretion by law.**

Even if the APA did provide the district court jurisdiction here— which it does not—the Organizations' claims would still fail. Both the

statute and the regulation that govern HHS's action as to ORR make clear that the agency is not required to fund Acacia or the Organizations as subcontractors, because it is instead vested with discretion over these funding decisions. *See Cmty. Legal Servs. in E. Palo Alto*, 135 F.4th 852 (Bumatay, J. and VanDyke, J., dissenting) ("The government exercised [its] discretion [under the TVPRA and the Foundational Rule] in March 2025 to terminate funding" to Acacia.). HHS's termination decision is therefore unreviewable under the APA, because the challenged action is committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

Where a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the APA does not authorize judicial review. *Webster v. Doe*, 486 U.S. 592, 600 (1988). That is precisely the case here. Congress deliberately left the provision of government-funded counsel to UAC to the agency's discretion, by using broad, precatory language and by funding the program through a lump-sum appropriation. There is "no law to apply" in this context, only the agency's policy judgments about how best to allocate finite child-welfare resources. Accordingly, the APA bars

38

courts from second-guessing HHS's decision to reduce or reallocate funding for direct representation services.

First, addressing the statutory framework regarding access to counsel, the TVPRA provides,

> **The Secretary of Health and Human Services shall ensure, to the greatest extent practicable and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362)**, that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security, and who are not described in subsection (a)(2)(A), have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking. **To the greatest extent practicable, the Secretary of Health and Human Services shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge.**

8 U.S.C. § 1232(c)(5) (emphases added). By its plain terms, § 1232(c)(5) does not mandate that HHS fund attorneys for unaccompanied minors; in fact, it requires that any provision of counsel be "consistent with ... 8 U.S.C. 1362," which states that aliens have the "privilege" of being represented by counsel in removal proceedings "at no expense to the Government." 8 U.S.C. § 1362. Thus, it entrusts the agency, in its sole discretion, to make practicable efforts to ensure that UAC have legal

representation—and with a clear preference for *pro bono* counsel rather than government-funded representation. *See id.*

Several aspects of this language confirm the discretionary nature of the task. First, the qualifier "to the greatest extent practicable" signals that providing counsel for UAC is an aspirational goal, not an absolute command. Congress left HHS leeway to pursue the goal of legal representation using practicable steps, not through particular mechanisms set forth by Congress. Second, the statute explicitly ties HHS's efforts to what is "consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362)." That cross-referenced provision guarantees that UAC in removal proceedings may be represented by counsel, but only "at no expense to the Government." In other words, existing law affirmatively precludes any interpretation that would obligate the government to provide counsel at government expense in immigration court. By requiring consistency with § 1362, Congress made clear that HHS's duty to "ensure" counsel are available should not be construed as creating a right to government-funded attorneys. Third, the section concludes with Congress's express directive that HHS must

exercise its discretion to prefer *pro bono* representation over government-funded representation.

Nothing in the statute compels HHS to expend a particular sum, to guarantee an attorney for each child, or to prioritize expenditures for counsel over other important agency responsibilities. The provision is instead framed as a general policy to "protect [children] from mistreatment, exploitation, and trafficking" through efforts to increase legal representation—not as a concrete rule that a court may enforce in any given instance. 8 U.S.C. § 1232(c)(5). In sum, Congress set an important objective, "maximize legal counsel for these children," but left the means and extent of achieving that objective to HHS's judgment.

The regulations applying the statute confirm that understanding. The Foundational Rule provides,

> **To the extent ORR determines** that appropriations are available, and **insofar as it is not practicable for ORR to secure pro bono counsel**, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, **subject to ORR's discretion and available appropriations**....

45 C.F.R. § 410.1309(a)(4) (emphases added); *see also id.* at (a)(1) ("This paragraph (a) describes ORR's responsibilities in relation to legal services for unaccompanied children, consistent with 8 U.S.C.

41

1232(c)(5).”). That dual condition—express agency discretion plus limited appropriations—places these decisions squarely beyond judicial review.

The Foundational Rule makes clear that funding for direct immigration legal representation services is entirely subject to agency discretion. ORR's funding obligation comes into play only "[t]o the extent *ORR* determines that appropriations are available," demonstrating that at the threshold, ORR must make a discretionary assessment regarding the availability of limited funds within its lump-sum appropriation. 45 C.F.R. § 410.1309(a)(4) (emphasis added). Courts are not well-positioned to review that determination, which is expressly conferred on the agency. And even if ORR determines that funds are available, and that it is not practicable to use *pro bono* counsel, as required by statute, any provision of legal representation is "subject to ORR's discretion." *Id.* It is difficult to imagine language that more clearly vests an agency with discretion over a particular decision. Far from creating a binding entitlement, the regulation conditions these benefits on the agency's discretionary assessment as to the best allocation of resources.

