No. 25-2808
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

*Defendants-Appellants*.
_____

Appeal from the United States District Court
for the Northern District of California, San Francisco Division
Case No. 3:25-cv-02847-AMO
_____

**BRIEF OF *AMICI CURIAE* AMERICAN ACADEMY OF PEDIATRICS,
HEAL REFUGEE HEALTH AND ASYLUM COLLABORATIVE,
MIDWEST HUMAN RIGHTS CONSORTIUM,
AND PHYSICIANS FOR HUMAN RIGHTS
IN OPPOSITION TO THE PETITION FOR REHEARING EN BANC**
_____

Jenna Zhang
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000

Lauren Willard Zehmer
Anne Lee
Sameer Aggarwal
Brittney Moreno
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF *AMICI CURIAE* .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 3

ARGUMENT ............................................................................ 4

I.  Unaccompanied Children in U.S. Government Custody are a
    Particularly Vulnerable Segment of the Population Given Prior
    Exposure to Trauma. ........................................................... 4

    A.  Unaccompanied Children Often Experience Many Types of
        Traumas. .................................................................. 5

    B.  Multiple Traumatic Experiences Can Have a Cumulative Effect
        on the Health and Development of Unaccompanied Children. ........... 9

II. Stripping Funding for Legal Proceedings Would Contribute to Trauma
    and Adverse Health Outcomes for Unaccompanied Children.................. 10

    A.  Children Without Legal Counsel Lack the Mental Capacity to
        Understand and Navigate Immigration Legal Proceedings.............. 11

    B.  Legal Proceedings Can Re-Traumatize and Cause Other
        Adverse Health Effects on Unaccompanied Children..................... 13

    C.  Legal Representation Functions as a Buffer Against
        Psychological and Physical Harm. ..................................... 14

III. Permitting the Withdrawal of Statutorily Mandated Funding Would
     Substantially and Irreparably Injure Unaccompanied Children. ................ 18

CONCLUSION ......................................................................... 20

CERTIFICATE OF COMPLIANCE................................................... 21

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020).............................................................19

*Angelica S. v. U.S. Dep't of Health & Hum. Servs.*,
    2025 WL 1635369 (D.D.C. June 9, 2025)...............................16, 18

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020)...............................................18, 19

*Nken v. Holder*,
    556 U.S. 418 (2009).............................................................4, 18

**Statutes**

6 U.S.C. § 279(g)(2) ........................................................................5

8 U.S.C. § 1232(b)(1) ....................................................................19

**Other Authorities**

Andrew F. Beck et al., *Reductions in Hospitalizations Among
    Children Referred to a Primary Care–Based Medical-Legal
    Partnership*, 41 Health Affs. 341 (2022).........................................17

Jonathan Beier & Karla Fredricks, *A Path to Meeting the Medical and
    Mental Health Needs of Unaccompanied Children in U.S.
    Communities* (2023)......................................................................7

David W. Brown et al., *Adverse Childhood Experiences and the Risk
    of Premature Mortality*, 37 Am. J. Preventative Med. 389 (2009)....................10

David A. Crenshaw et al., *Developmentally and Trauma-Sensitive
    Courtrooms*, 59 J. Humanistic Psych. 779 (2019) .............................................15

Alexia Cooper et al., *Maltreated and Nonmaltreated Children's
    Knowledge of the Juvenile Dependency Court System*
    15 Child Maltreat. 255 (2010)..........................................................13

Kimberly M. Cuthrell, *Trauma-Informed Legal Advocacy: Medicolegal Approaches & Best Practices for Immigration Attorneys*, 20 Int'l Neuropsychiatric Disease J. 62 (2023)..............................16

Mark Greenberg et al., *Strengthening Services for Unaccompanied Children in U.S. Communities*, Migration Pol'y Inst. (2021)..........................15

Omar G. Gudiño et al., *Relative Impact of Violence Exposure and Immigrant Stressors on Latino Youth Psychopathology*, 39 J. Cmty. Psych. 316 (2011) ............................................................................7

Judith L. Herman, *The Mental Health of Crime Victims: Impact of Legal Intervention*, 16 J. Traumatic Stress 159 (2003) ....................................15

Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolesc. Health 216 (2009)...............................12

William A. Kandel, Congressional Research Service, *Unaccompanied Alien Children: An Overview* (2024)................................................................5

Winston Liaw et al., *Medical-Legal Partnership Effects on Mental Health, Health Care Use, and Quality of Life in Primary Care: A Randomized Clinical Trial*, 36 J. Am. Bd. Fam. Med. 414 (2023) ..................17

Julie M. Linton et al., *Detention of Immigrant Children*, 139 Am. Acad. of Pediatrics 1 (2017)...........................................................8, 19

Ryan Matlow et al., *Guidance for Mental Health Professionals Serving Unaccompanied Children Released from Government Custody*, Stan. Ctr. for Hum. Rights & Int'l Justice (2021) .........................9, 10

Terrie E. Moffitt et al., *Childhood Exposure to Violence and Lifelong Health: Clinical Intervention Science and Stress Biology Research Join Forces*, 25 Dev. Psaychopathol 1 (2013)..............................................9, 10

National Child Traumatic Stress Network, *Children, Youth, and Families Who Experience Migration-Related Trauma and Family Separation* (2021) ...........................................................................5, 6

iv

Joanna Norton et al., *Association Between Uncertainty Regarding Right-to-Stay and Mental Health in Unaccompanied and Separated Migrated Children (UASC) Reaching Adulthood: Findings from France*, 58 Soc. Psych. & Psych. Epidemiology 939 (2023) ........................13

Office of Inspector General, U.S. Dep't of Health & Hum. Servs., *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* (2019) ......................8, 16

Office of Refugee Resettlement, U.S. Dep't of Health & Hum. Servs., Fact Sheets and Data (2025) ....................................................5, 6, 8

Robert H. Pantell, *The Child Witness in the Courtroom*, 139 J. Pediatrics 1 (2017).........................................................14, 19

Jodi A. Quas et al., *Maltreated Children's Understanding of and Emotional Reactions to Dependency Court Involvement*, 27 Behav. Sci. L. 97 (2009) .....................................................11, 12

Jodi A. Quas & Gail S. Goodman, *Consequences of Criminal Court Involvement for Child Victims*, 18 Psych. Pub. Pol'y & L. 392 (2012).............................................12

Emily Ryo & Reed Humphrey, *Children in Custody: A Study of Detained Migrant Children in the United States*, 68 UCLA L. Rev. 136 (2021) ...........................................................6

Save the Children, *Migrant Children Fleeing Violence Face New Dangers and Uncertainty at Mexico's Northern Border, New Report Finds* (May 5, 2025)..........................................................7

Anne Elizabeth Sidamon-Eristoff et al., *Trauma Exposure and Mental Health Outcomes Among Central American and Mexican Children Held in Immigration Detention at the United States-Mexico Border*, 64 Developmental Psychobiology 1 (2022)......................................6, 9

Jack P. Shonkoff et al., *The Lifelong Effects of Early Childhood Adversity and Toxic Stress* 129 Pediatrics e232 (2012) ............................16, 17

Suzan J. Song, *Mental Health of Unaccompanied Children: Effects of U.S. Immigration Policies*, 7 BJPsych Open 1 (2021) ................................13, 14

Stan Sonu et al., *Adverse Childhood Experiences and the Onset of Chronic Disease in Young Adulthood*, 123 Preventative Med. 163 (2019) ...................................................................10

U.S. Dep't. of Health & Hum. Servs., *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* (2019) .........................................................8

United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* (2016) ..................................7

Karen Zwi et al., *The Impact of Detention on the Social-Emotional Wellbeing of Children Seeking Asylum: A Comparison with Community-Based Children*, 27 Euro. Child & Adolescent Psych. 411 (2018).............................................14

## INTEREST OF *AMICI CURIAE*

*Amici curiae* the American Academy of Pediatrics ("AAP"), HEAL Refugee Health and Asylum Collaborative ("HEAL"), the Midwest Human Rights Consortium ("MHRC"), and Physicians for Human Rights ("PHR") respectfully submit this brief in opposition to the Government's petition for rehearing en banc from the panel's order of May 14, 2025.[1] *Amici* submit this brief with the consent of all parties to this appeal.[2]

AAP is a national, not-for profit organization dedicated to improving child and adolescent health. AAP is a non-partisan professional membership organization that represents over 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists nationwide.

