No. 25-2808

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,

Plaintiffs-Appellees,

*v.*

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

Defendants-Appellants.

## DEFENDANTS-APPELLANTS' REPLY BRIEF

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant
Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney
General

WILLIAM C. SILVIS
Assistant Director

KATELYN MASETTA-ALVAREZ
MICHAEL A. CELONE
Senior Litigation Counsels
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals
Section
P.O. Box 878, Ben Franklin
Station
Washington, DC 20044
Telephone: (202) 305-2040
Michael.a.Celone@usdoj.gov
*Counsel for Defendants-Appellants*

1

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

ARGUMENT ................................................................................................... 4

    I.    **The Court should not apply the motion-for-reconsideration standard.** .............................................................................................. 4

    II.    **Plaintiffs have not overcome the Tucker Act's jurisdictional barrier.** ................................................................................................. 5

        *a.    Neither 8 U.S.C. § 1232(c)(5) nor the Foundational Rule provide Plaintiffs a source of rights to funding for UAC legal services.* ................... 5

        *b.    Under Plaintiffs' own theory of the case, the only remedy that would redress their alleged injury is reinstating the Acacia Contract.* ................. 13

    III.    **The TVPRA vests ORR with unreviewable discretion over its funding decisions.** ......................................................................... 19

    IV.    **The Foundational Rule reinforces ORR's discretion to determine whether to fund legal counsel when pro bono counsel is not practicable.** ........................................................................... 27

    V.    **Plaintiffs fail to meaningfully refute that the District Court relied exclusively on Plaintiffs' alleged financial hardship in finding that they would suffer irreparable harm absent an injunction.** .................................................................................. 30

    VI.    **Nothing suggests that the District Court considered the public interest in conserving the public fisc in balancing the equities.** ....................................................................................... 32

**CONCLUSION** .......................................................................................... 33

**CERTIFICATE OF SERVICE** ............................................................... 35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
  486 F.3d 638 (9th Cir. 2007) ....................................................... 14

*Amica Center for Immigrant Rights v. Dep't of Justice*,
  No. CV 25-298, 2025 WL 1852762 (D.D.C. July 6, 2025) . 8, 9, 10,
  12

*California v. U.S. Dep't of Educ.*,
  No. CV 25-10548-MJJ, 2025 WL 760825 (D. Mass. Mar. 10,
  2025) ............................................................................................ 18

*Cmty. Legal Servs. In E. Palo Alto v. Health and Human,
  Srvs.*, 135 F. 4th 852 (9th Cir. 2025) .................................. 18, 19

*Connell v. Lima Corp.*,
  988 F.3d 1089 (9th Cir. 2021) ...................................................... 19

*Corner Post, Inc. v. Bd. Of Governors of Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ................................................................ 3, 21

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ...................................... 5, 6, 10, 11

*Department of Education v. California*,
  145 S. Ct. 966 (2025) .............................................................. 2, 18

*Harris Cnty., Texas v. Kennedy*,
  No. 25-CV-1275, 2025 WL 1707665 (D.D.C. June 17, 2025) ....... 5

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ....................................................... 13

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers
  of Am. V. Donovan*,
  746 F.2d 855 (D.C. Cir. 1984) ..................................................... 21

*Kidwell v. Dep't of Army*,
  56 F.3d 279 (D.C. Cir. 1995) ....................................................... 17

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................... 23, 24, 25, 26

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ....................................................... 8

*Mi Familia Vota v. Fontes*,
  111 F.4th 976 (9th Cir. 2024) ....................................................... 4

*Nat'l Treasury Emps. Union v.* Trump,
  2025 WL 1441563 n.4 (D.C. Cir. May 16, 2025)......................... 33
*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................... 5
*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004).......................................................................... 15
*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
  5 F.4th 997 (9th Cir. 2021) ......................................................... 15
*Winter*,
  555 U.S........................................................................................ 31, 32

Statutes

5 U.S.C. § 706(1) ........................................................................... 14, 15
8 U.S.C. 1362 .......................................................................... 19, 20, 26
8 U.S.C. § 1232 ..................................................................................... 22
18 U.S.C. § 1905 ..................................................................................... 8
25 U.S.C. § 13 ....................................................................................... 24
41 U.S.C. § 111 ....................................................................................... 9
Pub. L. 96-422 ..................................................................................... 22
Pub. L. 107-296 ................................................................................... 22
Pub. L. 110-457 (2008)....................................................................... 2, 23
Pub. L. 118-47 ..................................................................................... 21
U.S.C. § 1232(c)(5) ............................................................................. 21

Regulations

45 C.F.R. § 410.1309(a)(4) ............................................................. 27, 28
45 C.F.R. § 410.1309(b)(2) ................................................................. 30
89 FR 34384-01 ................................................................................... 28
FAR § 52.212-4(l) ................................................................................. 14

## INTRODUCTION

Plaintiffs' brief fails to rebut any of the government's independently dispositive bases for reversal. Appellants should therefore prevail on this appeal.