Taken together, the TVPRA and Foundational Rule confer broad discretion on the agency. They articulate goals and authorize spending,

42

but do not require any specific level of funding or service. This is the hallmark of a decision that is committed to agency discretion.

Further, Congress elected to fund HHS's myriad responsibilities under the TVPRA using a lump-sum appropriation. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A, Tit. I, Sec. 1101(8) (2025) (extending Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. D, Tit. I, 138 Stat. 460, 664-65 (2024)); *see also* 8 U.S.C. § 1232(c)(5). As the Supreme Court has explained, "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. When Congress funds a program through a general appropriation, it generally "allow[s] [the agency] flexibility to shift funds" and set priorities within the program. *Id.* at 193. That is exactly the case here. Each year, Congress appropriates a single, flexible sum to ORR, which must cover several inherently competing needs—shelter, care, legal services, and more. Nothing in the appropriation or the authorizing statute earmarks a mandatory amount for direct legal representation. It is left to ORR to determine how much of the pot to

43

devote to legal services contracts, consistent with the "practicable" standard. 8 U.S.C. § 1232(c)(5); 45 C.F.R. § 410.1309(a)(4). Such budgetary judgments are a quintessential example of matters "committed to agency discretion by law." *Lincoln*, 508 U.S. at 192–93. Just as the agency in *Lincoln* had discretion to discontinue a discretionary health service program despite a general mandate to serve Indian health needs, ORR maintains discretion to adjust or terminate funding for representation without running afoul of the statute or the regulation. There simply is "no meaningful standard" in § 1232(c)(5) for a court to apply in reviewing ORR's allocation of funds.

The District Court mistakenly concluded that these provisions cabin HHS's discretion, but its reasoning cannot withstand scrutiny. The District Court asserted that "the TVPRA mandates direct legal representation, and Congress has expressly appropriated funds for [those] services." 1-ER-18. But as explained, the TVPRA does not mandate legal representation paid for by the Government; nor does it mandate legal representation in every case. To the extent it has any

mandatory effect, it orders only an effort—to "ensure to the greatest extent practicable"—not a particular outcome. 8 U.S.C. § 1232(c)(5).

As for the District Court's appropriations analysis, it misconceived the nature of a lump-sum appropriation. The District Court found that Congress made funds available for "services required under the TVPRA, including direct representation." 1-ER-18; *see also* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 664-65 (2024) (providing appropriation "[f]or necessary expenses for … carrying out … section 235 of the [TVPRA]")). That is an *option*, not a *requirement*. The District Court's citation to a Senate Report implying that Congress expected ORR to use some funds for this purpose (1-ER-4, 1-ER-18) makes no difference. Even if a subjective expectation in legislative history could somehow bind an agency—which of course, it cannot—ORR's decision to terminate its contract with Acacia does not indicate that ORR will not spend any funds on legal representation. All that is at issue here is the agency's partial curtailment of funds in light of programmatic developments or policy changes. And no statute or appropriation requires the agency to continue spending at the same level it has elected in the past. Rather, the statute, regulations, and

45

appropriations all reinforce that this program is subject to ORR's discretion—discretion it lawfully exercised in terminating its contract with Acacia. *See Lincoln*, 508 U.S. at 193; *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985).

Congress's ongoing legislative efforts underscore that conclusion. After HHS partially terminated the Acacia contract, Senators introduced a bill designed "to provide counsel for unaccompanied children" in immigration proceedings. S. 1297, 119th Cong. § 301(a)(1) (2025), https://www.congress.gov/bill/119th-congress/senate-bill/1297/text. That Congress is actively debating new legislation to guarantee legal representation for UAC confirms that existing law imposes no such obligation. This Court should reject the Organizations' request to impose an obligation that Congress has so far declined to enact.