HEAL is a public health partnership among the Johns Hopkins University, Esperanza Center/Catholic Charities of Baltimore, Asylee Women Enterprise, and Loyola University Maryland. Through innovative partnerships and education, HEAL expands access to responsive health care and supportive services for immigrant survivors of torture and trauma seeking refuge in the United States.

---

[1] The views expressed in this brief are those of amici curiae and do not represent the views of its partner institutions.

[2] Pursuant to Fed. R. App. P. 29(a)(4)(E), the undersigned counsel certifies that counsel for *amici* authored this brief in whole; that no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and that no person or entity, other than *amici* and their counsel, contributed monetarily to the preparation or submission of this brief.

MHRC is a collaborative of legal, medical, and mental health providers that serves as a referral network for forensic asylum evaluations. MHRC medical and mental health professionals conduct psychological and medical assessments of asylum seekers.

PHR is a non-profit organization that advocates for the protection of human rights by mobilizing health professionals to promote and advance the right to health for all. PHR's volunteer health professionals, including Dr. Amy J. Cohen, M.D., who advised on this brief, conduct medical evaluations of asylum seekers to help document physical and psychological trauma.

*Amici*'s collective and extensive experience in providing healthcare and support services to child immigrant survivors of trauma make them uniquely able to assist the Court in deciding this case. *Amici* have seen firsthand the trauma migrant children have endured both before and during their time in U.S. custody. In *Amici*'s experience, legal advocates often represent the most critical, if not only, "buffering" forces helping unaccompanied children navigate these highly stressful events. *Amici*'s experience confirms that severing legal support and existing relationships for this highly vulnerable population would cause irreparable harm.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Unaccompanied children placed in Customs and Border Protection ("CBP") and Office of Refugee Resettlement ("ORR") facilities are highly vulnerable to the life-altering impact of psychological trauma. Having survived journeys that are themselves painful and arduous, unaccompanied children arriving at the United States border are put into legal proceedings that are intimidating and incomprehensible to someone their age. This compounded pre- and post-migration trauma can cause these children to have lifelong negative physical and mental health outcomes. It is therefore critical that unaccompanied children have access to legal representation who can provide "buffering" forces to blunt the impact of the additional trauma that these legal proceedings can impose. For these children, legal counsel often become the only identified adults whose sole purpose is to advocate for the child's best interests, and they stand in as a surrogate parent—providing children with protection, hope, and safety, and offsetting the powerlessness that is central to their suffering.

Congress recognized the critical importance of providing unaccompanied children with legal representation by mandating funding for these services in the Trafficking Victims Protection Reauthorization Act ("TVPRA"). The Government's decision to halt this required funding not only violates the plain text of the statute, but also would inflict substantial and irreparable harm to

unaccompanied children, including by both: (1) failing to provide a trusted adult advocate who can help children navigate their circumstances and mitigate trauma and (2) causing additional trauma by severing existing relationships with attorneys who are often the sole advocate for a child's interests. The district court thus correctly granted the Plaintiffs' preliminary injunction request.

Under these circumstances, the Government cannot satisfy the third or fourth *Nken* factors to stay the district court's preliminary injunction: specifically, whether a stay would "substantially injure the other parties interested in the proceeding" and "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted). A stay would severely impact the health and development of the unaccompanied children who are statutorily entitled to legal representation. The public interest also strongly supports providing children with these long-standing protections while this appeal is litigated on the merits. Because the panel correctly denied the Government's request for a stay, rehearing en banc is unwarranted.

## ARGUMENT

### I. Unaccompanied Children in U.S. Government Custody are a Particularly Vulnerable Segment of the Population Given Prior Exposure to Trauma.

Unaccompanied children reach the United States having often experienced significant trauma in their home country and on their migration journey, which is then compounded by the additional trauma incurred from navigating immigration

custody and proceedings alone. These multiple traumatic experiences can have long-term effects on the physical and mental health of unaccompanied children.