The problems with Plaintiffs' approach primarily revolve around two errors: A revisionist account of the final agency action at issue in this appeal, and a misreading of the statutory text. But any analysis of the record and the law reveals that Plaintiffs challenge a contractual termination order, and the statutes at issue contain no mandatory grant of funds—to Plaintiffs or anyone else. The Tucker Act and the APA thus foreclosed district court jurisdiction over their claims.

As to the first issue, the final agency action that Plaintiffs challenge is the Office of Refugee Resettlement's (ORR's) notice of its decision to partially cancel its contract with Acacia (Contract-Cancellation Notice). Plaintiffs therefore seek relief from a contract-termination decision. Plaintiffs' source of rights and remedy sought are indisputably contractual. Although Plaintiffs now attempt to circumvent the Tucker Act by arguing that they are

challenging something other than the Contract-Cancellation Notice, the District Court in its order granting a preliminary injunction (PI Order) already found that the Contract-Cancellation Notice was indeed the final agency action on review. 1-ER-17. Continued payments to Acacia, and to Plaintiffs as Acacia's subcontractors, naturally follow from setting aside this action. Thus, this case is on all fours with *Department of Education v. California*, 145 S. Ct. 966 (2025), and the District Court lacked jurisdiction to review Plaintiffs' claims under the Tucker Act.

As to the second question, the plain text of 8 U.S.C. § 1232(c)(5) (Section 235 of the TVPRA[1]) contains no requirement that ORR fund counsel, even if pro bono counsel are insufficient. Plaintiffs read into the statute a requirement that ORR fund legal services for unaccompanied alien children (UAC) when pro bono counsel is not practicable, but no such requirement actually exists based on statutory text, context, or regulation. The Supreme Court has "repeatedly stated" that courts "may not replace the actual text

---

[1] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110-457 (2008).

with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. Of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (citations omitted). Yet that is precisely what Plaintiffs ask this Court to do.

Indeed, if anything, the statutory text suggests that ORR should refrain from using federal funding for UAC legal services. Section 1232(c)(5) commands ORR to make "every possible effort" to obtain "pro bono" counsel who will represent UAC "at no charge." 8 U.S.C. § 1232(c)(5). Coupled with the lump-sum appropriation that tasks ORR with allocating a limited pot of federal funds across numerous statutory objectives, Congress's clear mandate that ORR endeavor to secure pro bono counsel demonstrates the statute contains no meaningful standard for the District Court to review ORR's funding decisions regarding UAC legal services.

Even if this Court gets beyond the two threshold questions, the Court must still reverse and remand the District Court's order granting a preliminary injunction (PI Order) because the District Court abused its discretion. While Plaintiffs assert that they face irreparable harm to their "missions" because they cannot continue representing UAC, their alleged harms all boil down to a lack of

3

funding, which can only be redressed with money. And because the PI Order requires the payment of money from taxpayer funds, the District Court's failure to consider the harm to the public fisc or whether any bond would be appropriate was an abuse of discretion.

## ARGUMENT

### I.   The Court should not apply the motion-for-reconsideration standard.

Plaintiffs first argue that this Court may only depart from the motions panel's analysis in its order denying the Government's motion for a stay of the PI Order if the panel's decision "is clearly erroneous and its enforcement would work a manifest injustice" or if the panel's decision should be reconsidered. Answering Br., 28 (citing *Mi Familia Vota v. Fontes*, 111 F.4th 976, 980 (9th Cir. 2024)). That argument misunderstands the nature of this appeal and asks the court to apply the standard for motions for reconsideration. *See Mi Familia Vota*, 111 F. 4th at 980. To be clear, Defendants do not request reconsideration of the motions panel's decision denying a stay of the PI Order. Rather, this panel must assess Defendants' appeal on the merits. Because the motions panel was tasked only with assessing (on an expedited basis) whether

4

Defendants were *likely* to succeed on the merits of their appeal, *Nken v. Holder*, 556 U.S. 418, 435 (2009), that assessment does not bind this panel's merits analysis.

## II. Plaintiffs have not overcome the Tucker Act's jurisdictional barrier.

### a. Neither 8 U.S.C. § 1232(c)(5) nor the Foundational Rule provide Plaintiffs a source of rights to funding for UAC legal services.[2]

Plaintiffs also fail to rebut Defendants' dispositive Tucker Act argument, and instead attempt to rewrite the *Crowley* test for determining whether Plaintiffs' "source of rights" sound in contract or in law. Answering Br., 28 (citing *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1108–09 (D.C. Cir. 2022)). Regarding the first factor, Plaintiffs state that *Crowley* requires courts to

---

[2]      Plaintiffs assume that, under *Megapulse*, a "plaintiff's claims must *both* (1) rely on contract-based rights, and (2) seek a contract-based remedy." Answering Br., 27. But "the D.C. Circuit has not expressly addressed whether the [*Megapulse*] test is meant to be conjunctive or disjunctive—that is, whether the source of the right and the relief sought *both* must be contractual to deprive district courts of jurisdiction, or if just one of the two does the trick." *Harris Cnty., Texas v. Kennedy*, No. 25-CV-1275, 2025 WL 1707665, at *14 (D.D.C. June 17, 2025). Regardless, Defendants have shown that both the rights and remedies Plaintiffs seek sound in contract.