Further, the District Court's order not only second-guessed the agency's determination as to the best allocation of funds, but also as to the best recipient of funds allocated for direct legal representation services. *See* 1-ER-14 (finding that the District Court had jurisdiction over the Organizations' APA claims because the Organizations "seek an injunction and vacatur of the purportedly unlawful Cancellation Order.");

46

*see also* 1-ER-17 (noting that the final agency action challenged is the Cancellation Order); *see also* 1-ER-23 (concluding that the "Cancellation Order thus violates the Foundational Rule"). As Judge Callahan reiterated, "the decision to terminate funding—or the decision of *who* to fund—is committed to agency discretion by law under 5 U.S.C. § 701(a)(2)." *Cmty. Legal Servs. in E. Palo Alto*, 137 F.4th at 943 (Callahan, J., dissenting) (emphasis in original). And only the agency should be making determinations about how to spend its lump-sum-fund appropriation. In stepping in to make discretionary spending decisions on behalf of the agency, the District Court far exceeded its permissible role and should be reversed.

### C. The District Court's conclusion that the Organizations demonstrated irreparable harm was erroneous.

At its core, the harm the Organizations allege stems from the cessation of federal funding—an injury that is fundamentally monetary. While the Organizations attempt to frame this as "frustrating [their] primary mission of representing these children" or damaging their ability to provide services, their own submissions underscore the financial nature of the injury. 3-ER-325 ("There is no question that ceasing funding ... will cause imminent harm[.]"); 3-ER-326 ("Plaintiffs have

relied on ... assurances that funding ... will continue[.]"); *id.* ("Sustaining these services without this *funding* will cost the Northwest Immigrant Rights Project *$200,000 a month.*") (emphases added).

It is well-established, however, that monetary injury does not constitute irreparable harm because it can be remedied later through damages. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."). The Organizations cannot escape this fundamental principle simply by describing the consequences of a funding shortfall; their core injury remains economic and potentially remediable in the Court of Federal Claims. *See supra* Section VII.A.1.

Further, even assuming *arguendo* that loss of money is an irreparable injury, not all of the Organizations demonstrated an irreparable injury that would entitle them to injunctive relief; thus, an injunction entitling all the Organizations to continued funding was an abuse of discretion. Indeed, Plaintiffs' own submissions show varied responses: some organizations laid off staff, while The Amica Center for Immigrant Rights "ha[s] not yet issued any furloughs or laid off any staff

48

members[,]" 3-ER-239, and others are actively "seeking alternate funding [] sources[,]" 3-ER-235. The existence of alternative strategies underscores that the Organizations did not all face the same harm warranting a universal injunction.

*Second*, Plaintiffs' claim that the funding cessation forces them to stop providing legal services, leaving UAC unrepresented, is entirely unsupported. 2-ER-176–77. The challenged action concerns *payment* for services, not the *ability* to provide them. Indeed, many organizations that are not funded through the Acacia contract provide *pro bono* services for UAC. *See* ORR, Legal Resource Guide – Legal Service Provider List for UAC in ORR Care, *available at* https://acf.gov/sites/default/files/documents/orr/english_legal_service_pr oviders_guide_with_form_508.pdf. Like many other advocacy organizations nationwide, the Organizations remain free to provide these services *pro bono*. 8 U.S.C. § 1232(c)(5) (requiring HHS to "make every effort" to find "pro bono counsel"). Indeed, the Organizations' submissions indicate that dedicated counsel *are* continuing this work, albeit sometimes with adjusted staffing levels. *See* 3-ER-252 (Vermont Asylum Assistance Project: "[a] reduced team of three is now carrying the work

49

of four"). This reflects a resource allocation challenge, not irreparable harm to their legal ability to provide the services at the core of their missions.

*Third*, Plaintiffs' assertion that losing experienced staff is irreparable because rehiring is "impracticable" (2-ER-176) likewise fails to meet the high bar for irreparable harm. As a preliminary matter, the Organizations' potential loss of staff is a harm downstream from their alleged financial injury. To qualify as irreparable, then, it must be sufficiently severe that it would "threaten[]" the Organizations "with extinction." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985); *see Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). While losing experienced staff could pose some harm to the Organizations, the Organizations simply do not allege that they face the sort of severe harm that qualifies as irreparable.

And in any event, the asserted loss of experienced staff is precisely the type of speculative harm based on the predicted actions of third parties that cannot support an injunction. *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410 (2013); *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C.

50

Cir. 2015) (cautioning against crediting claims of anticipated injury based on predictions of future third-party action). The Organizations may seek and receive outside funding, which would obviate any financial need to lay off staff. *See* 2-ER-193 (noting that the Florence Project "continue[s] to … provide legal representation" to UAC through "drawing on funding from other sources and fundraising."). New staff might join the Organizations and provide legal services of equal quality to departing staff, mitigating any harm from those departures. Likewise, whether specific individuals who did depart the Organizations might decline to return if funding resumed, or whether the Organizations would have difficulties filling vacancies, are too speculative to demonstrate a certain and immediate irreparable injury. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.").