### A. Unaccompanied Children Often Experience Many Types of Traumas.

Migrant children arriving in the United States may be considered "unaccompanied" if they (1) are separated from their parent or guardian in custody, (2) are accompanied by an adult other than their parent or guardian, or (3) arrive alone. *See* 6 U.S.C. § 279(g)(2). These unaccompanied children have typically experienced significant trauma and distress, with many fleeing violence in their countries of origin and experiencing danger and violence during their journeys to the United States. *See* National Child Traumatic Stress Network, *Children, Youth, and Families Who Experience Migration-Related Trauma and Family Separation* 1 (2021) ("NCTSN"), https://perma.cc/U54F-SNEU. Some children arrive with family, but become "unaccompanied" and face additional trauma when they are separated from their caregivers upon entry into the United States. *Id*.

The number of unaccompanied minors arriving at the United States border has grown substantially over the past decade. William A. Kandel, Congressional Research Service, *Unaccompanied Alien Children: An Overview* 1 (2024), https://perma.cc/538R-PFQR. In fiscal year 2024, ORR received over 98,000 unaccompanied minor referrals from the Department of Homeland Security, and in prior years, that figure had peaked at over 128,000 children. Office of Refugee

Resettlement, U.S. Dep't of Health & Hum. Servs., Fact Sheets and Data (2025) ("ORR Fact Sheet"), https://perma.cc/M855-DPNL. While many unaccompanied minors are teenagers, the last two fiscal years have seen a significant increase in unaccompanied minors ages 12 and under, who accounted for 19% of the unaccompanied minors in ORR care in fiscal year 2023 and 24% in fiscal year 2024. *Id.* Thousands of these children are mere toddlers. *See* Emily Ryo & Reed Humphrey, *Children in Custody: A Study of Detained Migrant Children in the United States*, 68 UCLA L. Rev. 136, 165 (2021) ("Between November 2017 and July 2019, there were a total of 2,418 referrals of children 4 and younger (2.2 percent), 5,076 referrals of children between 5 and 8 (4.6 percent), 9,499 referrals of children between 9 and 12 (8.6 percent), 54,299 referrals of children between 13 and 16 (49.3 percent), and 38,759 referrals of children 17 or older (35.2 percent).").

**Pre-Migration Trauma.** Unaccompanied minors migrating to the United State have frequently suffered considerable trauma in their countries of origin. *See* Anne Elizabeth Sidamon-Eristoff et al., *Trauma Exposure and Mental Health Outcomes Among Central American and Mexican Children Held in Immigration Detention at the United States-Mexico Border*, 64 Developmental Psychobiology 1, at 8 (2022), https://tinyurl.com/2tv2wy2f; *see also* NCTSN, *supra*, at 1. The vast majority of unaccompanied children in U.S. custody are from Guatemala, El Salvador, and Honduras, which rank among the highest in the world for homicide,

drug trafficking, and gang violence. Jonathan Beier & Karla Fredricks, *A Path to Meeting the Medical and Mental Health Needs of Unaccompanied Children in U.S. Communities* 6 (2023), https://perma.cc/YEW2-6JMW. These conditions directly lead to traumatic experiences for children—including extreme poverty, domestic violence and abuse, forced separation from primary caretakers, sex and work trafficking, and a perpetual threat of violence stemming from drug trafficking and gang activity. United Nations High Commissioner for Refugees, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* 31–38 (2016), https://tinyurl.com/bdd5drrr. These experiences are often the impetus for children and families leaving their home countries in search of safety in the United States.

**Migration Trauma.** Migration to the United States can itself be a painful experience for children that requires them to leave behind all that is familiar and comforting. Omar G. Gudiño et al., *Relative Impact of Violence Exposure and Immigrant Stressors on Latino Youth Psychopathology*, 39 J. Cmty. Psych. 316, 317 (2011). During their journeys, children often fall victim to unthinkable exploitation—including kidnapping, sexual violence, and trafficking. Save the Children, *Migrant Children Fleeing Violence Face New Dangers and Uncertainty at Mexico's Northern Border, New Report Finds* (May 5, 2025), https://tinyurl.com/5evnzv5w.