consider whether resolving the plaintiff's claims *primarily* require *examination* of statutes or regulations the Government allegedly violated. Answering Br., 28. *Crowley*, however, requires courts to consider whether "the plaintiff's asserted rights and the government's purported authority **arise from** statute." *Crowley*, 38 F.4th at 1107 (emphasis added). As to the second factor, Plaintiffs attempt to recast the question of whether a plaintiff's rights "exist[ ] *prior to and apart from* rights created under the contract," *Crowley*, 38 F.4th at 1107, as an inquiry regarding the effects of the requested remedy—an entirely separate question. Lastly, the third factor does not ask whether "the claim asserted by the plaintiff *could be brought before the Court of Federal Claims*," (Answering Br., 28), but whether Plaintiffs seek "to enforce any duty imposed upon" the government "by the . . . **relevant contracts** to which" the government is a party, *Crowley*, 38 F.4th at 1107 (emphasis added). This Court should assess Plaintiffs' source of rights under *Crowley*, not Plaintiffs' strained interpretation of it.

Applying the correct *Crowley* standard, Plaintiffs have not shown that *their* asserted rights "arise from" statute. Plaintiffs

6

attempt to recast their suit, asserting that it does not challenge the Cancellation Order—the action that terminated their funding—but instead some broader decision never to fund counsel for UAC, in alleged violation of the statute. *See* Answering Br., 31 ("Providers do not claim *they are* entitled to government funding, they claim only that the law obligates the Government to fund direct representation for [UAC]."). But *Crowley*, which asks about the plaintiff's source of rights to bring a lawsuit, demonstrates that Plaintiffs' source of rights is contractual. Plaintiffs have standing to challenge the Cancellation Order because they were entitled to funding under the canceled Acacia contract. As they concede, *their* right to funding arises *only* from the contract—not from the alleged statutory and regulatory mandates.

Plaintiffs also claim that their source of rights is the APA. *Id.* at 30. But, as the Government explained in its Opening Brief, the APA does not create substantive rights. *See* Opening Br., 31. Otherwise, a contractor could challenge the termination of any government contract as arbitrary and capricious or contrary to law

and escape the strictures of the Tucker Act. Congress did not devise a scheme that could be stymied by such artful pleading.

Finally, Plaintiffs cite *Megapulse* as support that their source of rights are nonetheless "founded upon" Section 1232(c)(5) and the Foundational Rule. Answering Br., 30 (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982)). *Megapulse* fails to provide that support. There, the plaintiff challenged an agency opinion determining that it was not entitled to limited-rights treatment. *Megapulse*, 672 F.2d at 962-63. The court found the source of the plaintiff's rights was the Trade Secrets Act, 18 U.S.C. § 1905, which provides a cause of action for trade-secret proprietors like the plaintiff to pursue remedies for disclosing trade secrets. *Id.* at 969. Plaintiffs identify no similar source of rights independent of the Acacia contract. Neither the TVPRA nor the Foundational Rule purports to grant funded counsel a right to challenge ORR's funding decisions—which, as discussed *infra*, are subject to agency discretion.

*Amica Center for Immigrant Rights*, on the other hand, is on point. *Amica Center for Immigrant Rights v. Dep't of Justice*, No.

8

CV 25-298, 2025 WL 1852762, at *12 (D.D.C. July 6, 2025). The district court in *Amica* held that the plaintiffs, subcontractors to a cancelled Acacia contract, were precluded from bringing their APA claims because they essentially challenged the Government's contract-procurement decision. *Id.* There, the Government had funded two programs using an appropriation for several years but decided to terminate outside contracts for the program and instead use in-house resources. *Id.* at *7. The district court found that the decision to terminate funding to outside organizations was a contract-procurement decision squarely within the Tucker Act's reach and therefore precluded the subcontractors' APA claims. *Id.*; 41 U.S.C. § 111 (defining the term "procurement" to include "all stages of the process of acquiring property or services, beginning with the process for *determining a need for property or services* and ending with contract completion and *closeout*.") (emphasis added). The same result should obtain here.

ORR's decision to close out the Acacia contract, the agency action Plaintiffs challenge, was a contract-procurement decision and thus Plaintiffs' challenge to this decision must be brought in

the Court of Federal Claims. While Plaintiffs attempt to distinguish *Amica* because the plaintiffs there did not challenge the termination of a "program" (Answering Br., 29 n.5), their distinction does not hold water. ORR has not terminated its legal-services program altogether. ORR still provides every UAC a list of pro bono counsel and an individual legal consultation with an attorney, which may result in an attorney taking the child's case pro bono. 3-ER-290–94. Put simply, Plaintiffs cannot point to any agency action that terminates ORR's "program" to secure counsel altogether. Rather, Plaintiffs take issue with ORR's decision to close-out a multi-million-dollar contract for those legal services and instead prioritize the procurement of pro bono counsel (consistent with the statute). Plaintiffs' apparent belief that funding counsel is better policy than prioritizing pro bono counsel does not defeat Congress's dedicated scheme for resolving contractual disputes under the Tucker Act. *Amica*, 2025 WL 1852762, at *12.