In sum, a few of the Organizations have demonstrated, at most, temporary financial loss and operational challenges stemming from their own management decisions or speculative future events. The Organizations have failed to make the clear showing of likely, immediate,

51

and irreparable harm to each individual organization necessary to justify the extraordinary remedy of a universal preliminary injunction.

### D. The District Court failed to weigh the Government's equities.

The District Court's order imposes substantial and irreparable harm on the Government—harm that the District Court failed to adequately consider in balancing the equities. Above and beyond the obvious harms to the President's ability to execute core Executive Branch policies, the District Court's order to open the funding spigots irreparably harms the public fisc. The preliminary injunction required the Government to reinstate the Acacia contract (with $150 million still outstanding) immediately and "enjoined" the Government from withholding those funds.

The loss of likely unrecoverable funds is a classic injury supporting interim relief for the Government. *See Dep't of Educ.*, 145 S. Ct. at 969; *Heckler v. Turner*, 468 U.S. 1305, 1307–08 (1984) (Rehnquist, J., in chambers) (prospect of the Government being forced to make $2.6 million in improper payments per month supported a stay); *see also Dep't of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753, 757 (2025) (Alito, J., dissenting). Again, this case mirrors *Department of Education*, in which

the Supreme Court entered a stay pending appeal. "No grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond." *Dep't of Educ.*, 145 S. Ct. at 969. The Government is therefore "unlikely to recover the grant funds once they are disbursed." *Id.*

But the District Court failed to consider the harm to the public fisc or that the Government would not be able to recoup these funds even if it ultimately prevails on the merits. Instead, it focused on the harms to the Organizations and speculative harm to UAC—who are not parties to this suit—in determining that the public interest favored a preliminary injunction.[3] 1-ER-26–27. The District Court's disregard of the

---

[3]     The District Court assumed, without citing any evidence, that UAC will not have access to counsel because the Government is no longer funding direct-legal services. However, all UAC are provided a list of *pro bono* counsel and assistance to "ensure that the child is able to successfully engage an attorney at no cost to the Government" by regulation. 45 C.F.R. § 410.1309(a)(2)(ii). The Organizations have not presented any evidence, and thus have not met their burden of proof, that there is a lack of *pro bono* counsel available and willing to assist UAC in their immigration proceedings or that ORR is not assisting UAC to ensure that they are able to secure pro bono counsel. *Granny Good Foods Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 443 (1974) (explaining that the plaintiff, as the moving party, bears the burden of proof to demonstrate that the

Government's inability to recover potentially hundreds of millions of dollars was an abuse of discretion. And it compounded its error by refusing to impose a bond that would allow the Government to recoup those funds. *AIDS Vaccine*, 145 S. Ct. at 757 (Alito, J., dissenting); *Dep't of Educ.*, 145 S. Ct. at 969.

## VIII. CONCLUSION

Because the District Court lacked jurisdiction over the Organizations' APA claims for two independent reasons, this Court should reverse the District Court's decision and remand with instructions to dismiss this case. Alternatively, this Court should reverse the District Court's preliminary-injunction order because it was an abuse of discretion.

---

requirements for a preliminary injunction have been met). And in any event, harm to third parties "does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021); *see also Immigrant Legal Res. Ctr. v. City of McFarland*, 827 F. App'x 749, 751–52 (9th Cir. 2020) ("The standard for preliminary injunctions, however, requires irreparable harm to the plaintiffs themselves.") (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018)).

54

Dated: June 12, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

AUGUST FLENTJE
Special Counsel for Immigration
Litigation

WILLIAM C. SILVIS
Assistant Director

ELIZABETH K. FITZGERALD-
SAMBOU
MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
JONATHAN ROSS
Senior Litigation Counsel

ZACHARY CARDIN
Trial Attorney

s/ *Katelyn Masetta-Alvarez*
KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals
Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 514-0120

Facsimile: (202) 305-7000
Email:
katelyn.masetta.alvarez@usdoj.gov

*Counsel for Defendants-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on June 13, 2025.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

*s/ Katelyn Masetta-Alvarez*
KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel
United States Department of Justice

A

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)** <u>25-2808</u>

The undersigned attorney or self-represented party states the following:

[ X ]  I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** <u>s/ Katelyn Masetta-Alvarez</u>          **Date: June 12, 2025**

B

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>25-2808</u>

I am the attorney or self-represented party.

**This brief contains 9,824 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

C

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>s/ Katelyn Masetta-Alvarez</u>          **Date: June 12, 2025**

D