**Post-Migration Trauma.** The trauma experienced by unaccompanied minors who do arrive in the U.S. is further compounded by the "prisonlike conditions" they encounter in CBP facilities prior to their transfer to ORR. Julie M. Linton et al., *Detention of Immigrant Children*, 139 Am. Acad. of Pediatrics 1, 6 (2017) (describing negative behavioral and psychological outcomes experienced by children detained in U.S. immigration custody), https://tinyurl.com/bddsca68. "[E]ven brief detention can cause psychological trauma and induce long-term mental health risks for children." *Id.* ORR facilities also have "struggled to address the mental health needs of children who had experienced intense trauma." Office of Inspector General, U.S. Dep't of Health & Hum. Servs., *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 1 (2019) ("OIG Report"), https://perma.cc/D64Z-7ZCJ. Indeed, mental health clinicians who have provided care to children in ORR facilities have "expressed concerns about feeling unprepared to handle the level of trauma that some children presented, despite their prior training and experience, especially in short-term therapy." *Id*. at 18. To make matters worse, in recent months the average length of stay in ORR facilities for unaccompanied children has dramatically increased. *See supra* ORR Fact Sheet (noting the average length of care for a discharged child at 37 days in January 2025, 49 days in February, 112 in March, 217 in April, and 191 in May).

8

B.     *Multiple Traumatic Experiences Can Have a Cumulative Effect on the Health and Development of Unaccompanied Children.*

Traumatic experiences during childhood can lead to long-term adverse consequences on physical and mental health and development. Experts agree that significant early childhood stress—also called toxic stress—can impact health outcomes into adulthood. *See* Terrie E. Moffitt et al., *Childhood Exposure to Violence and Lifelong Health: Clinical Intervention Science and Stress Biology Research Join Forces*, 25 Dev. Psychopathol 1, 1 (2013), https://tinyurl.com/mvecdyky. "Early-life adversity and trauma are associated with higher rates of adverse mental health outcomes across the life span, including impaired cognitive and emotional development, behavioral problems, attempted suicide, posttraumatic stress disorder (PTSD), and anxiety, mood, and substance use disorders." Sidamon-Eristoff, *supra*, at 2.

Studies have further shown that "[c]umulative childhood—but not adult—trauma exposure predicts PTSD symptom complexity, suggesting that trauma experienced as a child may have an outsized impact on stress-regulatory processes." *Id.* (citation omitted). Migrating children may be "particularly vulnerable to stress experienced during migration and detention" due to the "[h]igh rates of premigration trauma exposure" among this group. *Id.* at 9; Ryan Matlow et al., *Guidance for Mental Health Professionals Serving Unaccompanied Children Released from*

9

*Government Custody*, Stan. Ctr. for Hum. Rights & Int'l Justice 25 (2021), https://perma.cc/9WJB-NVG8.

In addition to the well-documented psychological toll of immigration proceedings, toxic stress in childhood is also medically life-threatening. Chronic activation of stress response systems—especially when unbuffered by consistent adult relationships—has been strongly linked to later diabetes, cardiovascular disease, autoimmune disorders, cancer, and premature death. *See* David W. Brown et al., *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 Am. J. Preventative Med. 389, 391–94 (2009); Moffitt, *supra*, at 2 ("stressful experiences during childhood might start a child on the long road to heart disease or dementia."); Stan Sonu et al., *Adverse Childhood Experiences and the Onset of Chronic Disease in Young Adulthood*, 123 Preventative Med. 163, 168 (2019) (adverse childhood events "are strongly associated with the likelihood of multiple chronic diseases and poor self-rated health").

## II. Stripping Funding for Legal Proceedings Would Contribute to Trauma and Adverse Health Outcomes for Unaccompanied Children.

Preserving the statutorily-mandated funding for legal representation of unaccompanied children is important both as a matter of procedural fairness, but also for a child's mental and physical health. Children lack the capacity to navigate legal proceedings without assistance from a qualified adult. For many unaccompanied children, attorneys are the only consistent adult figures advocating for their well-

being, and their presence can buffer the child's physiological response to trauma. The loss of this relationship, coupled with the stress of navigating the legal system alone, adds significantly to the child's cumulative toxic stress load, thereby increasing their lifetime risk of serious, and even fatal, illness. In this way, the absence of legal counsel constitutes a measurable, medically documented risk to the child's long-term physical health.