As to *Crowley*'s second factor—whether Plaintiffs' rights exist "prior to or apart from" the Acacia contract, 38 F.4th at 1107—Plaintiffs contend that relief other than reinstatement of the

contract might partially redress their alleged injuries. Answering Br., 32. But the question *Crowley* is designed to answer is the "source" of Plaintiffs' rights, which is separate from the remedy they seek. Regardless, it is speculative to assert that some other "vehicle the Government chooses to comply with its statutory and regulatory obligations," *id.*, would result in payouts to Plaintiffs; ORR has demonstrated it does not wish to contract with Acacia for these services, so some other contractor would need to hire Plaintiffs as subcontractors. And in any event, Plaintiffs appear to wrongly assume that the Government can only meet its statutory and regulatory obligation by *funding* direct legal representations, contrary to the TVPRA's and Foundational Rule's clear preference for pro bono counsel and ORR's long history of relying solely on pro bono counsel to represent UAC. ORR's pro bono program has existed for 20 years, and for many of those years ORR relied exclusively on pro bono counsel. *See* Vera Institute, The Flow of Unaccompanied Children Through the Immigration System, at 22–23 (2012), https://vera-institute.files.svdcdn.com/production/downloads/ publications/the-

flow-of-unaccompanied-children-through-the-immigration-system.pdf?dm=1647370631 (explaining that 70% of UAC who remained in ORR's custody throughout their removal proceedings had pro bono counsel and that ORR "continued the pro bono program," and "subcontractors participating in the project were not allowed to use government funds to provide direct representation.").

Finally, as to *Crowley*'s third factor, Plaintiffs assert that because subcontractors cannot themselves proceed and obtain a remedy in the Court of Federal Claims, the Tucker Act fails to afford them an adequate remedy. Answering Br., 34–36. But this claim was correctly rejected in *Amica*: "A categorical rule that objecting subcontractors are not 'interested parties' [under the Tucker Act] would mean that prime contractors' challenges to procurements would be funneled to the Court of Claims, but subcontractors would be permitted to bring identical challenges in the district courts." *Amica*, 2025 WL 1852762, at *12; *see also* Opening Br., 34–36. Congress intended to funnel *all* claims related to federal-contract procurement in the Court of Claims. Allowing subcontractors to bypass this congressional intent by bringing

12

claims under the APA—which allows for broader relief than the Tucker Act—would create a perverse incentive for contractors to hide behind their subcontractors' claims to avoid the strictures of the Tucker Act. This Court should decline such a rule.

> ### b. Under Plaintiffs' own theory of the case, the only remedy that would redress their alleged injury is reinstating the Acacia Contract.

As to the second *Megapulse* factor, the relief sought, Plaintiffs assert that because the complaint only seeks injunctive and declaratory relief, Plaintiffs are not seeking contractual relief. Answering Br., 37. But the *Megapulse* test is not concerned with how Plaintiffs technically framed their request for relief, nor is it concerned with how the District Court technically framed the injunction. Rather, the question is whether the relief sought is "in essence" contractual, regardless of how a plaintiff styles her claims. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79 (D.C. Cir. 1985).

Looking beyond Plaintiffs' word choice in their complaint, the relief that Plaintiffs essentially seek is continued funding through reinstatement of the Acacia contract. Indeed, the nature of the

relief Plaintiffs seek is clear from the nature of the agency action they challenge. The district court made clear that the final agency action on which it grounded its ruling was the Contract-Cancellation Notice (or, as Plaintiffs refer to it, the "Cancellation Order"). The final agency action here is not a memo or other agency document announcing a policy against ever funding direct legal services, for example. Instead, it is a letter to a government contractor, cancelling certain line items in a contract "for the Government's convenience" pursuant to FAR § 52.212-4(l). 3-ER-297. Under the APA, the remedy available to redress an unlawful agency action is to "set aside" that action. 5 U.S.C. § 706(1); *Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action."). The remedy available here is therefore to set aside the Contract-Cancellation Notice, thereby reinstating the Acacia contract. That is fundamentally contractual relief.