> A. *Children Without Legal Counsel Lack the Mental Capacity to Understand and Navigate Immigration Legal Proceedings.*

Without assistance from legal counsel, children do not have the developmental capacity to navigate the complexities of proceedings that will determine their immigration status and are not well-positioned to represent their own interests. Legal systems are not designed for children. The language is opaque, courtrooms are intimidating, and expectations often far exceed the cognitive and emotional capacities of young children and adolescents. *See* Jodi A. Quas et al., *Maltreated Children's Understanding of and Emotional Reactions to Dependency Court Involvement*, 27 Behav. Sci. L. 97, at 4 (2009). Children often lack basic understanding of the key terms and concepts, and they "lack[] full or accurate understanding of what actually happened during their hearings." *Id.* at 1.

While young children are particularly disadvantaged in terms of their language skills and cognitive abilities, even older children are not prepared to represent their own interests. Adolescents—who have not attended higher

education, much less law school—still frequently struggle to grasp legal processes and "fail[] to completely grasp legal terms." *Id*. at 11. This is because the brain's frontal lobe, which is "home to key components of the neural circuitry underlying 'executive functions'… are among the last areas of the brain to mature," and "may not be fully developed until halfway through the third decade of life." Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolesc. Health 216, at 1 (2009). As a result, adolescents still require support, as they "d[o] not appear to fully understand" legal decisions, and thus cannot meaningfully engage with the process. Quas, *supra*, at 10.

Adolescents may experience even *greater* psychological harm from the legal process than younger children because older children may have "greater understanding of the significance" of "their legal situation and the implications" of their case and thus have "more negative attitudes about the legal system's fairness and legitimacy," which can contribute to increased feelings of fear and anxiety. Jodi A. Quas & Gail S. Goodman, *Consequences of Criminal Court Involvement for Child Victims*, 18 Psych. Pub. Pol'y & L. 392, 405 (2012). Thus, without guidance from legal counsel, children of all ages face serious barriers to understanding, much less representing, their best interests in immigration proceedings.

B. *Legal Proceedings Can Re-Traumatize and Cause Other Adverse Health Effects on Unaccompanied Children.*

Unrepresented children who must participate in legal proceedings are also at increased risk of re-traumatization and other adverse physical and mental health outcomes. These proceedings can be overwhelming and compound the feelings of powerlessness and confusion that many unaccompanied children have previously faced. *See* Alexia Cooper et al., *Maltreated and Nonmaltreated Children's Knowledge of the Juvenile Dependency Court System*, 15 Child Maltreat. 255, at 7 (2010) ("Children often express anxiety over not understanding what is happening in legal contexts, and a lack of understanding predicts increased distress." (citations omitted)). In immigration proceedings, unaccompanied children may have to articulate their fears and recount past experience, forcing them to relive prior trauma.

Research has shown that the uncertainty surrounding immigration status is associated with increased anxiety, depression, and PTSD. Joanna Norton et al., *Association Between Uncertainty Regarding Right-to-Stay and Mental Health in Unaccompanied and Separated Migrated Children (UASC) Reaching Adulthood: Findings from France*, 58 Soc. Psych. & Psych. Epidemiology 939, 947 (2023). This leads to "the 'building block effect' where uncertainty and insecurity add to a cumulative effect of exposure to trauma that is associated with an increase in mental health problems such as [PTSD]." Suzan J. Song, *Mental Health of Unaccompanied Children: Effects of U.S. Immigration Policies*, 7 BJPsych Open 1, 3 (2021),

13

https://tinyurl.com/2s4xjymy. And the traumatic effects can be exacerbated when children are placed in immigration detention centers, which have been found to lead to a higher prevalence of "depression, anxiety and PTSD symptoms," as well as "significantly more social, emotional and behavioral difficulties." Karen Zwi et al., *The Impact of Detention on the Social-Emotional Wellbeing of Children Seeking Asylum: A Comparison with Community-Based Children*, 27 Euro. Child & Adolescent Psych. 411, 411, 413 (2018).