To avoid this conclusion, Plaintiffs now assert that the agency action they challenge is broader than the Contract-Cancellation

14

Notice. On appeal, they claim to further challenge the Government's failure to provide a "meaningful alternative" to the Acacia Contract. Answering Br., 38. But that is not the final agency action on which the District Court premised its injunction. 1-ER-17 n.5 (stating that the parties "do not appear to dispute" that the final agency action is the Contract-Cancellation Notice (i.e., "Cancellation Order"), and therefore finding this to be the final agency action on review). Plaintiffs cannot change the scope of the agency action challenged below in response to the Government's arguments on appeal.[3]

---

[3] Even if Plaintiffs had attempted to challenge ORR's alleged failure to provide a meaningful alternative to the Acacia contract below, that alleged agency inaction would not constitute a discrete agency action appropriate for APA review. "It is axiomatic that Plaintiffs must identify an 'agency action' to obtain review under the APA." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010–11 (9th Cir. 2021) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004)). The APA requires that the "agency action" be "circumscribed" and "discrete," such as "a rule, order, license, sanction [or] relief." *Id.* (citing *Norton*, 542 U.S. at 62)). Plaintiffs here fail to identify any particular, discrete agency action in which ORR failed to provide a "meaningful alternative" to funding. Rather, their newfound claim would need to proceed as a challenge to agency action unlawfully withheld under 5 U.S.C. § 706(1), which requires a showing that ORR is required by law to take such action. 5 U.S.C. § 706(1); *Norton*, 542 U.S. at 64 (explaining that, to compel

15

Plaintiffs further argue that the District Court's injunction "does not reflect the restoration of funds specifically" to Plaintiffs. Answering Br., 40. The plain language of the District Court's order indicates otherwise. The District Court enjoined ORR from "withdrawing the services or funds," particularly for direct legal services, pursuant to the TVPRA and Foundational Rule. The definition of "withdraw" is "to take back (something presented, granted, enjoyed, possessed, or allowed)." Withdraw, Black's Law Dictionary (12th ed. 2024). Thus, the District Court prohibited the Government from "taking back" services or funds that were previously granted. As Plaintiffs note, the only contractor that was previously granted these funds was Acacia. Thus, under the plain language of the injunction, ORR cannot take back the funding granted to Acacia. Thus, while the order does not expressly call for reinstatement, that is its inexorable effect. Contrary to Plaintiffs' assertions that ORR simply chose to reinstate the Acacia Contract

_____

unlawfully withheld agency action, the plaintiff must identify a "*discrete* agency action that it is *required to take*.") (emphasis in original). They have not done so here.

16

to comply with the PI Order (Answering Br., 40), ORR had no other "choice" but to reinstate the Acacia contract to comply with the order.

Plaintiffs next argue that even if the PI Order requires ORR to reinstate the Acacia Contract, the funding that Plaintiffs will receive is only "incidental" to the injunctive and declaratory relief they seek. Answering Br., 40 (citing *Kidwell v. Dep't of Army*, 56 F.3d 279, 283 (D.C. Cir. 1995)). Not so. Plaintiffs' APA suit seeks to set aside the Contract-Cancellation Notice, the final agency action at issue. Setting aside the contract cancellation is thus the heart of their APA claim, not incidental to their request for relief. *Kidwell*, which did not involve a contract termination, is therefore inapposite. The plaintiff in *Kidwell* challenged a decision about how to categorize his military discharge. *Kidwell*, 56 F.3d at 283. The appellate court explained that the monetary benefits that might flow from a change in his discharge category were incidental to his request for relief, as they were not guaranteed and were not the crux of the benefit he sought. *Id.* Here, monetary relief is not just "incidental" to Plaintiffs' request to set aside the Contract-

17

Cancellation Notice, it is the core benefit provided under the Acacia Contract.

Instead, *Department of Education* should govern. Like the plaintiffs in *Department of Education*, Plaintiffs' claims here seek monetary relief at their core, even though they style their claims as requests for injunctive and declaratory relief. 145 S. Ct. at 966. At bottom, they asked the District Court to issue an order that forces ORR to reinstate a contract with Acacia so that they can obtain funding. Thus, the Supreme Court's analysis in *Department of Education* "should have controlled this case." *Cmty. Legal Servs. In E. Palo Alto v. Health and Human Srvs.*, 135 F. 4th 852, 855 (9th Cir. 2025) (Bumatay and VanDyke, JJ., dissenting). Plaintiffs attempt to distinguish *Department of Education* by arguing that, in that case, the plaintiff states requested "back-pay" and reinstatement of contracts (Answering Br., 42–43). But the district court's injunction in *Department of Education* did not explicitly require such payments. *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). Rather, continued payments were an *effect* of the order—just like

18

ORR will have to continue to pay obligations as they accrue as an effect of the injunction here, even though the injunction does not explicitly require such payments. *Cmty. Legal Servs.*, 135 F.4th at 855.