C. *Legal Representation Functions as a Buffer Against Psychological and Physical Harm.*

As unaccompanied minors contend with unfamiliar and often harsh environments while confined in immigration custody, legal representatives remain the most critical—if not only—buffer against the stress impacting their young brains and bodies. Trusted adults—including legal advocates—can become important attachment figures for children who are navigating the adversarial legal system, and thus, AAP recommends policies that facilitate legal representation, as attorneys are often the only identified adults with the sole responsibility of advocating for the best interests of the child. *See* Robert H. Pantell, *The Child Witness in the Courtroom*, 139 J. Pediatrics 1, 5–6 (2017). Legal representatives can thus serve as a buffer against harm by reducing the risk of re-traumatization and improving mental and physical health outcomes. For unaccompanied minors with existing legal representation, severing the relationship would both disrupt the therapeutic

14

relationships that the children have built with their advocates, and risk re-traumatizing the children by compromising the children's psychological safety and reactivating feelings of abandonment and instability.

Legal representation also can lower the risk of re-traumatization that accompanies legal proceedings for unaccompanied minors by addressing procedural delays, functioning as a surrogate parental figure, and identifying and responding to issues that raise concrete health issues for the child. The adversarial and drawn-out nature of court proceedings coupled with the incomprehensibility of such complex processes raise the risk of re-traumatizing the child. *See* David A. Crenshaw et al., *Developmentally and Trauma-Sensitive Courtrooms*, 59 J. Humanistic Psych. 779, 780 (2019). In fact, some researchers have argued that "if one set out intentionally to design a system for provoking symptoms of posttraumatic disorder, it might look very much like a court of law." Judith L. Herman, *The Mental Health of Crime Victims: Impact of Legal Intervention*, 16 J. Traumatic Stress 159, 159 (2003).

Delays in court proceedings—which happen frequently in the immigration context—can prolong uncertainty and thereby exacerbate anxiety and depression symptoms. *See* Mark Greenberg et al., *Strengthening Services for Unaccompanied Children in U.S. Communities*, Migration Pol'y Inst., 13 (2021) ("[I]n FY 2020, open immigration court cases were pending for an average of 2.7 years."), https://perma.cc/UG4L-JCW8. And these delays themselves can impose significant

harm—both mental and physical—as "a child's mental health often deteriorates as the length of their stay in ORR custody increases," OIG Report, *supra*, at 20. *See also Angelica S. v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1635369, at *9 (D.D.C. June 9, 2025) ("Courts have found that … prolonged detention qualif[ies] as irreparable injury."). Attorneys are well-equipped to address delays and explain the complexities of proceedings at a developmentally appropriate level, reducing the risk of re-traumatization. *See* Kimberly M. Cuthrell, *Trauma-Informed Legal Advocacy: Medicolegal Approaches & Best Practices for Immigration Attorneys*, 20 Int'l Neuropsychiatric Disease J. 62, 66 (2023), https://tinyurl.com/bdz73bd6.

Attorneys also often function as trusted surrogate parental figures—especially for young or traumatized children—offering hope, structure, and protection. *See* Jack P. Shonkoff et al., *The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, 129 Pediatrics e232, e235 (2012) ("Central to the notion of positive stress is the availability of a caring and responsive adult who helps the child cope with the stressor, thereby providing a protective effect that facilitates the return of the stress response systems back to baseline status."), https://perma.cc/AL9Y-ZVFA. In many cases, an attorney "may be the only person with whom the child is safely able to disclose important information such as being trafficked or suffering abuse by caretaker" because of the attorney's legal obligation of confidentiality. Greenberg, *supra*, at 23. Unsurprisingly, legal representation can also greatly affect the outcome

16

of immigration proceedings, as surveys have found that "73 percent of unaccompanied minors who were represented in court were granted permission to stay in the United States, compared to 15 percent of unrepresented children." *Id.* at 13.