### III.  The TVPRA vests ORR with unreviewable discretion over its funding decisions.

Plaintiffs fail to refute that the TVPRA and appropriations laws vest ORR with discretion as to the allocation of a lump-sum federal appropriation. Rather, they ignore part of 8 U.S.C. § 1232(c)(5)—language that commands ORR to make "every possible effort" to obtain pro bono counsel—to argue that the Government lacks discretion in determining how to distribute its lump-sum appropriation across various agency priorities. Answering Br., 46. And they disregard that Congress requires that such representation must be "consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362)," which states that aliens may be represented in immigration proceedings "at no expense to the government." 8 U.S.C. § 1232(c)(5). But this Court must give effect to every word of a statute in determining its meaning. *Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021)

19

(citations omitted). Congress's clear mandate that ORR make "every possible effort" to secure pro bono counsel coupled with its requirement that HHS provide such services consistent with 8 U.S.C. § 1362 (which prohibits federal funding for immigration legal services) in 8 U.S.C. § 1232(c)(5) indicate that Congress did not mandate that ORR fund direct-legal services, even if securing pro bono counsel is not practicable to meet the needs of all or most UAC. Thus, 8 U.S.C. § 1232(c)(5) provides no standard for when or whether ORR must distribute appropriated funds to direct-legal services rather than other purposes for which the funds may be disbursed.

Plaintiffs respond that the "greatest extent practicable" language from § 1232(c)(5) is a mandate for ORR to fund legal services to whatever extent pro bono counsel are not available (Answering Br., 53–54). But that assertion ignores the plain meaning of "practicable" and the statutory context, both of which demonstrate that the TVPRA does not command ORR to pay for legal representation for every UAC, and instead vests the agency with discretion to balance multiple statutory priorities. Indeed, the

only statutory command in that provision requires ORR to prioritize pro bono counsel—and only *permits* government-funded counsel if pro bono counsel cannot represent all UAC. 8 U.S.C. § 1232(c)(5).

In short, Section 1232(c)(5) simply does not say that ORR must fund counsel when pro bono counsel is not practicable. Although Plaintiffs ask that this Court read a mandatory standard into the statute, this Court cannot add language to the statute that is not there. Even if Plaintiffs believe that Congress intended ORR to fund counsel when pro bono counsel is not practicable, the "text of the statute controls." *Corner Post*, 603 U.S. at 815.

Nor does the Appropriations Act limit ORR's discretion. Plaintiffs argue that Congress earmarked funds for legal services because the Act states that the funding is for "carrying out Section 235 of the TVPRA." Answering Br., 55 (citing Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460 (Mar. 23, 2024) ("Appropriations Act")). But when Congress intends to "impose a legally binding restriction on an agency's use of funds, it does so by means of explicit statutory language." *Int'l Union, United*

21

*Auto., Aerospace & Agric. Implement Workers of Am. V. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984). Here, nothing in the Appropriations Act requires ORR to fund UAC legal services, nor even mentions such services.

Rather, Congress appropriated this single pot of funding not only for Section 235 of the TVPRA (8 U.S.C. § 1232), but also (1) for "necessary expenses for refugee and entrant assistance" under section 414 of the Immigration and Nationality Act and section 501 of the Refugee Education Assistance Act of 1980 (REAA), (2) "for carrying out section 462 of the Homeland Security Act of 2002, ((c))" and (3) for carrying out the Torture Victims Relief Act of 1998. Appropriations Act, 138 Stat. at 663. This covers a vast range of statutory provisions, from reimbursing state-education agencies for the education of certain refugee children (REAA, Pub. L. 96-422, § 501(B) (1980)) to "overseeing the infrastructure and personnel of facilities in which unaccompanied alien children reside" (HSA, Pub. L. 107-296, § 462(b)(1)(G) (2002)). And section 235 itself contains multiple statutory priorities, not just ensuring legal services for UAC. It contains numerous provisions regarding the care of UAC

22

in ORR's custody including, *inter alia*, ensuring the safe repatriation of UAC, providing safe and secure placements for UAC, safety and suitability assessments including home studies, child advocates, and data reporting. TVPRA, Pub. L. 110-457, § 235 (2008). How to balance the funding needs of those various programs, which must all draw from a single lump-sum appropriation, is a classically discretionary determination. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among *some or all of the permissible objects as it sees fit*."). Accordingly, Congress's appropriation did not transform section 1232(c)(5) into a statutory mandate.

Though Plaintiffs attempt to distinguish *Lincoln* because "there was no statutory requirement that the agency carry out the program at issue," (Answering Br., 54) that argument depends on their misreading of section 1232(c)(5) and misunderstands the statutes at issue in *Lincoln*. In that case, the Indian Health Service (IHS) provided a program serving certain handicapped children in the Southwest ("Program"), which it funded using a lump-sum

23

appropriation from Congress. *Id.* at 185. It expended these funds "under the authority of the Snyder Act and the Indian Healthcare Improvement Act." *Id.* The Snyder Act mandates that the IHS "*shall* direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians," for the "relief of distress and conservation of health." 25 U.S.C. § 13 (emphasis added). The Indian Healthcare Improvement Act similarly "authorized" expenditures "for the purposes of," *inter alia*, "therapeutic and residential treatment centers." *Lincoln*, 508 U.S. at 185 (citing 25 U.S.C. § 1621(a)(4)(D)). Despite these two statutes, "Congress never authorized or appropriated moneys expressly" for the Program; rather, the agency paid for the Program "out of annual lump-sum appropriations." *Id.* at 187. The plaintiffs alleged that IHS's decision to discontinue funding the Program violated the Snyder Act, the Indian Healthcare Improvement Act, the APA, and various agency regulations. *Id.* at 189. Relying on "the repeated references to [the Program] in the legislative history of the annual

24

appropriations Acts," the district court found that there was a basis for judicial review. *Id.*

The Supreme Court reversed, holding that the decision to discontinue the Program was unreviewable because "the appropriations Acts for the relevant period do not so much as mention the Program," and the Snyder Act and the Improvement Act only required general funding for Indian health. *Id.* at 193–94. The same reasoning applies here.