Furthermore, in the case of unaccompanied minors, legal representatives often connect children with services such as school enrollment, health care, mental-health services, food, and housing in addition to providing legal support. *Id.* at 2. Attorneys can also monitor the conditions of confinement, identify and respond to abuse or suicidal ideation, and advocate for medical and mental health care needs. Without legal representation, unaccompanied minors face concrete health risks such as missed treatments, psychiatric decompensation, and avoidable hospitalizations. *See* Winston Liaw et al., *Medical-Legal Partnership Effects on Mental Health, Health Care Use, and Quality of Life in Primary Care: A Randomized Clinical Trial*, 36 J. Am. Bd. Fam. Med. 414, 419–22 (2023), https://perma.cc/F8SM-AFRB; Andrew F. Beck et al., *Reductions in Hospitalizations Among Children Referred to a Primary Care–Based Medical-Legal Partnership*, 41 Health Affs. 341, 346 (2022), https://tinyurl.com/3pd2stdp. In this context, legal representation operates as a clinical intervention with the power to avert cascading harm.

**III. Permitting the Withdrawal of Statutorily Mandated Funding Would Substantially and Irreparably Injure Unaccompanied Children.**

Congress recognized the role that legal representation can play in preventing harm and mistreatment to unaccompanied minors in immigration proceedings when it mandated funding for such services under the TVPRA. The district court's preliminary injunction keeps these important services and relationships in place pending litigation of the merits.

Rehearing en banc is not warranted because the motions panel correctly denied the Government's request for a stay pending appeal. A stay would severely impact the long-term health and development of the unaccompanied children who are statutorily entitled to legal representation, and as Congress determined, the public interest strongly supports preserving children's long-standing access to representation while this appeal is litigated. *See Nken*, 556 U.S. at 434.

As explained above, staying the injunction would impose significant and irreparable harm on the unaccompanied children at the center of this proceeding. Removing legal representation would not only significantly impact the outcomes of the immigration proceeding, *see supra* at 16–17, but also worsen the long-term physical and mental health of unaccompanied children, *see supra* at 13–17. *See Doe #1 v. Trump*, 957 F.3d 1050, 1067–68 (9th Cir. 2020) (denying stay based on record evidence showing harmful effects on immigrants and local communities); *Angelica S.*, 2025 WL 1635369, at *9 ("prolonged detention" is "irreparable injury").

A stay is also unwarranted because it would contravene the public interest. When passing the TVPRA in 2008, Congress determined that the public interest would be furthered by funding for the representation of unaccompanied children. *See* 8 U.S.C. § 1232(b)(1); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1015 (9th Cir. 2020) ("[T]he public … has an interest in ensuring that statutes enacted by their representatives are not imperiled by executive fiat." (cleaned up)).

And Congress' decision is readily supported by the clinical and ethical consensus supporting legal representation for unaccompanied children. For example, the AAP calls for policies that reduce emotional distress and prioritize the child's best interest, including official recommendations that "children and families should have access to legal counsel throughout the immigration pathway," and that "[u]naccompanied minors should have free or pro bono legal counsel with them for all appearances before an immigration judge." Linton, *supra*, at 8. AAP also recommends that "no child, under any circumstance, should be required to represent himself or herself in an immigration proceeding." *See* Pantell, *supra*, at 5.

Issuing a stay, however, would require countless children to take on that burden and thus would inflict unnecessary and avoidable harm. The public interest does not favor a stay. *Cf. Doe #1*, 957 F.3d at 1068 (denying stay because "the public interest lies with maintaining the *status quo* while the appeal is pending").

**CONCLUSION**

For the foregoing reasons, this Court should deny the Government's petition.


June 20, 2025                                   Respectfully submitted,

                                                */s/ Lauren Willard Zehmer*

Jenna Zhang                                     Lauren Willard Zehmer
COVINGTON & BURLING LLP                         Anne Lee
Salesforce Tower                                Sameer Aggarwal
415 Mission Street, Suite 5400                  Brittney Moreno
San Francisco, CA 94105                         COVINGTON & BURLING LLP
Telephone: (415) 591-6000                       One CityCenter
                                                850 Tenth Street, NW
                                                Washington, DC 20001
                                                Telephone: (202) 662-6000


                                                *Counsel for Amici Curiae*
                                                *AAP, HEAL, MHRC, and PHR*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-2808

I am the attorney or self-represented party.

**This brief contains** 4,175 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Lauren Willard Zehmer **Date** June 20, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*