Likewise, the Appropriations Act here "do[es] not so much as mention" funding for UAC legal services. *Id.* at 193–94; *see also* Appropriations Act,138 Stat. 460. Rather, it provides general funding for dozens of statutory provisions. *See supra*. The TVPRA only speaks about UAC legal services in general terms without specifying what kinds of legal services ORR must provide, whether ORR must fund legal services when pro bono counsel are unavailable, or which UAC must receive legal services. Although Congress dictated that ORR "shall" ensure access to counsel to the greatest extent practicable, its appropriations are silent about funding such counsel. Indeed, unlike the statutes in *Lincoln*, the

25

TVPRA does not *require* or even explicitly *authorize* "funding" for direct legal services at all—even if obtaining pro bono counsel is not "practicable." In fact, it provides the express caveat that HHS's responsibility to ensure access to counsel be "consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362)," a statute that prohibits federally funded counsel for direct legal services. 8 U.S.C. § 1232(c)(5). Absent any statutory directive to *fund* legal services when pro bono services are not practicable, ORR's decisions about how to spend its lump-sum appropriation are left to its discretion. *Lincoln*, 508 U.S. at 191.

Plaintiffs argue that, under the Government's reasoning, "the only instances where courts would have the authority to review agency actions are when agencies are commanded to ensure a particular outcome[.]" Answering Br., 49. Plaintiffs misapprehend the Government's argument. The Government is not arguing that a particular funding outcome is required for an agency action to be reviewable. The problem here is that 8 U.S.C. § 1232(c)(5) provides no standard to determine whether or when ORR must start *funding* legal counsel because Section 1232(c)(5) is *silent* about such

26

funding, and the Appropriations Act does not earmark funding specifically for UAC legal counsel.[4]

## IV.  The Foundational Rule reinforces ORR's discretion to determine whether to fund legal counsel when pro bono counsel is not practicable.

Plaintiffs also misconstrue the "discretion" language in the Foundational Rule, arguing that it only "allows the Government some discretion in how funds are allocated for direct legal representation (i.e., as to which children receive representation or for which legal proceedings)." Answering Br., 51. As Defendants argued in their Opening Brief, the Rule unambiguously provides ORR discretion in determining not only *how* to allocate funds, but *whether* to allocate funds in the first place. *See* 45 C.F.R. § 410.1309(a)(4) (stating that funding for direct-legal services is "subject to ORR's discretion."); *see also* Opening Br. at 47. There is

---

[4] Plaintiffs warn that APA review of appropriations spending "would be rendered moot" if the Government's actions were "insulated from judicial review whenever appropriations were limited." Answering Br., 53. Not so. Rather, whenever Congress provides a lump-sum appropriation without any instructions for spending, the agency has unreviewable discretion in how to spend the appropriation, as long as its spending is consistent with the appropriations statute and other laws. This is the case regardless of whether appropriations are limited.

no textual basis to limit the Foundational Rule's broad caveat—that any funding for direct legal representation is "subject to ORR's discretion," 45 C.F.R. § 410.1309(a)(4)—in the way that Plaintiffs assert.

Indeed, the weight of authority supports the government's reading. When ORR promulgated the Foundational Rule, it explained in its notice of final rulemaking that the Rule provides ORR complete discretion to fund legal services. Unaccompanied Children Program Foundational Rule, 89 FR 34384-01, 34529 (2024). The notice stated that:

> ORR is finalizing the proposal that to the extent that appropriations are available, and insofar as it is not practicable to secure pro bono counsel for unaccompanied children as specified at 8 U.S.C. 1232(c)(5), *ORR would have discretion to fund legal service providers to provide direct immigration legal representation.*

*Id.* at 34580 (emphasis added). Under ORR's interpretation, the first two conditions—that appropriations are available and pro bono counsel is not practicable—must be met before ORR may exercise its discretion in funding legal counsel. If these two conditions are not met, ORR may not exercise its discretion; if they

are, ORR may, *in its discretion*, fund legal counsel. The conditions are just that—conditions. They preclude ORR from exercising its discretion in certain circumstances, but they do not require it to exercise its discretion if the conditions are met.

Accordingly, ORR has interpreted its rule to mean that, if appropriations are available and pro bono counsel is not practicable, then ORR may exercise its discretion to fund legal organizations like Plaintiffs. *See id.* at 34529 (". . . ORR proposed in the NPRM to establish its discretion to fund legal services for specific purposes, based on its judgment and priorities."); *id.* at 34526-34527 (confirming that ORR interprets the second sentence of 8 U.S.C. 1232(c)(5) (that the Secretary of HHS shall, "to the greatest extent practicable," make every effort to utilize the services of pro bono counsel) to mean that pro bono counsel is the "preferred means by which counsel is provided" to UAC, even though ORR is "authorized" to utilize services that are not pro bono). And likewise with respect to the agency's decisions to enter contracts for legal services. *Id.* at 34533 ("ORR would note that this language broadly describes what ORR may do, rather than what it

must do, by way of grant and contract funding mechanisms for immigration legal services to unaccompanied children.") (interpreting 45 C.F.R. § 410.1309(b)(2)). Nothing in the regulation provides the District Court with a standard to measure ORR's exercise of discretion.

### V. Plaintiffs fail to meaningfully refute that the District Court relied exclusively on Plaintiffs' alleged financial hardship in finding that they would suffer irreparable harm absent an injunction.

As the Government explained in its Opening Brief, the District Court erred in applying a double standard: it disclaimed Plaintiffs' financial injuries to determine that the Tucker Act did not apply, but it found that Plaintiffs would suffer irreparable harm based on those financial injuries. Opening Br., 33–34. Plaintiffs do not even attempt to address the District Court's selective findings. Instead, Plaintiffs paint the District Court's irreparable-harm finding as harm to their "mission" rather than to their checking accounts. Answering Br., 59. But they cannot get around the plain language of the District Court's order, which relies exclusively on the lack-of-funding evidence in finding irreparable harm. 1-ER-26.

30

Plaintiffs also fail to wrestle with the Government's argument that the only way to avoid the "irreparable harm" Plaintiffs allegedly face is a government payout. Indeed, Plaintiffs' arguments as to why they cannot provide services pro bono (or using non-governmental funds), which would equally pursue their missions, boil down to a lack of funding. Answering Br. 60–61. An organization cannot transform pocketbook injury into mission-based harm by building its business on government funds.

To avoid this inevitable conclusion, Plaintiffs argue that even if ORR contracted with a different organization, this would alleviate some of Plaintiffs' asserted harm because they could send their current clients to the new contractor. Answering Br., 64. But that would not alleviate the alleged burden on *Plaintiffs'* ability to pursue their missions. And Plaintiffs may not simply assert the interests of third parties not before the court to demonstrate irreparable harm. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish … that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)).

31

### VI.   Nothing suggests that the District Court considered the public interest in conserving the public fisc in balancing the equities.

Nowhere in the District Court's order does it even acknowledge the harm its order presents for the public fisc. *See generally* 1-ER-26–27. Not surprisingly, Plaintiffs fail to cite anything in the District Court's order suggesting otherwise, and instead simply insist that the District Court implicitly considered the harm to the public fisc. Answering Br., 65. But the silence in the District Court's PI Order tells a different story, and Plaintiffs cannot get around the plain language of the PI Order.

Plaintiffs also complain that the Government cannot claim harm to the public fisc because Congress has already appropriated funds for UAC legal counsel. *Id.* As explained *supra*, Congress has granted a lump-sum appropriation to ORR and has not required the Government to spend any portion of it on direct legal services. So funds expended on a contract ORR decided to terminate are unavailable for the agency to allocate to the myriad other statutory priorities that appropriation is meant to fund.

Moreover, Plaintiffs do not contest that the Government cannot recoup the funds expended if the Government ultimately prevails. Instead, they hide behind the District Court's finding that requiring a bond would effectively preclude judicial review. Answering Br., 66. But the District Court did not even attempt to determine what amount, even if substantially less than the total remaining on the Acacia Contract, Plaintiffs could provide as a bond to ensure that the Government is able to recoup at least some expenses. Instead, it assumed that Plaintiffs could not provide *any* bond amount, even one that is a fraction of the funding that Plaintiffs expect to receive. Because "injunction bonds are generally required," *Nat'l Treasury Emps. Union v.* Trump, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam), the district court's denial of a bond was an abuse of discretion.

## CONCLUSION

For the foregoing reasons, as well as the reasons in the Government's Opening Brief, this Court should reverse the PI Order.

Dated: August 14, 2025       Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal    Deputy    Assistant
Attorney General

DREW C. ENSIGN
Deputy    Assistant    Attorney
General
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director
KATELYN MASETTA-
ALVAREZ
Senior Litigation Counsel

<u>s/ *Michael A. Celone*</u>
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General  Litigation  and  Appeals
Section
P.O. Box 878,
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-2040
Facsimile: (202) 305-7000
Michael.A.Celone@usdoj.gov

*Counsel for Defendants-*
*Appellants*

34

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2025, counsel for Appellants electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system and that service will be accomplished via the CM/ECF system.


s/ *Michael A. Celone*
MICHAEL A. CELONE

Dated: August 14, 2025          *Attorney for Defendants-*
                               *Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-2808

I am the attorney or self-represented party.

**This brief contains** | 6,169 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated | | .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Michael A. Celone | **Date** | 08/14/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*